IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MQ GAMING, LLC, and CREATIVE KINGDOMS TECHNOLOGIES LLC,<br><br>Plaintiffs,<br><br>v.<br><br>LEGO SYSTEMS, INC., LEGO BRAND RETAIL, INC., WARNER BROS. HOME ENTERTAINMENT INC., WARNER BROS. INTERACTIVE ENTERTAINMENT INC., and WB GAMES INC.,<br><br>Defendants. | C.A. No.:<br><br>DEMAND FOR JURY TRIAL |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiffs MQ Gaming, LLC ("MQ Gaming") and Creative Kingdoms Technologies LLC ("CKT") (collectively, "Plaintiffs") file this Complaint for patent infringement against Defendants LEGO Systems, Inc. ("LSI"), LEGO Brand Retail, Inc. ("LBRI"), Warner Bros. Home Entertainment Inc. ("WBHEI"), Warner Bros. Interactive Entertainment Inc. ("WBIE") and WB Games Inc. ("WBGI") (collectively, "Defendants") under 35 U.S.C. § 271. Plaintiffs hereby state as follows:

**PARTIES**

1. Plaintiffs MQ Gaming and CKT are limited liability companies organized and existing under the laws of the State of Delaware, with their principal place of business at 1 Park Plaza, Suite 900, Irvine, California 92614.

2. On information and belief, Defendants LSI and LBRI (collectively, "LEGO") are corporations organized and existing under the laws of the State of Delaware, with a place of business located at 555 Taylor Road, Enfield, Connecticut 06083-1600.

3. On information and belief, LEGO has manufactured, imported, used, offered for sale, and/or sold products under the brand name "Lego Dimensions" and has provided associated support services for those products in this district and throughout the United States.

4. On information and belief, Defendants WBHEI, WBIE and WBGI (collectively, "Warner Bros.") are corporations organized and existing under the laws of the State of Delaware, with places of business at 4000 Warner Boulevard, Burbank, California 91522 (WBHEI and WBIE) and 12134 113th Ave. NE, Suite 300, Kirkland, WA 98034 (WBGI).

5. On information and belief, Warner Bros. has manufactured, imported, used, offered for sale, and/or sold products under the brand name "Lego Dimensions" and has provided associated support services for those products in this district and throughout the United States.

6. On information and belief, LEGO and Warner Bros. have acted in concert and are continuing to act in concert with respect to the manufacture, importation, use, offer for sale, and/or sale of the Lego Dimensions products and associated support services in this district and throughout the United States.

## JURISDICTION AND VENUE

7. This Court has personal jurisdiction over LEGO because, on information and belief, each LEGO entity is incorporated in Delaware and purposely avails itself of the privilege of doing business in Delaware and/or derives substantial revenue from goods and services provided to individuals in this district, including the sale and offering for sale of the Lego Dimensions products and associated support services.

8. This Court has personal jurisdiction over Warner Bros. because, on information and belief, each Warner Bros. entity is incorporated in Delaware and purposely avails itself of the privilege of doing business in Delaware and/or derives substantial revenue from goods and services provided to individuals in this district, including the sale and offering for sale of the Lego Dimensions products and associated support services.

9. This patent infringement action arises under the United States Patent Laws, Title 35 U.S.C. § 100 *et seq.*, including 35 U.S.C. § 271. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a). Venue is proper in this judicial district under 28 U.S.C. §§ 1391 and/or 1400 because Defendants reside in this district.

10. LEGO and Warner Bros. are properly joined under Fed. R. Civ. P. 20(a)(2) because, on information and belief, they have acted in concert with each other to develop, manufacture, import, market, and/or sell the Lego Dimensions products and associated services in this district and throughout the United States, such that the relief requested in this action arises out of the same transaction, occurrence, or series of transactions and will require resolution of common questions of law and/or fact.

**NATURE OF THIS ACTION**

11. This is an action for patent infringement arising under the Patent Laws of the United States, 35 U.S.C. § 100 et seq., and in particular under 35 U.S.C. § 271. This action relates to the Lego Dimensions products designed, manufactured, imported, marketed and distributed by Defendants, including but not limited to Lego Dimensions Starter Packs, Lego Dimensions Story Packs, Lego Dimensions Level Packs, Lego Dimensions Team Packs, and Lego Dimensions Fun Packs (collectively "the Accused Products").

**BACKGROUND**

12. In 1999, three entrepreneurs founded a small startup company called Creative Kingdoms, LLC ("CK"), with the audacious goal of bringing video games to life. Among other aspirations, they sought to integrate physical play objects such as toys and figurines into the virtual world of video games to create an entirely new gaming experience and a new game mechanic (an interactive element of a game) that had never existed before—a seamless integration of the real and virtual worlds. This would later become known as the "toys to life" genre of video gaming.

13. From the early 1980s through the early 2000s, video gaming was primarily a sedentary activity, in which seated players controlled a game using wired controllers with buttons and/or joysticks manipulated with fingers and thumbs (see examples below).[1]




Sega "SG-1000" (1983)



Nintendo "NES" (1985)



Sony "PlayStation" (1994)



Sony "PlayStation 2" (2000)



Nintendo "GameCube" (2001)



Microsoft "Xbox" (2001)

[1] See *List of home video game consoles*, WIKIPEDIA, https://en.wikipedia.org/wiki/ List_of_home_video_game_consoles (last visited 5/6/2019).

14. In November of 2000, Nintendo applied for a patent (U.S. Patent No. 6,811,489) on a home game console featuring, among other things, wireless controllers (see below).




While the advent of wireless controllers made gameplay more convenient (e.g., by untethering the controllers), the primary nature of video gaming remained sedentary and unchanged.

15. CK sought to create a more immersive play experience that allowed players to physically interact with a new type of "smart" toy having unique features such as wireless communication and internal memory. CK envisioned an "RFID-enabled[2] gaming experience"

[2] RFID (or Radio Frequency Identification) refers to technologies that use electromagnetic fields to wirelessly identify "tags" attached to objects.

in which play objects such as toys, action figures and trading cards could cause a video game console to "recreate the appearance [of a corresponding] character or object within the game."[3]




character or object to a favorite computer action game, adventure game, interactive play facility or the like. For example, a suitably configured video game console and video game may be provided which reads the card information and recreates the appearance and/or traits of particular depicted person, character of object within the game. If desired, the game console may further be configured to write information to the

* * *

enabled play facility or play environment. Similar RFID tags may also be applied to any of the other wands **100***a-h* disclosed and described herein or any other toys, play objects, jewelry, trinkets, action figures, collectibles, trading cards and generally any other items desired to be incorporated as part of an RFID-enabled gaming experience.

CK's vision was to improve upon existing video games to extend the gaming experience seamlessly from the virtual gaming world to the real world, so that players could interact not only with a computer-animated game played on a game console, but also with physical objects and toys that formed an integral part of the overall gaming experience.

16. CK received numerous awards and honors for its innovative technology, including the 2005 "Image and Impact" award from the International Association of Amusement Parks and Attractions and the Themed Entertainment Association's prestigious "Thea" award for "Best New Interactive Gaming Technology" in 2006. CK's innovative technology and products were also featured in national publications, including *Wired Magazine*, *Games Magazine*, *Parents*, and *Funworld*, and were featured on an episode of ABC's "Extreme Makeover—Home Edition."

---

[3] U.S. Patent No. 8,475,275, col. 29-30, and Figs. 39A-B, and 40.

17. In 2011—more than a decade after CK first conceived of and innovated the toys-to-life game mechanic, Activision launched its "Skylanders" gaming franchise, the first major title in the toys-to-life genre. Skylanders was an immediate commercial success—a "juggernaut" according to Activision.[4] "In just 15 months, Skylanders achieved life-to-date worldwide sales, including toys and accessories, in excess of $1 billion—faster than any other franchise in the company's history."[5]

18. As an NBC journalist described it at the time: "[T]he twist here is that the characters in the games are also real-world toys. And these physical toys appear to be sucked from our world right into the game world ... where they are then brought to digital life. Thanks to the magic worked by the RFID chip embedded in the bottom of each toy, the player simply places their Skylander figure on the Portal of Power (a plastic peripheral that comes with the games). An animated version of that character is then whisked into the game. But what really sends this tech over the top is the fact that the character's experiences in the game are stored on the matching toy's RFID chip. That means kids can take their Skylander toy with them to a friend's house and then pop that toy onto their friend's Portal and into their friend's Skylanders game where it will still have all of its own unique game stats and upgrades in tact. As I said, it's a toy ... it's a video game ... it's genius."[6]

---

[4] John Gaudiosi, *Activision CEO Eric Hirshberg Explains the Skylanders Phenomenon*, FORBES (6/5/2012), https://www.forbes.com/sites/johngaudiosi/2012/06/05/activision-ceo-eric-hirshberg-explains-the-skylanders-phenomenon/#21c618841374

[5] Activision-Blizzard 2012 Annual Report, p. 15.

[6] Winda Benedetti, *Robot maker brings Skylanders toys to life (try not to hate him)*, NBC NEWS (10/22/2012), https://www.nbcnews.com/tech/tech-news/robot-maker-brings-skylanders-toys-life-try-not-hate-him-flna1C6573796

19. The "genius" and "magic" behind Skylanders were actually the RFID-enabled toys and RFID-based gaming systems disclosed and claimed in patent applications filed by CK a decade earlier. These were the enabling technologies that allowed the plastic Skylanders figurines to appear to "come to life" in a video game. Indeed, CK's patented technology was at the very heart of the "toys-to-life" game mechanic that many in the industry described at the time as "novel," "nifty," "breakthrough," "magical," and even "genius." *See* NBCNews.com ("it's genius")[7]; BusinessWire.com ("the novel concept of bringing toys to life")[8]; Reuters.com ("a nifty technological twist")[9]; VentureBeat.com ("the simple, but magical, idea of bringing your toys to life in a video game could change both the video game and the toy industries and, more important, change the way kids play")[10]; Economist.com ("an entirely new type of gaming ecology . . . the first seamless bridge between physical (playing with toy figures) and virtual

---

[7] *Id.*

[8] Kerstine Johnson, *Skylanders SWAP Force™ "Mixes It Up" at Toy Fair 2013*, BUSINESS WIRE (2/5/2013), https://www.businesswire.com/news/home/20130205005785/en/ADDING-MULTIMEDIA-Skylanders-SWAP-Force%E2%84%A2-%E2%80%9CMixes-Up%E2%80%9D.

[9] Ronald Grover, *Disney joins JAKKS, LA billionaire to bring toys to life*, REUTERS (1/8/2013), https://www.reuters.com/article/us-disneytoys/disney-joins-jakks-la-billionaire-to-bring-toys-to-life-idUSBRE9070CU20130108?feedType=RSS.

[10] Jeff Grub, *Skylanders crosses the $1B revenue mark with over 100M toys sold*, VENTURE BEAT (2/11/2013), https://venturebeat.com/2013/02/11/skylanders-crosses-the-1b-revenue-mark-with-over-100m-toys-sold/.

gaming")[11]; GameZone.com ("breakthrough innovation").[12] The toys-to-life game mechanic and the technologies that enabled it were certainly not considered routine or conventional when Skylanders launched in 2011, let alone a decade earlier when the CK founders first filed for patent protection on their breakthrough inventions.

20. Following the astonishing success of Skylanders, other gaming companies rushed to enter the toys-to-life genre, seeking a share of what had become, in just three short years, "the world's most lucrative video game genre."[13] In 2013, Disney launched its "Disney Infinity" gaming franchise. Nintendo followed suit a year later with the launch of its "Amiibo" gaming franchise in 2014. Both utilized the same RFID-based gaming systems and technology developed by CK a decade earlier to accomplish the "toys to life" game mechanic. Like Activision with its Skylanders product, Disney and Nintendo enjoyed significant financial success in the lucrative toys-to-life genre with their respective products.[14]

---

[11] *Reaching for the Skylanders - A family-friendly gaming concept creates a buzz*, THE ECONOMIST (10/10/2013), https://www.economist.com/schumpeter/2013/10/10/reaching-for-the-skylanders.

[12] Lance Liebl, *Take that economy! Over 100 million Skylanders toys have sold*, GAMEZONE (2/7/2013), https://www.gamezone.com/news/take-that-economy-over-100-million-skylanders-toys-have-sold/.

[13] Chris Dring, *Toys-to-life: what's coming next*, THE GUARDIAN (9/11/2015), https://www.theguardian.com/lifeandstyle/2015/sep/11/toys-to-life-whats-coming-next.

[14] Lisa Richwine, *Disney sees Infinity video game hitting $1 billion in revenue*, REUTERS (6/12/2014), https://www.reuters.com/article/us-disney-interactive-idUSKBN0EN2NM 20140612; Kyle Hanson, *Amiibo Sales Reach 5.7 Million as Nintendo Posts Annual Profit*, AOTF (3/8/2018), https://attackofthefanboy.com/news/amiibo-sales-reach-5-7-million-nintendo-posts-annual-profit/.

21. In 2015, LEGO and Warner Bros. launched the "Lego Dimensions" gaming franchise, again using the same RFID-based gaming systems and technology to accomplish the "toys to life" game mechanic. Coming four years after the successful launch of Skylanders, many commentators surmised that LEGO's and Warner Bros.' belated entry into the toys-to-life market was motivated chiefly by a desire for quick profits. As one industry publication reported at the time: "Warner and Lego have finally joined forces to claim their piece of the delicious toys-to-life pie. Years after Skylanders proved that there's a ton of cash to be made on plastic figures that unlock in-game content, Dimensions is finally bringing that experience to Warner/TT's immensely popular franchise."[15]

22. It was widely reported and understood in the industry that LEGO and Warner Bros. were primarily interested in getting a share of the "ton of cash" that the toys-to-life genre had begun to generate. *See, e.g.,* Geek.com ("Lego wants some of that Skylanders cash, planning toys-to-life game);"[16] NintendoLife.com ("The Dimensions release is no doubt timed as a big-money move to push LEGO games back up to the charts, seeking an impact similar to Skylanders and Disney Infinity as evergreen hits.");[17] SeekingAlpha.com ("Danish toymaker

---

[15] Lee Mathews, *Lego Dimensions melds toys-to-life gaming and minifigs*, GEEK.COM (4/9/2015), https://www.geek.com/games/lego-dimensions-melds-toys-to-life-gaming-and-minfigs-1619919/.

[16] Jordan Minor, *Lego wants some of that Skylanders cash, planning toys-to-life game*, GEEK.COM (3/17/2015), https://www.geek.com/games/lego-wants-some-of-that-skylanders-cash-planning-toys-to-life-game-1618171/.

[17] Thomas Whitehead, *Reaction: LEGO Dimensions Could be a Sales Phenomenon, and Nintendo Must Push It For Wii U*, NINTENDOLIFE (4/9/2015), http://www.nintendolife.com/news/2015/04/reaction_lego_dimensions_could_be_a_sales_ phenomenon_and_nintendo_must_push_it_for_wii_u.

Lego is printing money. The company is awash in cash as its diversified operations continue to rake in the dough. . . . The company is also betting on a new videogame, Lego Dimensions, which will reach stores later in September. The videogame, developed in cooperation with Warner Bros., is Lego's entry ticket to the billion dollar toys-to-life market, which ties toys to videogames by letting physical action figures unlock new characters and levels inside the games.");[18] Fortune.com ("Warner Bros. Interactive Entertainment (WBIE), the gaming and interactive branch of Warner Bros., is bringing one of the most popular game franchises in the world into the competitive toy/game hybrid market with *Lego Dimensions*. The hybrid toy/game category, or toys-to-life, is big business with the success of Activision's *Skylanders*, Nintendo's Amiibos, and *Disney Infinity*. *Skylanders* alone has become a $3 billion business.")[19]

23. Lego Dimensions indeed enjoyed a successful launch, even beating out the best-selling Skylanders franchise and other competitive games in the toys-to-life genre.[20] And Lego Dimensions continued to enjoy this success even as the toys-to-life genre slowly began to

---

[18] Evan Buck, *Lego Is Printing Money - Will It Go Public?,* SEEKING ALPHA (9/4/2015), https://seekingalpha.com/article/3491406-lego-printing-money-will-go-public.

[19] John Gaudiosi, *Warner Bros. and Lego are teaming up to get a piece of this billion dollar market*, FORTUNE (4/23/2015), http://fortune.com/2015/04/23/warner-bros-lego/.

[20] Andy Robertson, *'LEGO Dimensions' Outsells 'Skylanders Superchargers' and 'Disney Infinity 3.0' In Launch Week*, FORBES (10/5/2015), https://www.forbes.com/sites/andyrobertson/2015/10/05/lego-dimensions-sales/#47199e1f4166.

decline. *See* Toy News ("LEGO Dimensions continues to outpace toys-to-life rivals Skylanders and Nintendo's Amiibo amid an overall drop in consumer spend within the sector.")[21]

24. In addition to the profits earned directly from sales of the Lego Dimensions gaming systems and related toys, LEGO and Warner Bros. also profited by using Lego Dimensions to promote their then-burgeoning LEGO movie franchise.

25. For example, Warner Bros.' major theatrical release of *The LEGO Batman Movie* (produced and distributed by Warner Bros. and released Feb. 10, 2017) benefited directly from the cross-marketing provided by the Lego Dimensions toys-to-life franchise. Specifically, a LEGO Batman Movie "Story Pack" (below left) and "Fun Pack" (below right) for Lego Dimensions was released on the same day as the movie and was used to create interest in the movie and drive young LEGO fans to theaters.[22]

[21] Robert Hutchins, *LEGO Dimensions sales outpace Amiibo and Skylanders amid overall sector decline, says NPD*, TOYNEWS (8/23/2016), https://www.toynews-online.biz/2016/08/23/lego-dimensions-sales-outpace-amiibo-and-skylanders-amid-overall-sector-decline-says-npd/.

[22] Spencer Perry, *The LEGO Batman Movie and Knight Rider Coming to LEGO Dimensions in 2017*, COMINGSOON (9/19/2016), https://www.comingsoon.net/games/news/767267-the-lego-batman-movie-and-knight-rider-coming-to-lego-dimensions-in-2017.







26. *The LEGO Batman Movie* ultimately grossed domestically more than $175,000,000 at the box office and more than $52,000,000 in home video sales.[23] On information and belief, at least some of those revenues were attributable to LEGO's and Warner Bros.' infringing sales and marketing of the Lego Dimensions toys-to-life franchise.

27. As explained above, LEGO and Warner Bros. came late to the toys-to-life genre, launching fourth behind Activision, Disney and Nintendo. Yet, LEGO steadfastly refused to take a license to the MQ Gaming portfolio, despite its late adoption of the technology and multiple good faith offers and invitations by MQ Gaming. MQ Gaming first offered to license its portfolio to LEGO in 2016. LEGO refused and would not even agree to a meeting to discuss reasonable license terms, instead using their outside counsel to rebuff all such attempts for nearly three years.

28. Warner Bros. likewise refused all overtures to discuss a license to the MQ Gaming portfolio. Indeed, Warner Bros. refused to even respond to MQ Gaming's letters from

---

[23] *The Lego Batman Movie (2017)*, THE NUMBERS, https://www.the-numbers.com/movie/Lego-Batman-Movie-The#tab=summary (last visited 5/6/2019).

October 2017 and July 2018 and likewise refused to respond to a request directed through Warner Bros.' outside counsel to begin a dialog. In short, Warner Bros. ignored MQ Gaming completely.

29. After nearly three years of being ignored and rebuffed by LEGO and Warner Bros.—even as LEGO and Warner Bros. reaped enormous profits from their infringing sales and related promotion of blockbuster movies—MQ Gaming was left with no other choice than to reluctantly file this Complaint. MQ Gaming did everything it could to avoid litigation and regrets having to take this action.

## THE PATENTS IN SUIT

30. On July 2, 2013, U.S. Patent No. 8,475,275 ("the '275 patent"), titled "Interactive toys and games connecting physical and virtual play environments," was duly and lawfully issued by the U.S. Patent and Trademark Office. A true and correct copy of the '275 patent is attached hereto as Exhibit 1.

31. On April 22, 2014, U.S. Patent No. 8,702,515 ("the '515 patent"), titled "Multi-platform gaming system using RFID-tagged toys," was duly and lawfully issued by the U.S. Patent and Trademark Office. A true and correct copy of the '515 patent is attached hereto as Exhibit 2.

32. On July 29, 2014, U.S. Patent No. 8,790,180 ("the '180 patent"), titled "Computer-readable storage medium storing program instructions for a wireless computer gaming system," was duly and lawfully issued by the U.S. Patent and Trademark Office. A true and correct copy of the '180 patent is attached hereto as Exhibit 3.

33. On August 26, 2014, U.S. Patent No. 8,814,688 (“the ’688 patent”), titled “Customizable toy for playing a wireless interactive game having both physical and virtual elements,” was duly and lawfully issued by the U.S. Patent and Trademark Office. A true and correct copy of the ’688 patent is attached hereto as Exhibit 4.

34. On May 26, 2015, U.S. Patent No. 9,039,533 (“the ’533 patent”), titled “Wireless interactive game having both physical and virtual elements,” was duly and lawfully issued by the U.S. Patent and Trademark Office. A true and correct copy of the ’533 patent is attached hereto as Exhibit 5.

35. On October 20, 2015, U.S. Patent No. 9,162,149 (“the ’149 patent”), titled “Methods for providing interactive entertainment,” was duly and lawfully issued by the U.S. Patent and Trademark Office. A true and correct copy of the ’149 patent is attached hereto as Exhibit 6.

36. On March 1, 2016, U.S. Patent No. 9,272,206 (“the ’206 patent”), titled “System and method for playing an interactive game,” was duly and lawfully issued by the U.S. Patent and Trademark Office. A true and correct copy of the ’206 patent is attached hereto as Exhibit 7.

37. On July 19, 2016, U.S. Patent No. 9,393,491 (“the ’491 patent”), titled “Wireless entertainment device, system, and method,” was duly and lawfully issued by the U.S. Patent and Trademark Office. A true and correct copy of the ’491 patent is attached hereto as Exhibit 8.

38. On July 19, 2016, U.S. Patent No. 9,393,500 (“the ’500 patent”), titled “Wireless interactive game having both physical and virtual elements,” was duly and lawfully issued by the

U.S. Patent and Trademark Office. A true and correct copy of the ’500 patent is attached hereto as Exhibit 9.

39. On October 11, 2016, U.S. Patent No. 9,463,380 (“the ’380 patent”), titled “System and method for playing an interactive game,” was duly and lawfully issued by the U.S. Patent and Trademark Office. A true and correct copy of the ’380 patent is attached hereto as Exhibit 10.

40. On April 11, 2017, U.S. Patent No. 9,616,334 (“the ’334 patent”), titled “Multi-platform gaming system using RFID-tagged toys,” was duly and lawfully issued by the U.S. Patent and Trademark Office. A true and correct copy of the ’334 patent is attached hereto as Exhibit 11.

41. On August 22, 2017, U.S. Patent No. 9,737,797 (“the ’797 patent”), titled “Wireless Entertainment Device, System, And Method,” was duly and lawfully issued by the U.S. Patent and Trademark Office. A true and correct copy of the ’797 patent is attached hereto as Exhibit 12.

42. On September 26, 2017, U.S. Patent No. 9,770,652 (“the ’652 patent”), titled “Wireless Interactive Game Having Both Physical And Virtual Elements,” was duly and lawfully issued by the U.S. Patent and Trademark Office. A true and correct copy of the ’652 patent is attached hereto as Exhibit 13.

43. On June 12, 2018, U.S. Patent No. 9,993,724 (“the ’724 patent”), titled “Interactive Gaming Toy,” was duly and lawfully issued by the U.S. Patent and Trademark Office. A true and correct copy of the ’724 patent is attached hereto as Exhibit 14.

44. On July 3, 2018, U.S. Patent No. 10,010,790 ("the '790 patent"), titled "System and Method for Playing an Interactive Game," was duly and lawfully issued by the U.S. Patent and Trademark Office. A true and correct copy of the '790 patent is attached hereto as Exhibit 15.

45. On July 17, 2018, U.S. Patent No. 10,022,624 ("the '624 patent"), titled "Wireless Interactive Game Having Both Physical And Virtual Elements," was duly and lawfully issued by the U.S. Patent and Trademark Office. A true and correct copy of the '624 patent is attached hereto as Exhibit 16.

46. On January 15, 2019, U.S. Patent No. 10,179,283 ("the '283 patent"), titled "Wireless Entertainment Device, System, And Method," was duly and lawfully issued by the U.S. Patent and Trademark Office. A true and correct copy of the '283 patent is attached hereto as Exhibit 17.

47. MQ Gaming is the assignee and owner of the entire right, title and interest in and to each of the patents identified herein (collectively, the "Asserted Patents"). CKT is an exclusive field-of-use licensee under the MQ Gaming portfolio, including the Asserted Patents. Together, Plaintiffs have the sole right to assert all causes of action arising under the Asserted Patents and the right to any remedies for infringement of them, including the right to sue for infringement and collect past damages.

## <u>THE ACCUSED PRODUCTS</u>

48. The Accused Products include all Lego Dimensions products designed, manufactured, imported, marketed and distributed by Defendants, including but not limited to

Lego Dimensions Starter Packs, Lego Dimensions Story Packs, Lego Dimensions Level Packs, Lego Dimensions Team Packs, and Lego Dimensions Fun Packs (see examples below).













49. The Lego Dimensions Starter Packs are sold in platform-specific bundles configured to work with each of the five major gaming platforms (WiiU, PS3, PS4, Xbox 360, and Xbox One). The Lego Dimensions Story Packs, Lego Dimensions Level Packs, Lego Dimensions Team Packs, and Lego Dimensions Fun Packs are non-platform-specific "expansion packs" configured to be used with all Lego Dimensions Starter Packs.[24]

---

[24] See LEGO.com, https://www.lego.com/en-us/themes/dimensions/faq ("Expansion Packs allow you to collect more LEGO® toys, and add new characters, vehicles, and even game levels to LEGO DIMENSIONS™ for greater mash-up combinations.") (last visited 5/6/2019).

50. Upon information and belief, Defendants have made, sold, and/or offered for sale throughout the United States, and/or imported into the United States, "toys-to-life" products, including, but not limited to, the Accused Products, that are covered by valid and infringed claims of the Asserted Patents.

51. Upon information and belief, Defendants have manufactured, imported, offered for sale, and/or sold the Accused Products through established distribution channels in the District of Delaware and throughout the United States, including, but not limited to, Amazon, Best Buy, GameStop, Kmart, LEGO Store, LEGO Shop, Target, Toys R Us, and Walmart, and have knowledge that the Accused Products are sold and have been sold through these channels.

52. On information and belief, the Lego Dimensions Starter Pack (among other LEGO Dimensions products) remains available for purchase from the LEGO Shop on www.shop.lego.com.[25] On information and belief, Lego Dimensions products remain available for sale through at least the LEGO Shop in the United States, Canada and the United Kingdom. LEGO also maintains its Lego Dimensions website, with product information, product videos, character information, build/rebuild instructions, and frequently asked questions (including technical support).[26]

---

[25] Attached hereto as Exhibit 18 are true and correct copies of three receipts from LEGO Shop confirming the purchase and sale of three Lego Dimensions Starter Packs (one for PS4, one for Xbox 360, and one for WiiU) on April 15, 2019, April 17, 2019, and April 18, 2019.

[26] LEGO.com, https://www.lego.com/en-us/themes/dimensions (last visited 5/6/2019); LEGO.com, https://www.lego.com/en-us/service/buildinginstructions/search?ignorereferer=true#?search&text=71232 (last visited 5/6/2019); *see also* Brandon Staley, *LEGO Dimensions Has Officially Been Discontinued*, CBR (10/23/2017), https://www.cbr.com/lego-dimensions-discontinued/ ("[Warner Bros. Interactive Entertainment, TT Games, and the LEGO Group] will

53. On information and belief, Warner Bros. maintains the official companion app for Lego Dimensions, containing videos, screenshots and build/rebuild instructions.[27] It also maintains at least two dedicated Lego Dimensions websites where it provides gameplay and technical support for the Lego Dimensions products[28] and advertises and promotes the Lego Dimensions products and directs website visitors to purchase Lego Dimensions products from Amazon and GameStop via direct hyperlinks provided by Warner Bros.' website.[29] On information and belief, Warner Bros. has engaged in these activities knowing Amazon and GameStop continue to sell and offer for sale Lego Dimensions products to website visitors who hyperlink from Warner Bros.' website to Amazon's and GameStop's websites.[30]

54. Defendants' acts with respect to the Accused Products have been without license or authority of MQ Gaming or CKT with respect to each of the Asserted Patents.

---

continue to provide ongoing server and customer support for LEGO Dimensions packs. Existing packs will continue to work interchangeably and will remain available for purchase.").

[27] LEGO.com, https://www.lego.com/en-us/themes/dimensions/games/lego-dimensions-08e6116902f144139dfc34b3dd6f85b6 (last visited 5/6/2019).

[28] *WB Games Support*, WB GAMES, https://legogamessupport.wbgames.com/hc/en-us/categories/360000090167-LEGO-Dimensions (last visited 5/6/2019).

[29] *Available Now on Xbox One, Xbox 360, PS4, PS3, WiiU - Lego Dimensions*, WB, https://www.warnerbros.com/games-and-apps/lego-dimensions/ (last visited 5/6/2019).

[30] Attached hereto as Exhibit 19 are true and correct copies of order and shipment confirmations from Amazon confirming the purchase and sale on April 15, 2019 of two Lego Dimensions Starter Packs (both for PS4), a Lego Dimensions Story Pack (Ghostbusters), a Lego Dimensions Level Pack (Sonic the Hedgehog), a Lego Dimensions Team Pack (Teen Titans Go), and a Lego Dimensions Fun Pack (Lord of the Rings). Attached hereto as Exhibit 20 are true and correct copies of order and shipment confirmations from GameStop confirming the purchase and sale on April 20, 2019 of a Lego Dimensions Starter Pack.

**COUNT I – INFRINGEMENT OF THE '275 PATENT**

55. By the acts alleged herein Defendants have directly infringed and continue to directly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the '275 patent under 35 U.S.C. § 271(a).

56. The Accused Products, such as all Lego Dimensions Starter Packs (shown below) comprise "[a]n interactive game including one or more collectible figures for entertaining a game participant playing a computer-animated game on a compatible gaming platform wherein said collectible figures represent persons, characters or objects associated with said game."






For example, each Lego Dimensions Starter Pack (above left) is an interactive game for entertaining a game participant playing a computer-animated game (above right) on a compatible

gaming platform (e.g., a home game console). The game uses collectable figures that represent characters, vehicles and gadgets associated with the game (see below).




57. Each Lego Dimensions Starter Pack includes "one or more collectable figures depicting or representing persons, characters or objects associated with a computer-animated game, each said collectable figure comprising an electronically-readable radio frequency identification (RFID) tag comprising a unique identification number for uniquely identifying each said corresponding collectable figure." For example, each Lego Dimensions Starter Pack includes three collectable minifigures (below left).





Each minifigure depicts or represents a corresponding character in the game. On information and belief, the base (Toy Tag) of each minifigure (above right) incorporates a MIFARE NTAG213 RFID tag with a 7-byte unique identification number (tag UID) that uniquely identifies the corresponding minifigure. Alternatively, the Toy Tags alone meet this claim limitation, either

literally and/or under the doctrine of equivalents, because the Toy Tags themselves depict or represent specific characters in the game (see below) and perform the same function in the same way to achieve the same result as the assembled toys.




Alternatively, each unassembled minifigure meets this limitation, either literally and/or under the doctrine of equivalents, because game participants are not required to assemble the minifigures to access and play the game and an unassembled minifigure performs the same function in the same way to achieve the same result as the assembled minifigure.[31]

58. Each RFID tag includes "i) non-volatile programmable memory configured to store selected game-relevant information associated with each said corresponding collectible figure, ii) a radio frequency (RF) transceiver configured to facilitate two-way wireless communication with one or more compatible RFID reader devices, and iii) a tag antenna configured to wirelessly receive electrical energy through inductive coupling when exposed to an external electromagnetic field to power at least said RF transceiver." (see below).

[31] See LEGO.com, https://www.lego.com/en-us/themes/dimensions/faq ("Only the LEGO Toy Tag must be placed on the LEGO Toy Pad for the game to recognize it.") (last visited 5/6/2019).




**Fig 2. Block diagram of NTAG213/215/216**

For example, each NTAG213 RFID tag includes i) 144 bytes of EEPROM non-volatile programmable memory[32] that is configured to store selected game relevant information comprising coded information (e.g., a character ID) identifying a corresponding in-game character; ii) an RF transceiver[33] configured to provide two-way wireless communication with a compatible RFID reader device (e.g., the included Toy Pad); and iii) a tag antenna[34] configured to be energized by inductive coupling when exposed to an externally-generated electromagnetic field for powering the RFID tag and RF transceiver (e.g., when placed on or near the Toy Pad).

59. Each Lego Dimensions Starter Pack includes an "RFID reader device configured to wirelessly power and communicate with each said RFID tag at least in part through inductive

[32] See *NTAG213/215/216 Product data sheet*, Rev. 3.0 (7/24/2013), https://4donline.ihs.com/images/VipMasterIC/IC/PHGL/PHGLS28456/PHGLS28456-1.pdf, at 6 ("NTAG213 EEPROM [includes] 144 bytes user programmable read/write memory.") (last visited 5/13/2019).

[33] *Id*. at 7.

[34] *Id*. at 5.

coupling with said tag antenna and wherein said wireless communication includes communication of at least said unique identification number." For example, each Lego Dimensions Starter Pack includes a Toy Pad comprising an RFID reader (see below).




The Toy Pad uses electromagnetic fields and inductive coupling to wirelessly power and communicate with the RFID tag associated with each minifigure.[35] The wireless communication includes the unique identification number (tag UID) of the RFID tag.

60. Each Lego Dimensions Starter Pack includes "game software comprising program instructions stored in a machine readable format and configured to be read and executed by a computing device associated with a compatible gaming platform for conducting a computer-animated game, said game software further comprising program instructions for causing said computing device to: i) ascertain selected game-relevant information from one or more collectible figures provided within communication range of said RFID reader device, ii) use said selected game-relevant information to determine selected attributes relevant to said corresponding depicted or represented persons, characters or objects, and iii) produce in the

[35] *Id*. at 7 ("During operation, the [RFID reader] generates an RF field. The RF field must always be present (with short pauses for data communication) as it is used for both communication and as power supply for the tag.")

computer animation of said game said depicted or represented persons, characters or objects with said relevant selected attributes in accordance with said selected game-relevant information."








For example, each Lego Dimensions game software (stored in machine-readable format on the included videogame disk and/or the Lego Toy Pad) includes program instructions that instruct a game console to conduct a computer-animated game in which the associated game characters interact. The game software also includes program instructions that instruct the Toy Pad (RFID reader) to ascertain selected game-relevant information stored on each Toy Tag (e.g., the character ID) and to communicate that information to the console through an attached USB cable. The game software running on the console uses the coded game-relevant information to

determine selected attributes (e.g., visual appearance and in-game abilities) of a game character or object corresponding to each Toy Tag and to cause the game console to produce computer-animated characters and/or objects having the selected attributes.[36]

61. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’275 patent under 35 U.S.C. § 271(b), (c) by selling, and/or offering for sale throughout the United States, and/or importing into the United States, components constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the ’275 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, and by intentionally encouraging and instructing purchasers of such components to use them in a manner that directly infringes (literally and/or under the doctrine of equivalents) at least claim 1 of the ’275 patent, and with specific intent to cause or encourage such infringement. These components include at least all Lego Dimensions Story Packs, Lego Dimensions Level Packs, Lego Dimensions Team Packs, and Lego Dimensions Fun Packs (see examples below).

---

[36] See LEGO.com, https://www.lego.com/en-us/themes/dimensions/faq (“The LEGO® Toy Pad is a physical device that allows you to bring any combination of up to 7 characters, vehicles, and/or gadgets into the game all at once.”) (last visited 5/6/2019).







Each of these Accused Products includes at least one RFID-tagged minifigure and/or associated Toy Tag especially made and adapted to be used with each Lego Dimensions Starter Pack to access additional Adventure Worlds and special character abilities in the game.

62. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’275 patent under 35 U.S.C. § 271(b), (c) by selling, and/or offering for sale throughout the United States, and/or importing into the United States, unassembled Lego minifigures and Toy Tags constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the ’275 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, and by intentionally encouraging and instructing purchasers of such components to assemble and use them in a manner that directly infringes (literally and/or under the doctrine of equivalents) at least claim 1 of the ’275 patent, and with specific intent to cause or encourage such infringement (see below).






63. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’275 patent under 35 U.S.C. § 271(f) by supplying in or from the United States all or a substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe at least claim 1 of the ’275 patent if such combination occurred within the United States, and/or by supplying in or from the United States components constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the ’275 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, where such components are uncombined in whole or in part, knowing that such components are so made or adapted and intending that such components will be combined outside of the United States in a manner that would infringe at least claim 1 of the ’275 patent if such combination occurred within the United States. Such components include at least all Lego Dimensions Starter

Packs, Lego Dimensions Story Packs, Lego Dimensions Level Packs, Lego Dimensions Team Packs, and Lego Dimensions Fun Packs.

64. On information and belief, Warner Bros. has also indirectly infringed and continues to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’275 patent under 35 U.S.C. § 271(b) by advertising and promoting the Accused Products and directing its website visitors to purchase the Accused Products from third-party retailers such as Amazon and GameStop via direct hyperlinks provided by Warner Bros. and/or by inducing such third-party retailers to sell and offer for sale the Accused Products in direct infringement (literally and/or under the doctrine of equivalents) of at least claim 1 of the ’275 patent, and with specific intent to cause or encourage such infringement.

65. Defendants have been on notice of the ’275 patent since at least as early as the service of this Complaint. Moreover, LEGO has been on notice of the ’275 patent since at least as early as July 19, 2016 when MQ Gaming notified LEGO it was infringing at least claims 1-2, 5-7, 38, 47 and 50-51 of the ’275 patent. Warner Bros. has been on notice the ’275 patent since at least as early as October 6, 2017 when MQ Gaming notified Warner Bros. it was infringing at least claims 1-2, 5-7, 38, 47 and 50-51 of the ’275 patent. Defendants’ continued actions of making, using, selling, offering for sale, and/or importing into the United States any of the Accused Products, is with Defendants’ knowledge of the ’275 patent, knowledge of infringement of the ’275 patent, intent to encourage others (*e.g.*, consumers and third-party retailers) to infringe the ’275 patent through the Accused Products and knowledge that Defendants’ encouraging acts actually result in direct infringement of at least claim 1 of the ’275 patent.

66. On information and belief, Defendants' direct and indirect infringement was deliberate and in willful disregard of Plaintiffs' intellectual property rights as provided for in the '275 patent. During nearly three years of correspondence, Defendants have never once asserted or even suggested that any claim of the '275 patent is invalid, and Defendants have never articulated a non-infringement position that has any support under prevailing principles of patent law. On information and belief, Warner Bros. has been aware of MQ Gaming's infringement allegations by virtue of its commercial partnership with LEGO. Despite being aware of the '275 patent, Warner Bros. continued to infringe, willfully, wantonly, and recklessly, as did LEGO.

67. The claims of the '275 patent, including claim 1, are directed to technological improvements that are unique to the field of electronic gaming and have no pre-electronic-gaming precursor or counterpart. Combining a physical element such as a toy or figurine with a computer animated game using an RFID tag having non-volatile programmable memory and that is wirelessly powered by an RFID reader to exchange gaming and other information has no counterpart in the pre-electronic gaming world. For example, in the Examiner's Statement of Reasons for Allowance the examiner noted "[t]he best prior art references of US 6,773,344 and US 6,352,478 to Gabai et al. and US 5,853,327 to Gilboa neither teach nor suggest the following limitations in the context of the claims … 'RFID tag further comprising non-volatile programmable memory configured to store selected game-relevant information associated with each said corresponding collectible figure, tag antenna configured to wirelessly receive electrical energy through inductive coupling when exposed to an external electromagnetic field to power at least said RFID transceiver'." (Ex. 21 at 3). Thus, the claims of the '275 patent are directed to concrete, physical combinations and technological improvements that have no pre-Internet or

pre-electronic-gaming counterpart and were not routine, well-known, or conventional to persons skilled in the art at the time of the invention.

**COUNT II – INFRINGEMENT OF THE ’515 PATENT**

68. By the acts alleged herein Defendants have directly infringed and continue to directly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’515 patent under 35 U.S.C. § 271(a).

69. The Accused Products, such as all Lego Dimensions Starter Packs comprise “[a] multi-platform gaming system for amusing or entertaining one or more game participants playing a game on a gaming platform comprising one or more video game consoles, home game consoles, hand-held game units, computer gaming devices, internet gaming devices or live-action gaming facilities.” For example, each Lego Dimensions Starter Pack is a multi-platform gaming system for entertaining up to two game participants playing a computer-animated game on any number of compatible gaming platforms (e.g., WiiU, PS3, PS4, Xbox, etc.).

70. Each Lego Dimensions Starter Pack includes “a plurality of collectible toys depicting or representing one or more game characters or objects relevant to a game adapted to be played on said gaming platform.” For example, each Lego Dimensions Starter Pack includes three LEGO minifigure toys and one vehicle toy. Each Lego Dimensions toy (and/or associated Toy Tag) represents a corresponding game character or object in the Lego Dimensions game. Note that the Toy Tags alone also literally meet this claim limitation because the Toy Tags are “collectible toys” that depict or represent characters or objects in the game (see below).




Alternatively, the unassembled Lego Dimensions toys meet this limitation, either literally and/or under the doctrine of equivalents, because game participants are not required to assemble the toys to access and play the game and because the unassembled toys perform the same function in the same way to achieve the same result as the assembled toys.

71. Each Toy Tag includes "an RFID tag comprising a corresponding unique tag identification number; at least one antenna; integrated circuitry comprising instructions to wirelessly transmit and receive information to and from an associated RFID tag reader; and non-volatile memory storing game-relevant information including at least one of skills, abilities or attributes associated with one of said game characters or objects, wherein at least a portion of said game-relevant information is encrypted." For example, on information and belief, each Toy Tag incorporates a MIFARE NTAG213 RFID tag which has a 7-byte unique identification number (tag UID), a flat spiral-wound antenna, integrated wireless communications circuitry, and non-volatile EEPROM memory storing a 4-byte password and coded information identifying associated attributes of a corresponding in-game character, including character ID (e.g., Batman, Gandalf, Wyldstyle) vehicle/gadget ID (e.g., Batmobile) and vehicle/gadget upgrades. The password and character ID are encrypted using a modified TEA encryption algorithm.

72. At least one of the Lego Dimensions toys included with each Starter Pack is configured so that "game participants [can] develop said skills, abilities or attributes of a particular game character or object represented by said game-relevant information stored on one or more collectable toys of said plurality of collectible toys while playing a first game or first game session on said gaming platform and subsequently use said one or more collectible toys to wirelessly communicate said game-relevant information to the same or a different gaming platform and play a second game or second game session using said particular game character or object with some or all of said developed skills, abilities or attributes." For example, the Lego Dimensions Batmobile toy is configured to be upgraded in the game (see below).




Once upgrades are earned or selected, game participants are given the option to "save upgrades to Toy Tag" which causes coded upgrade information to be stored in the EEPROM of the Toy Tag. Once "upgraded" the Batmobile Toy Tag can wirelessly communicate the coded upgrade information to the same or different gaming platforms to thereby allow a game participant to play a second game or second game session using the earned upgrades.

73. Each Lego Dimensions Starter Pack includes "an RFID tag reader comprising instructions to wirelessly power and communicate with each said RFID tag when a corresponding one of said plurality of collectible toys is presented within a readable range of said reader device, thereby enabling the reader device to wirelessly transmit and receive information to and from said corresponding one of said plurality of collectible toys; and instructions to communicate with said gaming platform such that said game-relevant information is communicated to and from each said presented collectible toy and said gaming platform, wherein said communicated information includes at least said unique tag identification number." For example, each Lego Dimensions Starter Pack includes a Toy Pad comprising, on information and belief, a MIFARE MFRC630 RFID reader (see below).







## WHAT DOES THE LEGO® TOY PAD DO?

The LEGO® Toy Pad is a physical device that allows you to bring any combination of up to 7 characters, vehicles, and/or gadgets into the game all at once. The LEGO Toy Pad lights up, flashes and even changes color to give players clues as to where to go, what to look for, or how to solve a puzzle in game. Gamers command the action – where and when the physical toys are moved on the LEGO Toy Pad will impact what happens in the game.

The Toy Pad is programmed to wirelessly power and communicate with each Toy Tag and to wirelessly transmit and receive information to and from the corresponding RFID tag contained

therein. The Toy Pad is also programmed to communicate this information via a USB cable to an associated gaming platform (e.g., a home game console). The communicated information includes at least the unique tag identification number.

74. Each Lego Dimensions Starter Pack includes "a non-transitory medium storing game instructions to be executed by said gaming platform to carry out said game, said game instructions comprising: program instructions to instruct said gaming platform to conduct an interactive character-based game in which said one or more game characters are visually and aurally represented by computer animation, wherein said one or more game participants advance in the game at least in part by finding clues, solving puzzles or completing challenges presented by said game; and wherein said one or more game participants develop through game play progression skills, abilities or attributes associated with said one or more game characters or objects; program instructions to cause said gaming platform to communicate selected character or object information pertaining to said developed skills, abilities or attributes to said reader device; program instructions to cause said reader device to store corresponding character or object information or other game-relevant information in the memory of a corresponding collectible toy; and program instructions comprising an encryption algorithm to encrypt at least some portion of said game-relevant information prior to said reader device storing said game-relevant information in the memory of said corresponding collectible toy."




For example, the Lego Dimensions game software (program instructions stored on the included videogame disk and/or the Toy Pad) includes program instructions that instruct a game console to conduct an interactive character-based game in which the associated game characters "come to life" in the game. The game software also includes program instructions that instruct the Toy Pad (RFID reader) to ascertain selected game-relevant information stored on each Toy Tag (e.g., coded information identifying the character/vehicle/gadget identity and saved upgrades) and to communicate that information to the console via an attached USB cable. The game software running on the console uses the coded game-relevant information to determine selected attributes (e.g., visual appearance and in-game abilities) corresponding to each Toy Tag and to cause the game console to produce computer-animated characters and objects having the selected attributes. The game software also includes program instructions that cause the Toy Pad to write selected game-relevant information (e.g., coded information identifying the vehicle/gadget identity and upgrades) to at least the Batmobile Toy Tag. The program instructions also include an encryption algorithm configured to encrypt a 4-byte password that is used to authenticate the Toy Tag prior to storing the selected game-relevant information in the memory thereof.

75. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’515 patent under 35 U.S.C. § 271(b), (c) by selling, and/or offering for sale throughout the United States, and/or importing into the United States, components constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the ’515 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, and by intentionally encouraging and instructing purchasers of such components to use them in a manner that directly infringes (literally and/or under the doctrine of equivalents) at least claim 1 of the ’515 patent, and with specific intent to cause or encourage such infringement. These components include at least all Lego Dimensions Story Packs, Lego Dimensions Level Packs, Lego Dimensions Team Packs, and Lego Dimensions Fun Packs. Each of these Accused Products includes at least one RFID-tagged minifigure and/or associated Toy Tag especially made and adapted to be used with each Lego Dimensions Starter Pack to access additional Adventure Worlds and special character abilities in the game.

76. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’515 patent under 35 U.S.C. § 271(b), (c) by selling, and/or offering for sale throughout the United States, and/or importing into the United States, unassembled Lego minifigures and Toy Tags constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the ’515 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, and by intentionally encouraging and instructing purchasers of such components to assemble and use them in a

manner that directly infringes (literally and/or under the doctrine of equivalents) at least claim 1 of the ’515 patent, and with specific intent to cause or encourage such infringement.

77. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’515 patent under 35 U.S.C. § 271(f) by supplying in or from the United States all or a substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe at least claim 1 of the ’515 patent if such combination occurred within the United States, and/or by supplying in or from the United States components constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the ’515 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, where such components are uncombined in whole or in part, knowing that such components are so made or adapted and intending that such components will be combined outside of the United States in a manner that would infringe at least claim 1 of the ’515 patent if such combination occurred within the United States. Such components include at least all Lego Dimensions Starter Packs, Lego Dimensions Story Packs, Lego Dimensions Level Packs, Lego Dimensions Team Packs, and Lego Dimensions Fun Packs.

78. On information and belief, Warner Bros. has also indirectly infringed and continues to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’515 patent under 35 U.S.C. § 271(b) by advertising and promoting the Accused Products and directing its website visitors to purchase the Accused Products from third-party retailers such as Amazon and GameStop via direct hyperlinks provided by Warner Bros. and/or by inducing

such third-party retailers to sell and offer for sale the Accused Products in direct infringement (literally and/or under the doctrine of equivalents) of at least claim 1 of the ’515 patent, and with specific intent to cause or encourage such infringement.

79. Defendants have been on notice of the ’515 patent since at least as early as the service of this Complaint. Moreover, LEGO has been on notice of the ’515 patent since at least as early as July 19, 2016 when MQ Gaming notified LEGO it was infringing at least claims 1, 4, 7, 10, 14, 29, 31, 37 and 39 of the ’515 patent. Warner Bros. has been on notice the ’515 patent since at least as early as October 6, 2017 when MQ Gaming notified Warner Bros. it was infringing at least claims 1, 4, 7, 10, 14, 29, 31, 37 and 39 of the ’515 patent. Defendants’ continued actions of making, using, selling, offering for sale, and/or importing into the United States any of the Accused Products, is with Defendants’ knowledge of the ’515 patent, knowledge of infringement of the ’515 patent, intent to encourage others (e.g., consumers and third-party retailers) to infringe the ’515 patent through the Accused Products and knowledge that Defendants’ encouraging acts actually result in direct infringement of at least claim 1 of the ’515 patent.

80. On information and belief, Defendants’ direct and indirect infringement was deliberate and in willful disregard of Plaintiffs’ intellectual property rights as provided for in the ’515 patent. During nearly three years of correspondence, Defendants have never once asserted or even suggested that any claim of the ’515 patent is invalid, and Defendants have never articulated a non-infringement position that has any support under prevailing principles of patent law. On information and belief, Warner Bros. has been aware of MQ Gaming’s infringement allegations by virtue of its commercial partnership with LEGO. Despite being aware of the ’515 patent, Warner Bros. continued to infringe, willfully, wantonly, and recklessly, as did LEGO.

81. The claims of the ’515 patent, including claim 1, are directed to technological improvements that are unique to the field of electronic gaming and have no pre-electronic-gaming precursor or counterpart. Combining a physical element such as a toy or figurine with a computer animated game using an RFID tag that is wirelessly powered by an RFID reader to exchange gaming and other information, including the provision of encrypted game-relevant information stored on a physical toy to unlock corresponding portions of a virtual game displayed on an associated game console, has no counterpart in the pre-electronic gaming world. For example, in the Notice of Allowability the examiner noted while “both Driscoll [US 2004/0198158] and Gabai [US 6,352,478] use interactive toy devices to interact with themed environments and participant information is stored according to usage of said interactive toy device, neither Driscoll nor Gabai discloses or teaches ... implementing encryption techniques via encryption algorithms to store said information.” (Ex. 22 at 13). Thus, the claims of the ’515 patent are directed to concrete, physical combinations and technological improvements that have no pre-Internet or pre-electronic-gaming counterpart and were not routine, well-known, or conventional to persons skilled in the art at the time of the invention.

**COUNT III – INFRINGEMENT OF THE ’180 PATENT**

82. By the acts alleged herein Defendants have directly infringed and continue to directly infringe (literally and/or under the doctrine of equivalents) at least claim 33 of the ’180 patent under 35 U.S.C. § 271(a).

83. The Accused Products, such as all Lego Dimensions Starter Packs comprise “[a] wireless toy and associated wireless gaming device for entertaining one or more game participants playing a game using a compatible gaming platform, and wherein a first portion of said game is conducted in a physical play environment through physical interaction with one or more

physical toys and wherein a second portion of said game is conducted in a virtual play environment through one or more computer-animated effects provided by said compatible gaming platform."




For example, each Lego Dimensions Starter Pack includes multiple wireless toys and an associated Toy Pad for entertaining one or more game participants playing a game on a compatible gaming platform (e.g., a home game console). A first portion of the game is conducted in a physical play environment (above, left) by selectively moving or positioning the wireless toys on the Toy Pad. A second portion of the game is conducted in a virtual play environment (above, right) through various computer-animated effects displayed on a compatible gaming platform.[37]

84. Each Lego Dimensions Starter Pack includes "a wireless gaming device comprising: i) a first radio frequency (RF) transceiver configured to provide two-way wireless

---

[37] See LEGO.com, https://www.lego.com/en-us/themes/dimensions/faq ("Gamers command the action -- where and when the physical toys are moved on the LEGO Toy Pad will impact what happens in the game.") (last visited 5/6/2019).

communication of game-relevant information with one or more wireless-compatible devices, and ii) a communication interface configured to communicate game-relevant information to and from said compatible gaming platform." For example, each Lego Dimensions Starter Pack includes a Toy Pad comprising, on information and belief, a MIFARE MFRC630 RFID reader (see below).







The MFRC630 RFID reader includes a first RF transceiver configured to provide two-way wireless communications with the wireless toys.[38] These wireless communications include game-relevant information (e.g., character/vehicle ID) stored in each wireless toy. The Toy Pad is configured to communicate this information to a compatible gaming platform (e.g., a home game console) via a USB cable interface, which connects the Toy Pad to the gaming platform.

85. Each Lego Dimensions Starter Pack includes at least one "portable wireless toy comprising: i) a toy body configured to be held, moved and positioned selectively by a game participant within said physical play environment, ii) a unique identification number uniquely identifying said portable wireless toy, and iii) a second RF transceiver configured to provide

---

[38] See *MFRC630 Product data sheet*, Rev. 3.2 (9/10/2013), www.biakom.com/pdf/MFRC630_NXP.pdf, at 1 ("The MFRC630 is a highly integrated transceiver IC for contactless communication at 13.56 MHz.") (last visited 5/13/2019).

two-way wireless communication of game-relevant information with at least said first RF transceiver." For example, each Lego Dimensions Starter Pack includes four wireless toys (three minifigures and one vehicle toy) (see below).





Each toy is portable and can be held, moved and positioned selectively by a game participant. On information and belief, the removable base (Toy Tag) of each toy incorporates a MIFARE NTAG213 RFID tag with a 7-byte unique identification number (tag UID) that uniquely identifies each toy. The NTAG213 tag includes a second RF transceiver configured to provide two-way wireless communication with the MIFARE MFRC630 RFID reader (Toy Pad). Note that each Toy Tag alone also literally meets this claim limitation because each is a "portable wireless toy" (see below).



Alternatively, each unassembled Lego Dimensions toy meets this limitation, either literally and/or under the doctrine of equivalents, because game participants are not required to assemble the toy to access and play the game and because an unassembled toy performs the same function in the same way to achieve the same result as the assembled toy.

86. The Lego Dimensions Toy Pad is "configured to display at least one lighting effect based at least in part on one or more wireless communications exchanged between said first RF transceiver and said second RF transceiver." For example, in the "Chroma" mode a game participant can place the Gandalf Toy Tag at a particular physical location on the Toy Pad and then move the corresponding in-game character to a particular virtual location in the computer-animated game to select a desired color (see below).




The Toy Pad exchanges wireless communications with the Gandalf Toy Tag to determine its identity and physical location on the Toy Pad. It then changes the color of the Toy Pad at that location to match the color selected by the corresponding virtual character in the computer-animated game.

87. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 33 of the ’180 patent under 35 U.S.C. § 271(b), (c) by selling, and/or offering for sale throughout the United States, and/or importing into the United States, components constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the ’180 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, and by intentionally encouraging and instructing purchasers of such components to use them in a manner that directly infringes (literally and/or under the doctrine of equivalents) at least claim 33 of the ’180 patent, and with specific intent to cause or encourage such infringement. These components include at least all Lego Dimensions Story Packs, Lego Dimensions Level Packs, Lego Dimensions Team Packs, and Lego Dimensions Fun Packs. Each of these Accused Products includes at least one RFID-tagged minifigure and/or associated Toy Tag especially made and adapted to be used with each Lego Dimensions Starter Pack to access additional Adventure Worlds and special character abilities in the game.

88. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 33 of the ’180 patent under 35 U.S.C. § 271(b), (c) by selling, and/or offering for sale throughout the United States, and/or importing into the United States, unassembled Lego minifigures and Toy Tags constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the ’180 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, and by intentionally encouraging and instructing purchasers of such components to assemble and use them in a

manner that directly infringes (literally and/or under the doctrine of equivalents) at least claim 33 of the ’180 patent, and with specific intent to cause or encourage such infringement.

89. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 33 of the ’180 patent under 35 U.S.C. § 271(f) by supplying in or from the United States all or a substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe at least claim 33 of the ’180 patent if such combination occurred within the United States, and/or by supplying in or from the United States components constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the ’180 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, where such components are uncombined in whole or in part, knowing that such components are so made or adapted and intending that such components will be combined outside of the United States in a manner that would infringe at least claim 33 of the ’180 patent if such combination occurred within the United States. Such components include at least all Lego Dimensions Starter Packs, Lego Dimensions Story Packs, Lego Dimensions Level Packs, Lego Dimensions Team Packs, and Lego Dimensions Fun Packs.

90. On information and belief, Warner Bros. has also indirectly infringed and continues to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 33 of the ’180 patent under 35 U.S.C. § 271(b) by advertising and promoting the Accused Products and directing its website visitors to purchase the Accused Products from third-party retailers such as Amazon and GameStop via direct hyperlinks provided by Warner Bros. and/or

by inducing such third-party retailers to sell and offer for sale the Accused Products in direct infringement (literally and/or under the doctrine of equivalents) of at least claim 33 of the ’180 patent, and with specific intent to cause or encourage such infringement.

91. Defendants have been on notice of the ’180 patent since at least as early as the service of this Complaint. Moreover, LEGO has been on notice of the ’180 patent since at least as early as July 19, 2016 when MQ Gaming notified LEGO it was infringing at least claims 1-4, 8, 16-19, 22-24, 33-35, 39 and 41-43 of the ’180 patent. Warner Bros. has been on notice the ’180 patent since at least as early as October 6, 2017 when MQ Gaming notified Warner Bros. it was infringing at least claims 1-4, 8, 16-19, 22-24, 33-35, 39, 41-43 of the ’180 patent. Defendants’ continued actions of making, using, selling, offering for sale, and/or importing into the United States any of the Accused Products, is with Defendants’ knowledge of the ’180 patent, knowledge of infringement of the ’180 patent, intent to encourage others (e.g., consumers and third-party retailers) to infringe the ’180 patent through the Accused Products and knowledge that Defendants’ encouraging acts actually result in direct infringement of at least claim 33 of the ’180 patent.

92. On information and belief, Defendants’ direct and indirect infringement was deliberate and in willful disregard of Plaintiffs’ intellectual property rights as provided for in the ’180 patent. During nearly three years of correspondence, Defendants have never once asserted or even suggested that any claim of the ’180 patent is invalid, and Defendants have never articulated a non-infringement position that has any support under prevailing principles of patent law. On information and belief, Warner Bros. has been aware of MQ Gaming’s infringement allegations by virtue of its commercial partnership with LEGO. Despite being aware of the ’180 patent, Warner Bros. continued to infringe, willfully, wantonly, and recklessly, as did LEGO.

93. The claims of the ’180 patent, including claim 33, are directed to technological improvements that are unique to the field of electronic gaming and have no pre-electronic-gaming precursor or counterpart. Combining a physical element such as a toy or figurine with a computer animated game using an RFID tag that is wirelessly read by an RFID reader to exchange gaming and other information, including the provision of program instructions for displaying lighting effects based on one or more wireless communications exchanged between an RFID tagged toy and an RFID reader, has no counterpart in the pre-electronic gaming world. For example, in the Notice of Allowability the examiner noted “[n]one of [the prior art] references suggests interactive toys with unique identifiers tracking players’ progress in an interactive play environment … as claimed. Tracking progress and combining game play in both real or interactive environments and virtual play environments (the cross-platform nature of the claims) will serve to attract and retain players’ interest in the interactive play environment, in particular the attentions of younger players who are accustomed to playing video and online games. None of these references produces effects in response to the unique identifier of the interactive toy or portable body as claimed. Such effects will make the play environment more interactive, since the player will not know what to expect. The effects could be used to reward, surprise, or scare the player, rewarding or penalizing various actions to induce progress in play of the game.” (Ex. 23 at 5). Thus, the claims of the ’180 patent are directed to concrete, physical combinations and technological improvements that have no pre-Internet or pre-electronic-gaming counterpart and were not routine, well-known, or conventional to persons skilled in the art at the time of the invention.

**COUNT IV – INFRINGEMENT OF THE ’688 PATENT**

94. By the acts alleged herein Defendants have directly infringed and continue to directly infringe (literally and/or under the doctrine of equivalents) at least claim 47 of the ’688 patent under 35 U.S.C. § 271(a).

95. The Accused Products, such as all Lego Dimensions Starter Packs comprise “[a] wireless gaming system for amusing or entertaining a game participant playing a computer-animated game on a compatible gaming platform.” For example, each Lego Dimensions Starter Pack is a wireless (RFID-based) toys-to-life gaming system in which game participants use physical toys to interact with a computer-animated game played on an associated game console.

96. Each Lego Dimensions Starter Pack includes “at least one gaming item comprising a portable toy configured to be used by a game participant as a player input device or a player tracking device in a computer-animated game carried out on a compatible gaming platform.” For example, each Lego Dimensions Starter Pack includes three Lego minifigures (Batman, Gandalf and Wyldstyle), each of which is configured to be used as a player input device and/or player tracking device in the computer-animated game. A game participant can use the Gandalf minifigure and/or associated Toy Tag as an input device by selectively placing or moving it on the Toy Pad to access and play as a corresponding character in the computer-animated game. Note that the minifigure need not be assembled with its corresponding Toy Tag to literally meet this claim limitation. For example, claim 53 (which depends from claim 47) makes clear the portable toy may comprise “first and second mating components configured to be modularly and detachably assembled with one another.” Alternatively, each unassembled minifigure meets this limitation, either literally and/or under the doctrine of equivalents, because game participants are not required to assemble the minifigure to access and play the game and

because an unassembled minifigure performs the same function in the same way to achieve the same result as the assembled minifigure.

97. Each Toy Tag includes "non-volatile memory storing a unique identifier uniquely identifying said at least one gaming item; programmable non-volatile memory configured to store a first selection of game-relevant information comprising one or more attributes of a game character played by said game participant in said computer-animated game; and a first wirelessly-powered transceiver configured to provide two-way wireless communications with one or more wireless-compatible devices and wherein said two-way wireless communications communicate at least said unique identifier." For example, on information and belief, each Toy Tag incorporates a passive (i.e., wirelessly powered) MIFARE NTAG213 RFID tag which has a 7-byte unique identification number (tag UID), programmable non-volatile EEPROM memory configured to store a first selection of game-relevant information (e.g., a character ID) identifying associated attributes of a corresponding in-game character, and a first wirelessly-powered transceiver (RF-interface) configured to provide two-way wireless communications (including of the tag UID) with at least the Lego Dimensions Toy Pad.

98. Each Lego Dimensions Starter Pack also includes "one or more adjunct gaming items configured to be used by said game participant in combination with said at least one gaming item to access one or more features or portions of said computer-animated game, said one or more adjunct gaming items comprising: i) non-volatile memory configured to store a second selection of game-relevant information, and ii) a second wirelessly-powered transceiver configured to provide two-way wireless communications with said one or more wireless-compatible devices." For example, the Batman and Wyldstyle Lego minifigures and/or associated Toy Tags are adjunct gaming items that can used in combination with the Gandalf

minifigure and/or its associated Toy Tag to access additional "Adventure Worlds" in the game (e.g., DC Comics Adventure World and The Lego Movie Adventure World)





WHAT ARE ADVENTURE WORLDS?

Each of the brands in LEGO® DIMENSIONS™ has its own unique Adventure World where players can explore, go on quests, race, and collect studs and bricks. There are 14 Adventure Worlds, and each world can be unlocked with any LEGO DIMENSIONS minifigure belonging to that brand. With the Starter Pack, players have instant access to 3 Adventure Worlds – DC Comics™ (with Batman™), The Lord of the Rings™ (with Gandalf™), and The LEGO® Movie™ (with Wyldstyle™). And just like the levels in the LEGO DIMENSIONS Starter Pack, any character can use any vehicle or gadget in any Adventure World.

They also allow game participants to access special in-game abilities (e.g., Batman's Grapple, Boomerang and Stealth abilities, and Wyldstyle's Relic Detector, Acrobat and Master Build abilities) to help "crack puzzles" and "overpower enemies" in the game (see below).





"Activate Batman's special Grapple, Boomerang and Stealth abilities; Wyldstyle's Relic Detector, Acrobat and Master Build abilities ... to crack puzzles and overpower enemies. Use whatever minifigure with whichever vehicle or gadget – go ahead... break the rules!"

The Lego Dimensions Batmobile toy and/or associated Toy Tag sold with each Starter Pack is another example of an adjunct gaming item that can be used in combination with the Gandalf minifigure and/or associated Toy Tag to access optional features of the game. For example, placing the Batmobile toy and/or associated Toy Tag on the Toy Pad allows the Gandalf character to drive and operate the Batmobile in the game (see below).







On information and belief, each of these additional gaming items (Batman, Wyldstyle, Batmobile and/or their associated Toy Tags) incorporates a passive (i.e., wirelessly powered) MIFARE NTAG213 RFID tag which has non-volatile EEPROM memory configured to store a second selection of game-relevant information (e.g., character ID, vehicle ID), and a second wirelessly-powered transceiver which provides two-way wireless communications with at least the Lego Dimensions Toy Pad.

99. Each Lego Dimensions Starter Pack includes "a wireless reader device configured to wirelessly power and communicate with each of said first and second wirelessly-powered transceivers and to ascertain therefrom said first selection of game-relevant information and said second selection of game-relevant information and to communicate said first selection of game-relevant information and said second selection of game-relevant information to said compatible gaming platform." For example, each Lego Dimensions Starter Pack includes a Toy Pad comprising, on information and belief, a MIFARE MFRC630 RFID reader. The Toy Pad is configured to wirelessly power and communicate with each Toy Tag and to wirelessly transmit and receive information to and from the corresponding RFID tag contained therein, including the game-relevant information stored in each gaming item placed on the Toy Pad. The Toy Pad is

also configured to communicate this information via a USB cable to an associated gaming platform (e.g., a home game console).

100. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 47 of the ’688 patent under 35 U.S.C. § 271(b), (c) by selling, and/or offering for sale throughout the United States, and/or importing into the United States, components constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the ’688 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, and by intentionally encouraging and instructing purchasers of such components to use them in a manner that directly infringes (literally and/or under the doctrine of equivalents) at least claim 47 of the ’688 patent, and with specific intent to cause or encourage such infringement. These components include at least all Lego Dimensions Story Packs, Lego Dimensions Level Packs, Lego Dimensions Team Packs, and Lego Dimensions Fun Packs. Each of these Accused Products includes at least one RFID-tagged minifigure and/or associated Toy Tag especially made and adapted to be used with each Lego Dimensions Starter Pack to access additional Adventure Worlds and special character abilities in the game.

101. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 47 of the ’688 patent under 35 U.S.C. § 271(b), (c) by selling, and/or offering for sale throughout the United States, and/or importing into the United States, unassembled Lego minifigures and Toy Tags constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the ’688 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, and by intentionally

encouraging and instructing purchasers of such components to assemble and use them in a manner that directly infringes (literally and/or under the doctrine of equivalents) at least claim 47 of the '688 patent, and with specific intent to cause or encourage such infringement.

102. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 47 of the '688 patent under 35 U.S.C. § 271(f) by supplying in or from the United States all or a substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe at least claim 47 of the '688 patent if such combination occurred within the United States, and/or by supplying in or from the United States components constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the '688 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, where such components are uncombined in whole or in part, knowing that such components are so made or adapted and intending that such components will be combined outside of the United States in a manner that would infringe at least claim 47 of the '688 patent if such combination occurred within the United States. Such components include at least all Lego Dimensions Starter Packs, Lego Dimensions Story Packs, Lego Dimensions Level Packs, Lego Dimensions Team Packs, and Lego Dimensions Fun Packs.

103. On information and belief, Warner Bros. has also indirectly infringed and continues to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 47 of the '688 patent under 35 U.S.C. § 271(b) by advertising and promoting the Accused Products and directing its website visitors to purchase the Accused Products from third-party

retailers such as Amazon and GameStop via direct hyperlinks provided by Warner Bros. and/or by inducing such third-party retailers to sell and offer for sale the Accused Products in direct infringement (literally and/or under the doctrine of equivalents) of at least claim 47 of the ’688 patent, and with specific intent to cause or encourage such infringement.

104. Defendants have been on notice of the ’688 patent since at least as early as the service of this Complaint. Moreover, LEGO has been on notice of the ’688 patent since at least as early as July 19, 2016 when MQ Gaming notified LEGO it was infringing at least claims 47-51 and 57-58 of the ’688 patent. Warner Bros. has been on notice the ’688 patent since at least as early as October 6, 2017 when MQ Gaming notified Warner Bros. it was infringing at least claims 47-51 and 57-58 of the ’688 patent. Defendants’ continued actions of making, using, selling, offering for sale, and/or importing into the United States any of the Accused Products, is with Defendants’ knowledge of the ’688 patent, knowledge of infringement of the ’688 patent, intent to encourage others (e.g., consumers and third-party retailers) to infringe the ’688 patent through the Accused Products and knowledge that Defendants’ encouraging acts actually result in direct infringement of at least claim 47 of the ’688 patent.

105. Defendants’ acts of direct and indirect infringement of at least claim 47 of the ’688 patent have caused damage to Plaintiffs, and Plaintiffs are entitled to recover damages in an amount subject to proof at trial.

106. On information and belief, Defendants’ direct and indirect infringement was deliberate and in willful disregard of Plaintiffs’ intellectual property rights as provided for in the ’688 patent. During nearly three years of correspondence, Defendants have never once asserted or even suggested that any claim of the’688 patent is invalid, and Defendants have never

articulated a non-infringement position that has any support under prevailing principles of patent law. On information and belief, Warner Bros. has been aware of MQ Gaming's infringement allegations by virtue of its commercial partnership with LEGO. Despite being aware of the '688 patent, Warner Bros. continued to infringe, willfully, wantonly, and recklessly, as did LEGO.

107. The claims of the '688 patent, including claim 47, are directed to technological improvements that are unique to the field of electronic gaming and have no pre-electronic-gaming precursor or counterpart. Combining a physical element such as a toy or figurine with a computer animated game using an RFID tag that is wirelessly powered by an RFID reader to exchange gaming and other information, including the provision of an adjunct gaming item to access additional game features, has no counterpart in the pre-electronic gaming world. Thus, the claims of the '688 patent are directed to concrete, physical combinations and technological improvements that have no pre-Internet or pre-electronic-gaming counterpart and were not routine, well-known, or conventional to persons skilled in the art at the time of the invention.

**COUNT V – INFRINGEMENT OF THE '533 PATENT**

108. By the acts alleged herein Defendants have directly infringed and continue to directly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the '533 patent under 35 U.S.C. § 271(a).

109. The Accused Products, such as all Lego Dimensions Starter Packs comprise "[a] wireless interactive gaming system combining physical and virtual gameplay elements." For example, each Lego Dimensions Starter Pack is a wireless (RFID-based) interactive toys-to-life gaming system in which game participants use physical toys to interact with a computer-animated "virtual" game played on an associated game console.

110. Each Lego Dimensions Starter Pack includes a "doll or action figure comprising a first radio frequency identification (RFID) tag comprising non-volatile memory storing a first selection of information configured to enable a game participant to access and play a computer-animated game on a compatible gaming platform." For example, each Lego Dimensions Starter Pack includes three Lego minifigures (Batman, Gandalf and Wyldstyle), each of which is a "doll" or "action figure" configured to enable a game participant to access and play the computer-animated Lego Dimensions game on a compatible gaming platform (e.g., a home game console). For example, a game participant can place the Gandalf minifigure onto the Toy Pad to access and play the Lego Dimensions game as Gandalf. The base (Toy Tag) of each minifigure is removable and, on information and belief, incorporates a MIFARE NTAG213 RFID tag. The NTAG213 RFID tag has 144 bytes of non-volatile memory storing a first selection of information comprising a character ID (e.g., 02=Gandalf) and at least one access code or password configured to unlock a corresponding Adventure World (e.g., Lord of the Rings) within the game. Alternatively, the Gandalf Toy Tag alone and/or unassembled minifigure meets this claim limitation, either literally and/or under the doctrine of equivalents, because game participants are not required to assemble the minifigure to access and play the game and because the Gandalf Toy Tag and/or unassembled minifigure performs the same function in the same way to achieve the same result as the assembled Gandalf minifigure.

111. Each Lego Dimensions Starter Pack includes "a plurality of adjunct gaming items each comprising a second RFID tag comprising non-volatile memory storing a second selection of information configured to enable said game participant to access one or more optional features of said computer-animated game, each said adjunct gaming item comprising a molded plastic body having a cavity formed therein and wherein said second RFID tag is disposed in said cavity

and encapsulated within said molded plastic body." For example, the Batman and Wyldstyle Lego minifigures and/or associated Toy Tags comprise adjunct gaming items that can used in combination with the Gandalf minifigure and/or its associated Toy Tag to access additional "Adventure Worlds" (e.g., DC Comics Adventure World, The Lego Movie Adventure World). They also allow game participants to access special in-game abilities (e.g., Batman's Grapple, Boomerang and Stealth abilities, and Wyldstyle's Relic Detector, Acrobat and Master Build abilities) to help "crack puzzles" and "overpower enemies" in the game. On information and belief, each adjunct gaming item (Batman, Wyldstyle, Batmobile and/or their associated Toy Tags) incorporates a MIFARE NTAG213 RFID tag having non-volatile EEPROM memory storing a second selection of information comprising a character ID and an access code configured to unlock one or more optional features of the Lego Dimensions game. Each corresponding Toy Tag comprises a molded plastic body having upper and lower halves (see disassembled Toy Tag below right).







The RFID tag is disposed and encapsulated within a cavity formed between the upper and lower halves of the factory-assembled Toy Tag (above left).

112. Each Lego Dimensions Starter Pack includes "an RFID reader configured to: i) wirelessly power and communicate with each of said first and second RFID tags through inductive coupling; ii) ascertain said corresponding first and second selections of information, and iii) communicate said first and second selections of information to said compatible gaming platform." For example, each Lego Dimensions Starter Pack includes a Toy Pad comprising, on information and belief, a MIFARE MFRC630 RFID reader, which uses inductive coupling of electromagnetic fields to wirelessly power and communicate with each NTAG213 tag associated with each gaming item. Through these wireless communications the Toy Pad is able to ascertain the information stored in each of the gaming items and adjunct gaming items placed on the Toy Pad. The Toy Pad is configured to then communicate this information to a compatible gaming platform (e.g., a home game console) via a USB cable, which connects the Toy Pad to the associated gaming platform.

113. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the '533 patent under 35 U.S.C. § 271(b), (c) by selling, and/or offering for sale throughout the United States, and/or importing into the United States, components constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the '533 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, and by intentionally encouraging and instructing purchasers of such components to use them in a manner that directly infringes (literally and/or under the doctrine of equivalents) at least claim 1 of the '533 patent, and with specific intent to cause or encourage such infringement. These components include at least all Lego Dimensions Story Packs, Lego Dimensions Level Packs, Lego Dimensions Team Packs, and Lego Dimensions Fun

Packs. Each of these Accused Products includes at least one RFID-tagged minifigure and/or associated Toy Tag especially made and adapted to be used with each Lego Dimensions Starter Pack to access additional Adventure Worlds and special character abilities in the game.

114. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’533 patent under 35 U.S.C. § 271(b), (c) by selling, and/or offering for sale throughout the United States, and/or importing into the United States, unassembled Lego minifigures and Toy Tags constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the ’533 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, and by intentionally encouraging and instructing purchasers of such components to assemble and use them in a manner that directly infringes (literally and/or under the doctrine of equivalents) at least claim 1 of the ’533 patent, and with specific intent to cause or encourage such infringement.

115. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’533 patent under 35 U.S.C. § 271(f) by supplying in or from the United States all or a substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe at least claim 1 of the ’533 patent if such combination occurred within the United States, and/or by supplying in or from the United States components constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the ’533 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses,

where such components are uncombined in whole or in part, knowing that such components are so made or adapted and intending that such components will be combined outside of the United States in a manner that would infringe at least claim 1 of the ’533 patent if such combination occurred within the United States. Such components include at least all Lego Dimensions Starter Packs, Lego Dimensions Story Packs, Lego Dimensions Level Packs, Lego Dimensions Team Packs, and Lego Dimensions Fun Packs.

116. On information and belief, Warner Bros. has also indirectly infringed and continues to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’533 patent under 35 U.S.C. § 271(b) by advertising and promoting the Accused Products and directing its website visitors to purchase the Accused Products from third-party retailers such as Amazon and GameStop via direct hyperlinks provided by Warner Bros. and/or by inducing such third-party retailers to sell and offer for sale the Accused Products in direct infringement (literally and/or under the doctrine of equivalents) of at least claim 1 of the ’533 patent, and with specific intent to cause or encourage such infringement.

117. Defendants have been on notice of the ’533 patent since at least as early as the service of this Complaint. Moreover, LEGO has been on notice of the ’533 patent since at least as early as July 19, 2016 when MQ Gaming notified LEGO it was infringing at least claims 1-4, 7 and 8-12 of the ’533 patent. Warner Bros. has been on notice the ’533 patent since at least as early as October 6, 2017 when MQ Gaming notified Warner Bros. it was infringing at least claims 1-4, 7 and 8-12 of the ’533 patent. Defendants’ continued actions of making, using, selling, offering for sale, and/or importing into the United States any of the Accused Products, is with Defendants’ knowledge of the ’533 patent, knowledge of infringement of the ’533 patent, intent to encourage others (e.g., consumers and third-party retailers) to infringe the ’533 patent

through the Accused Products and knowledge that Defendants' encouraging acts actually result in direct infringement of at least claim 1 of the '533 patent.

118. On information and belief, Defendants' direct and indirect infringement was deliberate and in willful disregard of Plaintiffs' intellectual property rights as provided for in the '533 patent. During nearly three years of correspondence, Defendants have never once asserted or even suggested that any claim of the '533 patent is invalid, and Defendants have never articulated a non-infringement position that has any support under prevailing principles of patent law. On information and belief, Warner Bros. has been aware of MQ Gaming's infringement allegations by virtue of its commercial partnership with LEGO. Despite being aware of the '533 patent, Warner Bros. continued to infringe, willfully, wantonly, and recklessly, as did LEGO.

119. The claims of the '533 patent, including claim 1, are directed to technological improvements that are unique to the field of electronic gaming and have no pre-electronic-gaming precursor or counterpart. Combining a physical element such as a toy or figurine with a computer animated game using an RFID tag that is wirelessly powered by an RFID reader to exchange gaming and other information, including the provision of adjunct gaming items to access optional game features, has no counterpart in the pre-electronic gaming world. Thus, the claims of the '533 patent are directed to concrete, physical combinations and technological improvements that have no pre-Internet or pre-electronic-gaming counterpart and were not routine, well-known, or conventional to persons skilled in the art at the time of the invention.

**COUNT VI – INFRINGEMENT OF THE '149 PATENT**

120. By the acts alleged herein Defendants have directly infringed and continue to directly infringe (literally and/or under the doctrine of equivalents) at least claim 1, directed to "[a] wireless toy system and associated reader" of the '149 patent under 35 U.S.C. § 271(a).

121. The Accused Products, such as all Lego Dimensions Starter Packs comprise "[a] wireless toy system and associated reader for enabling a game participant to access and play selected portions of an interactive game on a compatible home game console, personal computer, or hand-held game unit." For example, each Lego Dimensions Starter Pack is a toy system for enabling a game participant to play selected portions (e.g., up to three "Adventure Wolds") of the Lego Dimensions game on a compatible home game console (e.g., WiiU, PS4, Xbox, etc.).

122. Each Lego Dimensions Starter Pack includes "a first wireless toy comprising a first radio frequency identification (RFID) tag having non-volatile programmable memory storing a first selection of game-relevant information, wherein said first wireless toy provides said game participant access to play a first portion of said interactive game." For example, each Lego Dimensions Starter Pack includes an RFID-tagged LEGO Batman toy (below left) that allows a game participant to access the DC Comics Adventure World within the Lego Dimensions game (see description below right).





WHAT ARE ADVENTURE WORLDS?

Each of the brands in LEGO® DIMENSIONS™ has its own unique Adventure World where players can explore, go on quests, race, and collect studs and bricks. There are 14 Adventure Worlds, and each world can be unlocked with any LEGO DIMENSIONS minifigure belonging to that brand. With the Starter Pack, players have instant access to 3 Adventure Worlds – DC Comics™ (with Batman™), The Lord of the Rings™ (with Gandalf™), and The LEGO® Movie™ (with Wyldstyle™). And just like the levels in the LEGO DIMENSIONS Starter Pack, any character can use any vehicle or gadget in any Adventure World.

On information and belief, the removable base (Toy Tag) of the Batman toy contains a MIFARE NTAG213 RFID tag. This RFID tag contains 144 bytes of non-volatile programmable memory storing a first selection of game-relevant information comprising a character ID. Note that the Batman Toy Tag alone also literally meets this claim limitation because it is a "wireless toy." Alternatively, the unassembled Batman toy meets this limitation, either literally and/or under the doctrine of equivalents, because game participants are not required to assemble the toy to access and play the game and because an unassembled toy performs the same function in the same way to achieve the same result as the assembled toy.

123. Each Lego Dimensions Starter Pack includes "a second wireless toy comprising a second RFID tag having non-volatile memory storing a second selection of game-relevant information and an encryption key and wherein said second selection of game-relevant information is different than said first selection of game-relevant information, wherein said second wireless toy provides said game participant access to play a second portion of said interactive game that cannot otherwise be accessed by said game participant using only said first wireless toy." For example, the Lego Dimensions Starter Pack includes an RFID-tagged LEGO Gandalf toy (below left) that allows a game participant to access the Lord of the Rings Adventure World within the Lego Dimensions game (below right) that cannot be accessed using only the Batman toy.





The Gandalf toy also allows a game participant to access Gandalf's special in-game abilities (e.g., Magic, Magical Shield and Illumination abilities) to "crack puzzles" and "overpower enemies" and to thereby advance further in the game than could otherwise be achieved using the Batman toy alone. On information and belief, the removable base (Toy Tag) of the Gandalf toy contains a MIFARE NTAG213 RFID tag. This tag contains 144 bytes of non-volatile memory storing a second selection of game-relevant information comprising a different character ID and a 7-byte encryption key (tag UID). Note that the Gandalf Toy Tag alone also literally meets this claim limitation because it is a "wireless toy." Alternatively, the unassembled Gandalf toy meets this limitation, either literally and/or under the doctrine of equivalents, because game participants are not required to assemble the toy to access and play the game and because an unassembled toy performs the same function in the same way to achieve the same result as the assembled toy.

124. Each Lego Dimensions Starter Pack includes "an RFID reader comprising: i) a radio frequency (RF) transceiver configured to provide two-way wireless communications with each said first and second RFID tags over a wireless communication range of less than 60 cm and to thereby ascertain said first and second selections of game-relevant information and said encryption key; and ii) a communication interface configured to enable said RFID reader to communicate with said compatible home game console, personal computer, or hand-held game unit." For example, each Lego Dimensions Starter Pack includes a Toy Pad comprising, on information and belief, a MIFARE MFRC630 RFID reader, which is configured to provide two-way wireless communications with each NTAG213 RFID tag associated with each wireless toy over a range less than 60 cm (e.g., when the Toy Tag is placed on the Toy Pad).[39] Through these

[39] See *NTAG213/215/216 Product data sheet*, *supra* note 32, at 3 ("Operating distance up to 100 mm [10 cm] (depending on various parameters as e.g. field strength and antenna geometry).").

wireless communications the Toy Pad is able to ascertain the character IDs stored in the Batman and Gandalf Toy Tags and the 7-byte encryption key (tag UID) stored in the Gandalf Toy Tag. The Toy Pad is also configured to communicate with a compatible home game console (e.g., WiiU, PS4, Xbox) via a USB cable interface (not shown).

125. The Toy Pad and/or Gandalf Toy Tag are configured so that "said second selection of game-relevant information comprises at least one access code comprising encrypted information and wherein, after said access code is decrypted or authenticated using said encryption key, said game participant is provided access to play said second portion of said interactive game." For example, on information and belief, the information stored in the non-volatile memory of the Gandalf Toy Tag includes a 4-byte password that is encrypted using a modified TEA encryption algorithm. When the Gandalf Toy Tag is placed on the Toy Pad, the Toy Pad ascertains the encryption key (the tag UID) stored on the associated RFID tag and uses a modified TEA algorithm and a hash of the tag UID to authenticate the password. Once the password is authenticated the Toy Pad decrypts or authenticates the stored character ID (which is also encrypted) and communicates it to the associated game console. This allows the game console to unlock the Lord of the Rings Adventure World within the Lego Dimensions game. This also allows a game participant to play the Lego Dimensions game as the Gandalf character and to access Gandalf's special in-game abilities in the game.

126. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the '149 patent under 35 U.S.C. § 271(b), (c) by selling, and/or offering for sale throughout the United States, and/or importing into the United States, components constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an

infringement of the ’149 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, and by intentionally encouraging and instructing purchasers of such components to use them in a manner that directly infringes (literally and/or under the doctrine of equivalents) at least claim 1 of the ’149 patent, and with specific intent to cause or encourage such infringement. These components include at least all Lego Dimensions Story Packs, Lego Dimensions Level Packs, Lego Dimensions Team Packs, and Lego Dimensions Fun Packs. Each of these Accused Products includes at least one RFID-tagged minifigure and/or associated Toy Tag especially made and adapted to be used with each Lego Dimensions Starter Pack to access additional Adventure Worlds and special character abilities in the game.

127. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’149 patent under 35 U.S.C. § 271(b), (c) by selling, and/or offering for sale throughout the United States, and/or importing into the United States, unassembled Lego minifigures and Toy Tags constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the ’149 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, and by intentionally encouraging and instructing purchasers of such components to assemble and use them in a manner that directly infringes (literally and/or under the doctrine of equivalents) at least claim 1 of the ’149 patent, and with specific intent to cause or encourage such infringement.

128. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’149 patent under 35 U.S.C. § 271(f) by supplying in or from the United States all or a substantial portion of the components of a patented invention, where such components are

uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe at least claim 1 of the ’149 patent if such combination occurred within the United States, and/or by supplying in or from the United States components constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the ’149 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, where such components are uncombined in whole or in part, knowing that such components are so made or adapted and intending that such components will be combined outside of the United States in a manner that would infringe at least claim 1 of the ’149 patent if such combination occurred within the United States. Such components include at least all Lego Dimensions Starter Packs, Lego Dimensions Story Packs, Lego Dimensions Level Packs, Lego Dimensions Team Packs, and Lego Dimensions Fun Packs.

129. On information and belief, Warner Bros. has also indirectly infringed and continues to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’149 patent under 35 U.S.C. § 271(b) by advertising and promoting the Accused Products and directing its website visitors to purchase the Accused Products from third-party retailers such as Amazon and GameStop via direct hyperlinks provided by Warner Bros. and/or by inducing such third-party retailers to sell and offer for sale the Accused Products in direct infringement (literally and/or under the doctrine of equivalents) of at least claim 1 of the ’149 patent, and with specific intent to cause or encourage such infringement.

130. Defendants have been on notice of the ’149 patent since at least as early as the service of this Complaint. Moreover, LEGO has been on notice of the ’149 patent since at least as early as July 19, 2016 when MQ Gaming notified LEGO it was infringing at least claims 1-6,

8-9, 11-14, 15-18, and 20 of the ’149 patent. Warner Bros. has been on notice the ’149 patent since at least as early as October 6, 2017 when MQ Gaming notified Warner Bros. it was infringing at least claims 1-6, 8-9, 11-14, 15-18, and 20 of the ’149 patent. Defendants’ continued actions of making, using, selling, offering for sale, and/or importing into the United States any of the Accused Products, is with Defendants’ knowledge of the ’149 patent, knowledge of infringement of the ’149 patent, intent to encourage others (e.g., consumers and third-party retailers) to infringe the ’149 patent through the Accused Products and knowledge that Defendants’ encouraging acts actually result in direct infringement of at least claim 1 of the ’149 patent.

131. On information and belief, Defendants’ direct and indirect infringement was deliberate and in willful disregard of Plaintiffs’ intellectual property rights as provided for in the ’149 patent. During nearly three years of correspondence, Defendants have never once asserted or even suggested that any claim of the ’149 patent is invalid, and Defendants have never articulated a non-infringement position that has any support under prevailing principles of patent law. On information and belief, Warner Bros. has been aware of MQ Gaming’s infringement allegations by virtue of its commercial partnership with LEGO. Despite being aware of the ’149 patent, Warner Bros. continued to infringe, willfully, wantonly, and recklessly, as did LEGO.

132. The claims of the ’149 patent, including claim 1, are directed to technological improvements that are unique to the field of electronic gaming and have no pre-electronic-gaming precursor or counterpart. Combining a physical element such as a toy or figurine with a computer animated game using an RFID tag that is wirelessly read by an RFID reader to exchange gaming and other information, including the provision of an encrypted password and an encryption key stored on a physical toy to unlock corresponding portions of a virtual game

displayed on an associated game console, has no counterpart in the pre-electronic gaming world. For example, in the Notice of Allowability the examiner noted while "both Driscoll [US 2004/0198158] and Gabai [US 6,352,478] use interactive toy devices to interact with themed environments and participant information is stored according to usage of said interactive toy device, neither Driscoll nor Gabai discloses or teaches the claimed implementation of the ability of using multiple interactive toy devices in [sic, with] each controlling specific access to different portions of the interactive game only accessible with their respective devices, nor do these references disclose or teach decrypting or authenticating access codes using encryption keys." (Ex. 24 at 21). Thus, the claims of the '149 patent are directed to concrete, physical combinations and technological improvements that have no pre-Internet or pre-electronic-gaming counterpart and were not routine, well-known, or conventional to persons skilled in the art at the time of the invention.

## COUNT VII – INFRINGEMENT OF THE '206 PATENT

133. By the acts alleged herein Defendants have directly infringed and continue to directly infringe (literally and/or under the doctrine of equivalents) at least claim 23 of the '206 patent under 35 U.S.C. § 271(a).

134. Each of the Accused Products, including all Lego Dimensions Starter Packs, Lego Dimensions Story Packs, Lego Dimensions Level Packs, Lego Dimensions Team Packs, and Lego Dimensions Fun Packs, includes at least one "promotional gaming item configured to be provided as part of a retail purchase transaction." For example, each Accused Product is configured to be sold to consumers as part of a retail purchase transaction and each Accused Product includes at least one promotional gaming item (e.g., an RFID-tagged LEGO minifigure

and/or its associated Toy Tag) from a corresponding movie, television and/or LEGO-branded toy franchise (e.g., The LEGO Batman Movie) (see examples below).









135. Each RFID-tagged LEGO minifigure and/or its associated Toy Tag comprises "a game token or toy configured for use in conjunction with one or more compatible gaming platforms comprising … a home game console." For example, each RFID-tagged LEGO minifigure (below left) includes an associated Toy Tag configured to be used in conjunction with a home game console (e.g., WiiU, PS4, Xbox) connected to a Toy Pad to access and play a corresponding virtual character in the Lego Dimensions game (below right).






136. Each Toy Tag includes "a wirelessly-powered radio frequency (RF) transceiver configured to provide two-way wireless communications with a wireless-compatible reader device associated with said one or more compatible gaming platforms over a limited communication range of less than 60 cm." For example, on information and belief, each Toy Tag incorporates a passive (wirelessly-powered) MIFARE NTAG213 RFID tag comprising an RF transceiver which provides two-way wireless communications with at least the Lego Dimensions Toy Pad over a limited communication range of less than 60 cm (e.g., when the Toy Tag is placed on the Toy Pad).

137. The RFID tag contained in each Toy Tag includes "non-volatile memory configured to store selected game-relevant information uniquely associated with said promotional gaming item." For example, each RFID tag comprises non-volatile EEPROM memory configured to store an encrypted character ID (e.g., at pages 36 and 37) that identifies a corresponding in-game character and an encrypted 4-byte password (e.g., at page 43) that is used to authenticate the Toy Tag and/or unlock portions of the Lego Dimensions game. Each of these items of information is uniquely associated with its corresponding RFID tag, which in turn is uniquely associated with its corresponding Toy Tag.

138. Each RFID tag includes "at least one item of encrypted information stored in said non-volatile memory, said encrypted information configured to be decrypted or authenticated using an encryption algorithm based on at least one encryption key that is uniquely associated with said promotional gaming item and which can be ascertained from information stored in said non-volatile memory thereof, and wherein said encrypted information is further configured when decrypted or authenticated to enable a game participant to access certain features or portions of a computer-animated game carried out on said one or more compatible gaming platforms." For

example, each RFID tag stores an encrypted character ID and an encrypted 4-byte password that, when decrypted or authenticated, enable a game participant to access additional Adventure Worlds (see below left) and/or special abilities (see below right).







The character ID and password are decrypted or authenticated using a modified TEA encryption algorithm and at least one encryption key (the tag UID) that is uniquely associated with the RFID tag and can be ascertained from information stored therein. When a Toy Tag is placed on the Toy Pad, the Toy Pad reads the RFID tag to ascertain its tag UID and encrypted password. The Toy Pad then uses a modified TEA encryption algorithm and a hash of the tag UID to authenticate the password. Once the password is authenticated the Toy Pad decrypts or authenticates the stored character ID and communicates it to the associated game console. This allows the game console to unlock additional Adventure Worlds and/or special character abilities.

139. The encrypted information (password and character ID) stored on each associated Toy Tag is "configured to be decrypted or authenticated using a multi-key encryption algorithm that uses at least a first key and a second key and wherein at least said first key is ascertainable from information stored in said non-volatile memory, and wherein at least one of said first key or said second key comprises a unique identification number stored in said non-volatile memory."

For example, the Lego Dimensions Toy Pad decrypts or authenticates the encrypted password and character ID information using two encryption keys: one public (the tag UID), and one private (a secret key used to generate a hash of the tag UID). The hashed tag UID is then divided into four sub-keys that are used by a TEA encryption algorithm to decrypt or authenticate the password and character ID information stored on each Toy Tag.

140. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 23 of the ’206 patent under 35 U.S.C. § 271(b), (c) by selling, and/or offering for sale throughout the United States, and/or importing into the United States, components constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the ’206 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, and by intentionally encouraging and instructing purchasers of such components to use them in a manner that directly infringes (literally and/or under the doctrine of equivalents) at least claim 23 of the ’206 patent, and with specific intent to cause or encourage such infringement. These components include at least all Lego Dimensions Starter Packs, Lego Dimensions Story Packs, Lego Dimensions Level Packs, Lego Dimensions Team Packs, and Lego Dimensions Fun Packs. Each Lego Dimensions Starter Pack includes a Toy Pad and associated game software that is especially made and adapted to be used with the Lego Dimensions Toy Tags and have substantially no other non-infringing uses. Each of the other Accused Products includes at least one RFID-tagged minifigure and/or associated Toy Tag especially made and adapted to be used with each Lego Dimensions Starter Pack to access additional Adventure Worlds and special character abilities in the game.

141. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 23 of the ’206 patent under 35 U.S.C. § 271(b), (c) by selling, and/or offering for sale throughout the United States, and/or importing into the United States, unassembled Lego minifigures and Toy Tags constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the ’206 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, and by intentionally encouraging and instructing purchasers of such components to assemble and use them in a manner that directly infringes (literally and/or under the doctrine of equivalents) at least claim 23 of the ’206 patent, and with specific intent to cause or encourage such infringement.

142. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 23 of the ’206 patent under 35 U.S.C. § 271(f) by supplying in or from the United States all or a substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe at least claim 23 of the ’206 patent if such combination occurred within the United States, and/or by supplying in or from the United States components constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the ’206 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, where such components are uncombined in whole or in part, knowing that such components are so made or adapted and intending that such components will be combined outside of the United States in a manner that would infringe at least claim 23 of the ’206 patent if such combination

occurred within the United States. Such components include at least all Lego Dimensions Starter Packs, Lego Dimensions Story Packs, Lego Dimensions Level Packs, Lego Dimensions Team Packs, and Lego Dimensions Fun Packs.

143. On information and belief, Warner Bros. has also indirectly infringed and continues to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 23 of the ’206 patent under 35 U.S.C. § 271(b) by advertising and promoting the Accused Products and directing its website visitors to purchase the Accused Products from third-party retailers such as Amazon and GameStop via direct hyperlinks provided by Warner Bros. and/or by inducing such third-party retailers to sell and offer for sale the Accused Products in direct infringement (literally and/or under the doctrine of equivalents) of at least claim 23 of the ’206 patent, and with specific intent to cause or encourage such infringement.

144. Defendants have been on notice of the ’206 patent since at least as early as the service of this Complaint. Moreover, LEGO has been on notice of the ’206 patent since at least as early as July 19, 2016 when MQ Gaming notified LEGO it was infringing at least claims 1-2, 6-8, 10, 23-24, 26, 28-29 and 30-34 of the ’206 patent. Warner Bros. has been on notice the ’206 patent since at least as early as October 6, 2017 when MQ Gaming notified Warner Bros. it was infringing at least claims 1-2, 6-8, 10, 23-24, 26, 28-29 and 30-34 of the ’206 patent. Defendants’ continued actions of making, using, selling, offering for sale, and/or importing into the United States any of the Accused Products, is with Defendants’ knowledge of the ’206 patent, knowledge of infringement of the ’206 patent, intent to encourage others (e.g., consumers and third-party retailers) to infringe the ’206 patent through the Accused Products and knowledge that Defendants’ encouraging acts actually result in direct infringement of at least claim 23 of the ’206 patent.

145. Defendants' acts of direct and indirect infringement of at least claim 23 of the '206 patent have caused damage to Plaintiffs, and Plaintiffs are entitled to recover damages in an amount subject to proof at trial.

146. On information and belief, Defendants' direct and indirect infringement was deliberate and in willful disregard of Plaintiffs' intellectual property rights as provided for in the '206 patent. During nearly three years of correspondence, Defendants have never once asserted or even suggested that any claim of the '206 patent is invalid, and Defendants have never articulated a non-infringement position that has any support under prevailing principles of patent law. On information and belief, Warner Bros. has been aware of MQ Gaming's infringement allegations by virtue of its commercial partnership with LEGO. Despite being aware of the '206 patent, Warner Bros. continued to infringe, willfully, wantonly, and recklessly, as did LEGO.

147. The claims of the '206 patent, including claim 23, are directed to technological improvements that are unique to the field of electronic gaming and have no pre-electronic-gaming precursor or counterpart. Combining a physical element such as a toy or figurine with a computer animated game using an RFID tag that is wirelessly powered by an RFID reader to exchange gaming and other information, including the provision of an encrypted password and an encryption key stored on a physical toy to unlock corresponding portions of a virtual game displayed on an associated game console, has no counterpart in the pre-electronic gaming world. Thus, the claims of the '206 patent are directed to concrete, physical combinations and technological improvements that have no pre-Internet or pre-electronic-gaming counterpart and were not routine, well-known, or conventional to persons skilled in the art at the time of the invention.

**COUNT VIII – INFRINGEMENT OF THE '491 PATENT**

148. By the acts alleged herein Defendants have directly infringed and continue to directly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the '491 patent under 35 U.S.C. § 271(a).

149. The Accused Products, such as all Lego Dimensions Starter Packs comprise "[a] dual-mode gaming system for playing an interactive game wherein a first game mode is carried out in a computer-generated play environment via one or more computer animations provided by a first gaming device and wherein a second game mode is carried out in a physical play environment via one or more physical toys associated with a second gaming device." For example, each Lego Dimensions Starter Pack is a toys-to-life gaming system for playing an interactive game in both a computer-generated play environment provided by a first gaming device (e.g., a home game console) and in a physical play environment via toys that interact with a second gaming device (e.g., the Lego Dimensions Toy Pad).

150. Each Lego Dimensions Starter Pack includes "one or more gaming toys each representing a person, character or object in said game, each of said one or more gaming toys comprising a passive radio frequency identification (RFID) tag." For example, each Lego Dimensions Starter Pack includes an RFID-tagged Batmobile toy (below left) which represents a corresponding Batmobile object in the computer-animated game (below right).

 

On information and belief, the Batmobile toy (and/or associated Toy Tag) includes a passive (wirelessly-powered) MIFARE NTAG213 RFID tag. Note that the Batmobile Toy Tag alone also literally meets this claim limitation because it is a "gaming toy[] … representing a person, character or object in said game." Alternatively, the unassembled Batmobile toy meets this limitation, either literally and/or under the doctrine of equivalents, because game participants are not required to assemble the toy to access and play the game and because an unassembled toy performs the same function in the same way to achieve the same result as the assembled toy.

151. The Batmobile Toy Tag includes "(i) a unique tag identification (ID) uniquely identifying said corresponding gaming toy in said game, and (ii) non-volatile, programmable memory configured to store a first selection of information comprising one or more changeable attributes of said corresponding person, character or object in said game." For example, the Batmobile Toy Tag includes a 7-byte unique identification number (tag UID) and non-volatile programmable EEPROM memory configured to store a first selection of information comprising a vehicle ID and various earned in-game vehicle upgrades. Once upgrades are earned, game participants are given the option to "save upgrades to Toy Tag" which causes coded upgrade information to be stored in the EEPROM of the Batmobile Toy Tag (e.g., at page 38). Once the

upgrades are saved, the Batmobile Toy Tag can be used to access the upgraded Batmobile in a second game session and/or on a different game console.

152. Each Lego Dimensions Starter Pack includes "a second gaming device configured to communicate with said first gaming device and to wirelessly power and communicate with said one or more gaming toys, said second gaming device comprising; an RFID reader configured to wirelessly power and communicate with each said RFID tag when in readable proximity therewith so as to ascertain a second selection of information, including at least said unique tag ID and said first selection of information, and to communicate said second selection of information to said first gaming device." For example, each Lego Dimensions Starter Pack includes a Toy Pad comprising, on information and belief, a MIFARE MFRC630 RFID reader. The Toy Pad is configured to wirelessly power and communicate with the Batman Toy Tag and to wirelessly transmit and receive information to and from the corresponding RFID tag contained therein. The communicated information includes at least the tag UID, vehicle ID and coded upgrade information. The Toy Pad is also configured to communicate this information to the first gaming device (e.g., a home game console) via a USB cable.

153. The Lego Dimensions Toy Pad includes "an effects controller configured to control one or more associated sound or lighting effects in accordance with said game." For example, the Toy Pad lights up, flashes and changes color to help game participants navigate and solve puzzles in the game.

154. Each Lego Dimensions Starter Pack includes "game software stored on a storage device and configured to be executed by said first and second gaming devices to carry out said game, said game software comprising program instructions that, upon execution; (i) cause said

first gaming device to display in said computer-generated play environment a person, character or object having attributes corresponding to said first selection of information; and (ii) cause said second gaming device to modify said first selection of information based on a game participant's progress or performance in said game." For example, the Lego Dimensions game software (stored on the included storage media and/or the Lego Toy Pad) includes program instructions for carrying out the Lego Dimensions game, including instructions that cause the game console to display a computer-animated Batmobile having attributes corresponding to the upgrade information ("saved upgrades") stored on the Batmobile Toy Tag. The game software also includes instructions that cause the Toy Pad to modify the upgrade information stored on the Batmobile Toy Tag when a game participant earns additional upgrades and chooses the "save upgrades to Toy Tag" option.

155. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the '491 patent under 35 U.S.C. § 271(b), (c) by selling, and/or offering for sale throughout the United States, and/or importing into the United States, components constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the '491 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, and by intentionally encouraging and instructing purchasers of such components to use them in a manner that directly infringes (literally and/or under the doctrine of equivalents) at least claim 1 of the '491 patent, and with specific intent to cause or encourage such infringement. These components include at least all Lego Dimensions Story Packs, Lego Dimensions Level Packs, Lego Dimensions Team Packs, and Lego Dimensions Fun Packs. Each of these Accused Products includes at least one RFID-tagged minifigure and/or

associated Toy Tag especially made and adapted to be used with each Lego Dimensions Starter Pack to access additional Adventure Worlds and special character abilities in the game.

156. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’491 patent under 35 U.S.C. § 271(b), (c) by selling, and/or offering for sale throughout the United States, and/or importing into the United States, unassembled Lego minifigures and Toy Tags constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the ’491 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, and by intentionally encouraging and instructing purchasers of such components to assemble and use them in a manner that directly infringes (literally and/or under the doctrine of equivalents) at least claim 1 of the ’491 patent, and with specific intent to cause or encourage such infringement.

157. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’491 patent under 35 U.S.C. § 271(f) by supplying in or from the United States all or a substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe at least claim 1 of the ’491 patent if such combination occurred within the United States, and/or by supplying in or from the United States components constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the ’491 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, where such components are uncombined in whole or in part, knowing that such components are

so made or adapted and intending that such components will be combined outside of the United States in a manner that would infringe at least claim 1 of the ’491 patent if such combination occurred within the United States. Such components include at least all Lego Dimensions Starter Packs, Lego Dimensions Story Packs, Lego Dimensions Level Packs, Lego Dimensions Team Packs, and Lego Dimensions Fun Packs.

158. On information and belief, Warner Bros. has also indirectly infringed and continues to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’491 patent under 35 U.S.C. § 271(b) by advertising and promoting the Accused Products and directing its website visitors to purchase the Accused Products from third-party retailers such as Amazon and GameStop via direct hyperlinks provided by Warner Bros. and/or by inducing such third-party retailers to sell and offer for sale the Accused Products in direct infringement (literally and/or under the doctrine of equivalents) of at least claim 1 of the ’491 patent, and with specific intent to cause or encourage such infringement.

159. Defendants have been on notice of the ’491 patent since at least as early as the service of this Complaint. Moreover, LEGO has been on notice of the ’491 patent since at least as early as July 19, 2016 when MQ Gaming notified LEGO it was infringing at least claims 1-4, 8-10 and 12 of the ’491 patent. Warner Bros. has been on notice the ’491 patent since at least as early as October 6, 2017 when MQ Gaming notified Warner Bros. it was infringing at least claims 1-4, 8-10 and 12 of the ’491 patent. Defendants’ continued actions of making, using, selling, offering for sale, and/or importing into the United States any of the Accused Products, is with Defendants’ knowledge of the ’491 patent, knowledge of infringement of the ’491 patent, intent to encourage others (e.g., consumers and third-party retailers) to infringe the ’491 patent

through the Accused Products and knowledge that Defendants' encouraging acts actually result in direct infringement of at least claim 1 of the '491 patent.

160. Defendants' acts of direct and indirect infringement of at least claim 1 of the '491 patent have caused damage to Plaintiffs, and Plaintiffs are entitled to recover damages in an amount subject to proof at trial.

161. On information and belief, Defendants' direct and indirect infringement was deliberate and in willful disregard of Plaintiffs' intellectual property rights as provided for in the '491 patent. During nearly three years of correspondence, Defendants have never once asserted or even suggested that any claim of the '491 patent is invalid, and Defendants have never articulated a non-infringement position that has any support under prevailing principles of patent law. On information and belief, Warner Bros. has been aware of MQ Gaming's infringement allegations by virtue of its commercial partnership with LEGO. Despite being aware of the '491 patent, Warner Bros. continued to infringe, willfully, wantonly, and recklessly, as did LEGO.

162. The claims of the '491 patent, including claim 1, are directed to technological improvements that are unique to the field of electronic gaming and have no pre-electronic-gaming precursor or counterpart. Combining a physical element such as a toy or figurine with a computer animated game using an RFID tag that is wirelessly powered by an RFID reader to exchange gaming and other information, including the provision of program instructions for storing on a physical toy and subsequently modifying changeable attributes of a corresponding virtual game object, has no counterpart in the pre-electronic gaming world. Thus, the claims of the '491 patent are directed to concrete, physical combinations and technological improvements

that have no pre-Internet or pre-electronic-gaming counterpart and were not routine, well-known, or conventional to persons skilled in the art at the time of the invention.

**COUNT IX – INFRINGEMENT OF THE '500 PATENT**

163. By the acts alleged herein Defendants have directly infringed and continue to directly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the '500 patent under 35 U.S.C. § 271(a).

164. Each of the Accused Products, including all Lego Dimensions Starter Packs, Lego Dimensions Story Packs, Lego Dimensions Level Packs, Lego Dimensions Team Packs, and Lego Dimensions Fun Packs, includes at least one "gaming toy for playing a game that combines both physical and virtual gameplay elements." For example, the LEGO Dimensions Starter Pack includes four gaming toys—three Lego minifigures and one vehicle toy. Each toy is configured to be used in the Lego Dimensions game as a central element of a toys-to-life game in which game participants use physical toys to interact with a computer-animated "virtual" game played on an associated game console. Other LEGO Dimensions gaming toys (minifigures, vehicles and gadgets) are sold in separate expansion packs (Story Packs, Fun Packs, Level Packs, Team Packs), and game participants are encouraged to purchase and use these additional gaming toys to advance further in the game (see below).



165. Each Lego Dimensions gaming toy includes "a plurality of modular components configured to be selectively and detachably assembled by a game participant to form a doll, action figure or object relevant to a computer-animated game played by said game participant on a compatible gaming platform." For example, each Lego Dimensions gaming toy comprises multiple modular components (e.g., LEGO blocks) configured to be selectively and detachably assembled to form either a minifigure, vehicle or gadget (see below). Each assembled gaming toy corresponds to an in-game character or object in the computer-animated game.




166. At least one modular component of each Lego Dimensions gaming toy comprises a Toy Tag, which, on information and belief, incorporates a MIFARE NTAG213 RFID tag. The NTAG213 RFID tag has an integrated circuit chip (NTAG213 tag IC) that includes "a microprocessor [and] non-volatile memory electrically coupled to said microprocessor and storing a first selection of information comprising a unique identifier uniquely identifying said gaming toy within said computer-animated game."




Fig 2. Block diagram of NTAG213/215/216




Fig 8. UID/serial number

For example, the NTAG213 tag IC includes a microprocessor (Digital Control Unit) that is electrically coupled to non-volatile EEPROM memory through an EEPROM interface (above left).[40] Pages 0 and 1 of the EEPROM memory store a first selection of information comprising a 7-byte unique identification number (tag UID, above right) that uniquely identifies the RFID tag and its associated Toy Tag.[41]

167. The NTAG213 tag IC also includes "programmable non-volatile memory electrically coupled to said microprocessor and storing a second selection of information comprising data representing one or more in-game attributes of a corresponding virtual character or object in said computer-animated game." For example, the NTAG213 tag IC includes 144 bytes of programmable non-volatile EEPROM memory organized in 36 pages (pages 4-39) with 4 bytes per page (see below).[42]

---

[40] *NTAG213/215/216 Product data sheet*, supra note 32, at 5.

[41] *Id.* at 12.

[42] *Id.* at 11.

| Page Adr | | Byte number within a page | | | | |
|---|---|---|---|---|---|---|
| Dec | Hex | 0 | 1 | 2 | 3 | Description |
| 0 | 0h | serial number | | | | Manufacturer data and static lock bytes |
| 1 | 1h | serial number | | | | |
| 2 | 2h | serial number | internal | lock bytes | lock bytes | |
| 3 | 3h | Capability Container (CC) | | | | Capability Container |
| 4 | 4h | user memory | | | | User memory pages |
| 5 | 5h | | | | | |
| ... | ... | | | | | |
| 38 | 26h | | | | | |
| 39 | 27h | | | | | |
| 40 | 28h | dynamic lock bytes | | | RFUI | Dynamic lock bytes |
| 41 | 29h | CFG 0 | | | | Configuration pages |
| 42 | 2Ah | CFG 1 | | | | |
| 43 | 2Bh | PWD | | | | |
| 44 | 2Ch | PACK | | RFUI | | |

aaa-008087

**Fig 5. Memory organization NTAG213**

Pages 36-39 of the EEPROM memory store a second selection of information comprising coded data indicating the toy type (character, vehicle or gadget), the corresponding in-game character, vehicle or gadget (e.g., 01=Batman, 02=Gandalf, 03=Wyldstyle, 1006=Batmobile) and saved vehicle/gadget upgrade information.

168. The NTAG213 tag IC also includes "a radio frequency (RF) transceiver electrically coupled to said microprocessor and configured to provide short-range two-way wireless communications with said compatible gaming platform over a limited wireless communication range of less than 60 cm and wherein said short-range two-way wireless communications include at least said second selection of information." For example, the NTAG213 tag IC includes an RF transceiver configured to provide short-range two-way wireless communications with a compatible gaming platform (e.g., a Toy Pad connected to a home gaming console) over a limited wireless communication range less than 60 cm (e.g., when the Toy Tag is placed on the Toy Pad). The communicated information includes at least the second selection of information comprising coded data indicating the toy type (character, vehicle or

gadget), the corresponding in-game character, vehicle or gadget (e.g., 01=Batman, 02=Gandalf, 03=Wyldstyle, 1006=Batmobile), and saved vehicle/gadget upgrade information.

169. The NTAG213 RFID tag includes "an antenna electrically coupled to said RF transceiver and configured to be wirelessly energized by an externally-generated electromagnetic field to thereby electrically power said gaming toy." For example, the NTAG213 RFID tag includes a flat spiral-wound antenna that is electrically coupled to the NTAG213 tag IC (which includes the RF transceiver). The antenna is configured to be wirelessly energized by the Lego Dimensions Toy Pad (on information and belief, a MIFARE MFRC630 RFID reader) when the Toy Tag is placed thereon to thereby electrically power the NTAG213 RFID tag (see below).






170. Each modular Toy Tag component "further comprises an internal cavity and wherein said microprocessor, said non-volatile memory, said programmable non-volatile memory, said RF transceiver, and said antenna are all disposed within said internal cavity and encapsulated within said at least one modular component." For example, each Toy Tag comprises a molded plastic body having upper and lower halves forming an internal cavity. The NTAG213 RFID tag (which includes all the components described above) is disposed and encapsulated within that cavity.

171. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’500 patent under 35 U.S.C. § 271(b), (c) by selling, and/or offering for sale throughout the United States, and/or importing into the United States, components constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the ’500 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, and by intentionally encouraging and instructing purchasers of such components to use them in a manner that directly infringes (literally and/or under the doctrine of equivalents) at least claim 1 of the ’500 patent, and with specific intent to cause or encourage such infringement. These components include at least all Lego Dimensions Starter Packs, Lego Dimensions Story Packs, Lego Dimensions Level Packs, Lego Dimensions Team Packs, and Lego Dimensions Fun Packs. Each Lego Dimensions Starter Pack includes a Toy Pad and associated game software that is especially made and adapted to be used with the Lego Dimensions gaming toys and have substantially no other non-infringing uses. Each of the other Accused Products includes at least one RFID-tagged minifigure and/or associated Toy Tag especially made and adapted to be used with each Lego Dimensions Starter Pack to access additional Adventure Worlds and special character abilities in the game.

172. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’500 patent under 35 U.S.C. § 271(b), (c) by selling, and/or offering for sale throughout the United States, and/or importing into the United States, unassembled Lego minifigures and Toy Tags constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the ’500 patent, and not a staple article or

commodity of commerce suitable for substantial non-infringing uses, and by intentionally encouraging and instructing purchasers of such components to assemble and use them in a manner that directly infringes (literally and/or under the doctrine of equivalents) at least claim 1 of the ’500 patent, and with specific intent to cause or encourage such infringement.

173. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’500 patent under 35 U.S.C. § 271(f) by supplying in or from the United States all or a substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe at least claim 1 of the ’500 patent if such combination occurred within the United States, and/or by supplying in or from the United States components constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the ’500 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, where such components are uncombined in whole or in part, knowing that such components are so made or adapted and intending that such components will be combined outside of the United States in a manner that would infringe at least claim 1 of the ’500 patent if such combination occurred within the United States. Such components include at least all Lego Dimensions Starter Packs, Lego Dimensions Story Packs, Lego Dimensions Level Packs, Lego Dimensions Team Packs, and Lego Dimensions Fun Packs.

174. On information and belief, Warner Bros. has also indirectly infringed and continues to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’500 patent under 35 U.S.C. § 271(b) by advertising and promoting the Accused Products

and directing its website visitors to purchase the Accused Products from third-party retailers such as Amazon and GameStop via direct hyperlinks provided by Warner Bros. and/or by inducing such third-party retailers to sell and offer for sale the Accused Products in direct infringement (literally and/or under the doctrine of equivalents) of at least claim 1 of the ’500 patent, and with specific intent to cause or encourage such infringement.

175. Defendants have been on notice of the ’500 patent since at least as early as the service of this Complaint. Moreover, LEGO has been on notice of the ’500 patent since at least as early as July 19, 2016 when MQ Gaming notified LEGO it was infringing at least claims 1-2, 4, 6-8, 9-14, 15-16 and 18-20 of the ’500 patent. Warner Bros. has been on notice the ’500 patent since at least as early as October 6, 2017 when MQ Gaming notified Warner Bros. it was infringing at least claims 1-2, 4, 6-8, 9-14, 15-16 and 18-20 of the ’500 patent. Defendants’ continued actions of making, using, selling, offering for sale, and/or importing into the United States any of the Accused Products, is with Defendants’ knowledge of the ’500 patent, knowledge of infringement of the ’500 patent, intent to encourage others (e.g., consumers and third-party retailers) to infringe the ’500 patent through the Accused Products and knowledge that Defendants’ encouraging acts actually result in direct infringement of at least claim 1 of the ’500 patent.

176. Defendants’ acts of direct and indirect infringement of at least claim 1 of the ’500 patent have caused damage to Plaintiffs, and Plaintiffs are entitled to recover damages in an amount subject to proof at trial.

177. On information and belief, Defendants’ direct and indirect infringement was deliberate and in willful disregard of Plaintiffs’ intellectual property rights as provided for in the

’500 patent. During nearly three years of correspondence, Defendants have never once asserted or even suggested that any claim of the ’500 patent is invalid, and Defendants have never articulated a non-infringement position that has any support under prevailing principles of patent law. On information and belief, Warner Bros. has been aware of MQ Gaming’s infringement allegations by virtue of its commercial partnership with LEGO. Despite being aware of the ’500 patent, Warner Bros. continued to infringe, willfully, wantonly, and recklessly, as did LEGO.

178. The claims of the ’500 patent, including claim 1, are directed to technological improvements that are unique to the field of electronic gaming and have no pre-electronic-gaming precursor or counterpart. Combining a physical element such as a toy or figurine with a computer animated game using an RFID tag that is wirelessly powered by an RFID reader to exchange gaming and other information, including the provision of an RFID-tagged gaming toy comprising multiple modular components configured to be selectively and detachably assembled by a game participant to form a doll, action figure or object configured for use in a toys-to-life computer-animated game, has no counterpart in the pre-electronic gaming world. Thus, the claims of the ’500 patent are directed to concrete, physical combinations and technological improvements that have no pre-Internet or pre-electronic-gaming counterpart and were not routine, well-known, or conventional to persons skilled in the art at the time of the invention.

## COUNT X – INFRINGEMENT OF THE ’380 PATENT

179. By the acts alleged herein Defendants have directly infringed and continue to directly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’380 patent under 35 U.S.C. § 271(a).

180. Each of the Accused Products, including all Lego Dimensions Starter Packs, Lego Dimensions Story Packs, Lego Dimensions Level Packs, Lego Dimensions Team Packs, and Lego Dimensions Fun Packs, includes at least one "wireless game token for enabling a game participant to securely access one or more restricted portions or features of a game played on a compatible gaming device, said wireless game token comprising a passive radio frequency identification (RFID) tag." For example, the LEGO Dimensions Starter Pack includes at least four RFID game tokens (Toy Tags) that unlock corresponding virtual characters or objects in the Lego Dimensions game. These virtual characters or objects (including their special in-game abilities) cannot be accessed without a corresponding Toy Tag; thus, they are "restricted portions or features" of the Lego Dimensions game (see screenshots below).







On information and belief, each Toy Tag incorporates a passive MIFARE NTAG213 RFID tag. Other LEGO Dimensions Toy Tags are sold in separate expansion packs (Story Packs, Fun Packs, Level Packs, Team Packs), and game participants are encouraged to purchase and use these additional Toy Tags to unlock additional portions or features of the Lego Dimensions game.

181. Each MIFARE NTAG213 RFID tag includes "an antenna configured to be energized by an RFID reader associated with a computerized gaming device comprising a personal computer, home game console or portable gaming device." For example, the NTAG213 RFID tag includes a flat spiral-wound antenna that is configured to be wirelessly energized by an RFID reader associated with a home game console (e.g., the Lego Dimensions Toy Pad connected to a WiiU, PS4 or Xbox game console).

182. Each MIFARE NTAG213 RFID tag has an integrated circuit chip (NTAG213 tag IC) that includes "a radio frequency (RF) transceiver electrically coupled to said antenna and configured to provide short-range two-way wireless communications with said RFID reader over a limited communication range of less than 60 cm and wherein said short-range two-way wireless communications are facilitated at least in part through inductive coupling between said antenna and said RFID reader." For example, the NTAG213 tag IC includes an RF transceiver configured to provide short-range two-way wireless communications with the Toy Pad over a limited communication range of less than 60 cm (e.g., when the Toy Tag is placed on the Toy Pad). The wireless communications are facilitated by inductive coupling between the tag antenna and the RFID reader antenna.

183. The NTAG213 tag IC also includes "non-volatile memory storing: (i) a unique identification number; and (ii) at least one access code that is encrypted using a key-based encryption algorithm with at least a first encryption key comprising said unique identification number; [and] wherein said at least one access code is configured to be decrypted using a key-based decryption algorithm with at least a second encryption key that is different than said first encryption key." For example, the NTAG213 tag IC includes non-volatile EEPROM memory organized in 4-byte pages. Pages 0 and 1 of the EEPROM memory store a 7-byte unique

identification number (tag UID) that uniquely identifies the RFID tag and its associated Toy Tag. Pages 36 and 37 store an encrypted 8-byte character ID that identifies a corresponding virtual character or object in the game. Page 43 stores an encrypted 4-byte password. The character ID and password (either or both of which comprise an "access code") are encrypted, and are configured to be decrypted, using a modified TEA encryption/decryption algorithm that uses at least two encryption keys: one public (the tag UID), and one private (a secret key used to generate a hash of the tag UID). The secret key is different than the tag UID.

184. The encrypted character ID and/or password are "configured, when decrypted and communicated to said computerized gaming device, to enable a game participant to access one or more portions or features of a game that would otherwise be inaccessible to said game participant." For example, when a Toy Tag is placed on the Toy Pad, the Toy Pad decrypts at least the stored character ID and communicates it to the associated game console running the Lego Dimensions game. This causes the game console to unlock additional Adventure Worlds and/or special abilities that would otherwise be inaccessible.

185. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the '380 patent under 35 U.S.C. § 271(b), (c) by selling, and/or offering for sale throughout the United States, and/or importing into the United States, components constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the '380 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, and by intentionally encouraging and instructing purchasers of such components to use them in a manner that directly infringes (literally and/or under the doctrine of equivalents) at least claim 1 of the '380 patent, and with specific intent to cause or

encourage such infringement. These components include at least all Lego Dimensions Starter Packs, Lego Dimensions Story Packs, Lego Dimensions Level Packs, Lego Dimensions Team Packs, and Lego Dimensions Fun Packs. Each Lego Dimensions Starter Pack includes a Toy Pad and associated game software that is especially made and adapted to be used with the Lego Dimensions game tokens (Toy Tags) and have substantially no other non-infringing uses. Each of the other Accused Products includes at least one RFID-tagged minifigure and/or associated Toy Tag especially made and adapted to be used with each Lego Dimensions Starter Pack to access additional Adventure Worlds and special character abilities in the game.

186. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’380 patent under 35 U.S.C. § 271(b), (c) by selling, and/or offering for sale throughout the United States, and/or importing into the United States, unassembled Lego minifigures and Toy Tags constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the ’380 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, and by intentionally encouraging and instructing purchasers of such components to assemble and use them in a manner that directly infringes (literally and/or under the doctrine of equivalents) at least claim 1 of the ’380 patent, and with specific intent to cause or encourage such infringement.

187. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’380 patent under 35 U.S.C. § 271(f) by supplying in or from the United States all or a substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such

components outside of the United States in a manner that would infringe at least claim 1 of the ’380 patent if such combination occurred within the United States, and/or by supplying in or from the United States components constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the ’380 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, where such components are uncombined in whole or in part, knowing that such components are so made or adapted and intending that such components will be combined outside of the United States in a manner that would infringe at least claim 1 of the ’380 patent if such combination occurred within the United States. Such components include at least all Lego Dimensions Starter Packs, Lego Dimensions Story Packs, Lego Dimensions Level Packs, Lego Dimensions Team Packs, and Lego Dimensions Fun Packs.

188. On information and belief, Warner Bros. has also indirectly infringed and continues to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’380 patent under 35 U.S.C. § 271(b) by advertising and promoting the Accused Products and directing its website visitors to purchase the Accused Products from third-party retailers such as Amazon and GameStop via direct hyperlinks provided by Warner Bros. and/or by inducing such third-party retailers to sell and offer for sale the Accused Products in direct infringement (literally and/or under the doctrine of equivalents) of at least claim 1 of the ’380 patent, and with specific intent to cause or encourage such infringement.

189. Defendants have been on notice of the ’380 patent since at least as early as the service of this Complaint. Moreover, LEGO has been on notice of the ’380 patent since at least as early as July 11, 2017 when MQ Gaming notified LEGO it was infringing at least claims 1 and 5-7 of the ’380 patent. Warner Bros. has been on notice the ’380 patent since at least as early

as October 6, 2017 when MQ Gaming notified Warner Bros. it was infringing at least claims 1 and 5-7 of the ’380 patent. Defendants’ continued actions of making, using, selling, offering for sale, and/or importing into the United States any of the Accused Products, is with Defendants’ knowledge of the ’380 patent, knowledge of infringement of the ’380 patent, intent to encourage others (e.g., consumers and third-party retailers) to infringe the ’380 patent through the Accused Products and knowledge that Defendants’ encouraging acts actually result in direct infringement of at least claim 1 of the ’380 patent.

190. Defendants’ acts of direct and indirect infringement of at least claim 1 of the ’380 patent have caused damage to Plaintiffs, and Plaintiffs are entitled to recover damages in an amount subject to proof at trial.

191. On information and belief, Defendants’ direct and indirect infringement was deliberate and in willful disregard of Plaintiffs’ intellectual property rights as provided for in the ’380 patent. During nearly two years of correspondence, Defendants have never once asserted or even suggested that any claim of the’380 patent is invalid, and Defendants have never articulated a non-infringement position that has any support under prevailing principles of patent law. On information and belief, Warner Bros. has been aware of MQ Gaming’s infringement allegations by virtue of its commercial partnership with LEGO. Despite being aware of the ’380 patent, Warner Bros. continued to infringe, willfully, wantonly, and recklessly, as did LEGO.

192. The claims of the ’380 patent, including claim 1, are directed to technological improvements that are unique to the field of electronic gaming and have no pre-electronic-gaming precursor or counterpart. Combining a physical element such as a toy or figurine with a computer animated game using an RFID tag that is wirelessly energized by an RFID reader to

exchange gaming and other information, including the provision of an encrypted access code and an encryption key stored on a physical toy to unlock corresponding portions of a virtual game displayed on an associated game console, has no counterpart in the pre-electronic gaming world. Thus, the claims of the ’380 patent are directed to concrete, physical combinations and technological improvements that have no pre-Internet or pre-electronic-gaming counterpart and were not routine, well-known, or conventional to persons skilled in the art at the time of the invention.

**COUNT XI – INFRINGEMENT OF THE ’334 PATENT**

193. By the acts alleged herein Defendants have directly infringed and continue to directly infringe (literally and/or under the doctrine of equivalents) at least claim 8 of the ’334 patent under 35 U.S.C. § 271(a).

194. Each of the Accused Products, including all Lego Dimensions Starter Packs, Lego Dimensions Story Packs, Lego Dimensions Level Packs, Lego Dimensions Team Packs, and Lego Dimensions Fun Packs, includes at least one “combination toy and gaming device that provides a game participant access to one or more portions or features of a computer-animated game played on a compatible game console.” For example, the LEGO Dimensions Starter Pack includes at least three minifigure gaming toys configured to be used in the Lego Dimensions game as a central element of a toys-to-life game played on a home game console. Among other things, each toy allows a game participant to access additional “Adventure Worlds” in the game (e.g., DC Comics Adventure World and The Lego Movie Adventure World). Each toy also allows a game participant to access special in-game abilities (e.g., Batman's Grapple, Boomerang and Stealth abilities, and Wyldstyle’s Relic Detector, Acrobat and Master Build abilities) to help “crack puzzles” and “overpower enemies” in the game. Other LEGO Dimensions gaming toys

are sold in separate expansion packs (e.g., Story Packs, Fun Packs, Level Packs, Team Packs), and game participants are encouraged to purchase and use these additional gaming toys to access additional portions and features of the game.

195. Each Lego Dimensions gaming toy comprises "a wireless-enabled toy representing a playable character in said computer-animated game and comprising a wirelessly-powered radio-frequency identification (RFID) tag configured to wirelessly communicate with one or more compatible RFID tag readers communicatively associated with said compatible game console, said RFID tag comprising non-volatile memory configured to store game-relevant information associated with said wireless-enabled toy." For example, each Lego Dimensions gaming toy represents a playable character in the LEGO Dimensions game (Batman, Gandalf, Wyldstyle). On information and belief, each toy incorporates a passive (i.e., wirelessly-powered) MIFARE NTAG213 RFID tag configured to wirelessly communicate with an associated RFID tag reader (e.g., the Lego Dimensions Toy Pad). The NTAG213 RFID tag includes non-volatile EEPROM memory configured to store certain information that determines how each gaming toy interacts with the LEGO Dimensions game. Note that each Toy Tag alone also literally meets this claim limitation because each Toy Tag is a "wireless-enabled toy" that represents a playable character in the game. Alternatively, each unassembled gaming toy meets this limitation, either literally and/or under the doctrine of equivalents, because game participants are not required to assemble the toy to access and play the game and because an unassembled toy performs the same function in the same way to achieve the same result as the assembled toy.

196. The EEPROM memory of each NTAG213 RFID tag stores "a first selection of game-relevant information stored in said non-volatile memory comprising unique information associated with said wireless-enabled toy." For example, pages 0 and 1 of the EEPROM memory

store a first selection of information comprising a 7-byte unique identification number (tag UID) that comprises unique information associated with each Toy Tag. The tag UID is used in the Lego Dimensions game to uniquely identify and track individual Toy Tags.

197. The EEPROM memory of each NTAG213 RFID tag also stores “a second selection of game-relevant information stored in said non-volatile memory comprising one or more attributes of said playable character.” For example, pages 36-37 of the EEPROM memory store a second selection of information comprising coded data identifying a playable character represented by the associated Toy Tag (e.g., 01=Batman, 02=Gandalf, 03=Wyldstyle).

198. The EEPROM memory of each NTAG213 RFID tag also stores “a third selection of game-relevant information stored in said non-volatile memory comprising encrypted information that can be decrypted or authenticated using an encryption key, and where at least a portion of said encryption key comprises said unique information associated with said wireless-enabled toy.” For example, page 43 of the EEPROM memory stores an encrypted 4-byte password that is used in the Lego Dimensions game to authenticate each Toy Tag. The password is configured to be decrypted and/or authenticated using a modified TEA encryption algorithm and an encryption key comprising a hash of the tag UID.

199. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 8 of the ’334 patent under 35 U.S.C. § 271(b), (c) by selling, and/or offering for sale throughout the United States, and/or importing into the United States, components constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the ’334 patent, and not a staple article or commodity of commerce suitable for

substantial non-infringing uses, and by intentionally encouraging and instructing purchasers of such components to use them in a manner that directly infringes (literally and/or under the doctrine of equivalents) at least claim 8 of the ’334 patent, and with specific intent to cause or encourage such infringement. These components include at least all Lego Dimensions Starter Packs, Lego Dimensions Story Packs, Lego Dimensions Level Packs, Lego Dimensions Team Packs, and Lego Dimensions Fun Packs. Each Lego Dimensions Starter Pack includes a Toy Pad and associated game software that is especially made and adapted to be used with the Lego Dimensions gaming toys and have substantially no other non-infringing uses. Each of the other Accused Products includes at least one RFID-tagged minifigure and/or associated Toy Tag especially made and adapted to be used with each Lego Dimensions Starter Pack to access additional Adventure Worlds and special character abilities in the game.

200. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 8 of the ’334 patent under 35 U.S.C. § 271(b), (c) by selling, and/or offering for sale throughout the United States, and/or importing into the United States, unassembled Lego minifigures and Toy Tags constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the ’334 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, and by intentionally encouraging and instructing purchasers of such components to assemble and use them in a manner that directly infringes (literally and/or under the doctrine of equivalents) at least claim 8 of the ’334 patent, and with specific intent to cause or encourage such infringement.

201. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 8 of the

’334 patent under 35 U.S.C. § 271(f) by supplying in or from the United States all or a substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe at least claim 8 of the ’334 patent if such combination occurred within the United States, and/or by supplying in or from the United States components constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the ’334 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, where such components are uncombined in whole or in part, knowing that such components are so made or adapted and intending that such components will be combined outside of the United States in a manner that would infringe at least claim 8 of the ’334 patent if such combination occurred within the United States. Such components include at least all Lego Dimensions Starter Packs, Lego Dimensions Story Packs, Lego Dimensions Level Packs, Lego Dimensions Team Packs, and Lego Dimensions Fun Packs.

202. On information and belief, Warner Bros. has also indirectly infringed and continues to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 8 of the ’334 patent under 35 U.S.C. § 271(b) by advertising and promoting the Accused Products and directing its website visitors to purchase the Accused Products from third-party retailers such as Amazon and GameStop via direct hyperlinks provided by Warner Bros. and/or by inducing such third-party retailers to sell and offer for sale the Accused Products in direct infringement (literally and/or under the doctrine of equivalents) of at least claim 8 of the ’334 patent, and with specific intent to cause or encourage such infringement.

203. Defendants have been on notice of the ’334 patent since at least as early as the service of this Complaint. Moreover, LEGO has been on notice of the ’334 patent since at least as early as July 11, 2017 when MQ Gaming notified LEGO it was infringing at least claims 8-12 of the ’334 patent. Warner Bros. has been on notice the ’334 patent since at least as early as October 6, 2017 when MQ Gaming notified Warner Bros. it was infringing at least claims 8-12 of the ’334 patent. Defendants’ continued actions of making, using, selling, offering for sale, and/or importing into the United States any of the Accused Products, is with Defendants’ knowledge of the ’334 patent, knowledge of infringement of the ’334 patent, intent to encourage others (e.g., consumers and third-party retailers) to infringe the ’334 patent through the Accused Products and knowledge that Defendants’ encouraging acts actually result in direct infringement of at least claim 8 of the ’334 patent.

204. Defendants’ acts of direct and indirect infringement of at least claim 8 of the ’334 patent have caused damage to Plaintiffs, and Plaintiffs are entitled to recover damages in an amount subject to proof at trial.

205. On information and belief, Defendants’ direct and indirect infringement was deliberate and in willful disregard of Plaintiffs’ intellectual property rights as provided for in the ’334 patent. During nearly two years of correspondence, Defendants have never once asserted or even suggested that any claim of the ’334 patent is invalid, and Defendants have never articulated a non-infringement position that has any support under prevailing principles of patent law. On information and belief, Warner Bros. has been aware of MQ Gaming’s infringement allegations by virtue of its commercial partnership with LEGO. Despite being aware of the ’334 patent, Warner Bros. continued to infringe, willfully, wantonly, and recklessly, as did LEGO.

206. The claims of the ’334 patent, including claim 8, are directed to technological improvements that are unique to the field of electronic gaming and have no pre-electronic-gaming precursor or counterpart. Combining a physical element such as a toy or figurine with a computer animated game using an RFID tag that is wirelessly read by an RFID reader to exchange gaming and other information, including the provision of an encrypted password configured to be decrypted or authenticated using an encryption key comprising unique information stored on a physical toy to unlock corresponding portions of a virtual game displayed on an associated game console, has no counterpart in the pre-electronic gaming world. Thus, the claims of the ’334 patent are directed to concrete, physical combinations and technological improvements that have no pre-Internet or pre-electronic-gaming counterpart and were not routine, well-known, or conventional to persons skilled in the art at the time of the invention.

## COUNT XII – INFRINGEMENT OF THE ’797 PATENT

207. By the acts alleged herein Defendants have directly infringed and continue to directly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’797 patent under 35 U.S.C. § 271(a).

208. The Accused Products, such as all Lego Dimensions Starter Packs comprise “[a] gaming system for playing a game wherein a game participant uses physical toys to interact with a computer-animated game played on a compatible game console.” For example, each Lego Dimensions Starter Pack is a toys-to-life gaming system in which game participants use physical toys to interact with a computer-animated game played on a game console.

209. Each Lego Dimensions Starter Pack includes “a plurality of gaming toys each depicting or representing a different character or object in said computer-animated game, each said gaming toy comprising a body having an internal cavity and a passive radiofrequency identification (RFID) tag disposed therein.” For example, each Lego Dimensions Starter Pack includes three minifigure gaming toys (below left) representing different characters in the Lego Dimensions game (Gandalf, Wyldstyle, Batman), and one vehicle gaming toy (below right) representing an object in the game (the Batmobile).





The base (Toy Tag) of each toy comprises a molded plastic body having upper and lower halves forming an internal cavity. On information and belief, a passive MIFARE NTAG213 RFID tag is disposed within that cavity. Note that the Toy Tags alone also literally meet this claim limitation because the Toy Tags are “gaming toys” that depict or represent different characters or objects in the game. Alternatively, each unassembled gaming toy meets this limitation, either literally and/or under the doctrine of equivalents, because game participants are not required to assemble the toy to access and play the game and because an unassembled toy performs the same function in the same way to achieve the same result as the assembled toy.

210. Each NTAG213 RFID tag comprises "(i) a unique tag identification (ID), and (ii) non-volatile memory storing machine-readable data identifying or describing one or more in-game attributes of said corresponding character or object." For example, each NTAG213 RFID tag has a 7-byte unique identification number (tag UID), and non-volatile EEPROM memory storing machine-readable data organized in 36 pages (pages 4-39) with 4 bytes per page. Pages 36 and 37 of the EEPROM memory store machine-readable data identifying the corresponding in-game character or object (e.g., 01=Batman, 02=Gandalf, 03=Wyldstyle, 1006=Batmobile). Page 39 of the EEPROM memory stores machine-readable data identifying or describing the character/object type (e.g., 00=character, 01=object). Page 38 of the EEPROM memory stores machine-readable data identifying or describing earned vehicle/gadget upgrades.

211. Each Lego Dimensions Starter Pack includes "a peripheral device comprising: (i) an RFID reader comprising memory storing instructions to communicate information with each said RFID tag over a limited communication range of less than 60 cm." For example, each Lego Dimensions Starter Pack includes a Toy Pad comprising, on information and belief, a MIFARE MFRC630 RFID reader with memory storing instructions that enable the reader to wirelessly communicate information with each NTAG213 RFID tag over a limited communication range of less than 60 cm (e.g., when the Toy Tag is placed on the Toy Pad).

212. Each Lego Dimensions Toy Pad also includes "(ii) a communication interface comprising memory storing instructions to communicate information to and from said game console." For example, each Lego Dimensions Toy Pad includes a USB interface with memory storing instructions that enable the Toy Pad to communicate information to and from a home game console via a connected USB cable.

213. Each Lego Dimensions Toy Pad also includes “(iii) an effects controller comprising memory storing instructions to display one or more sound effects or lighting effects.” For example, each Lego Dimensions Toy Pad includes an effects controller with memory storing instructions that enable the Toy Pad to light up, flash and change colors.

214. Each Lego Dimensions Starter Pack includes “non-transitory storage storing game software comprising program instructions configured to be executed by said game console to: (i) cause said peripheral device to wirelessly ascertain said machine-readable data from each said RFID tag and communicate said machine-readable data to said game console.” For example, the Lego Dimensions Starter Pack includes a videogame disk storing game software comprising program instructions configured to be executed by the associated game console. The game software includes program instructions that cause the Toy Pad (RFID reader) to wirelessly ascertain the machine-readable data stored in the EEPROM memory of each RFID tag (e.g., coded information identifying the corresponding in-game character or object, character/object type, and earned upgrades) and to communicate the machine-readable data to the game console via the USB interface and connected USB cable.

215. The game software also includes program instructions configured to be executed by said game console to: “(ii) display in said computer-animated game one or more characters or objects having attributes corresponding to said machine-readable data.” For example, when the Gandalf and Wyldstyle toys are placed on the Toy Pad (below left), the game console displays in the computer-animated game (below right) virtual characters having attributes corresponding to the machine-readable data stored on each corresponding Toy Tag.




Similarly, when the Batmobile toy is placed on the Toy Pad (below left), the game console displays in the computer-animated game (below right) a Batmobile vehicle having attributes corresponding to the machine-readable data stored in the Batmobile Toy Tag.







216. The game software also includes program instructions configured to be executed by said game console to "(iii) cause said effects controller to display at least one sound effect or lighting effect and wherein said at least one sound effect or lighting effect is selected based at least in part on said machine-readable data." For example, in the "Chroma" mode a game participant can place the Gandalf Toy Tag at a particular physical location on the Toy Pad and

then move the corresponding in-game character to a particular virtual location in the computer-animated game to select a desired color (see below).




The Toy Pad exchanges wireless communications with the Gandalf Toy Tag to determine its identity and physical location on the Toy Pad. Based on this information (which includes some or all of the machine-readable data stored on the Gandalf Toy Tag) the game console then instructs the Toy Pad to change the color of the Toy Pad at that location to match the color selected by the corresponding virtual character in the computer-animated game. Thus, the lighting effect is selected based at least in part on the machine-readable data.

217. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’797 patent under 35 U.S.C. § 271(b), (c) by selling, and/or offering for sale throughout the United States, and/or importing into the United States, components constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the ’797 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, and by intentionally encouraging and instructing purchasers of such components to use them in a manner that directly infringes (literally and/or under the

doctrine of equivalents) at least claim 1 of the ’797 patent, and with specific intent to cause or encourage such infringement. These components include at least all Lego Dimensions Story Packs, Lego Dimensions Level Packs, Lego Dimensions Team Packs, and Lego Dimensions Fun Packs. Each of these Accused Products includes at least one RFID-tagged minifigure and/or associated Toy Tag especially made and adapted to be used with each Lego Dimensions Starter Pack to access additional Adventure Worlds and special character abilities in the game.

218. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’797 patent under 35 U.S.C. § 271(b), (c) by selling, and/or offering for sale throughout the United States, and/or importing into the United States, unassembled Lego minifigures and Toy Tags constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the ’797 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, and by intentionally encouraging and instructing purchasers of such components to assemble and use them in a manner that directly infringes (literally and/or under the doctrine of equivalents) at least claim 1 of the ’797 patent, and with specific intent to cause or encourage such infringement.

219. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’797 patent under 35 U.S.C. § 271(f) by supplying in or from the United States all or a substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe at least claim 1 of the ’797 patent if such combination occurred within the United States, and/or by supplying in or

from the United States components constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the ’797 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, where such components are uncombined in whole or in part, knowing that such components are so made or adapted and intending that such components will be combined outside of the United States in a manner that would infringe at least claim 1 of the ’797 patent if such combination occurred within the United States. Such components include at least all Lego Dimensions Starter Packs, Lego Dimensions Story Packs, Lego Dimensions Level Packs, Lego Dimensions Team Packs, and Lego Dimensions Fun Packs.

220. On information and belief, Warner Bros. has also indirectly infringed and continues to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’797 patent under 35 U.S.C. § 271(b) by advertising and promoting the Accused Products and directing its website visitors to purchase the Accused Products from third-party retailers such as Amazon and GameStop via direct hyperlinks provided by Warner Bros. and/or by inducing such third-party retailers to sell and offer for sale the Accused Products in direct infringement (literally and/or under the doctrine of equivalents) of at least claim 1 of the ’797 patent, and with specific intent to cause or encourage such infringement.

221. Defendants have been on notice of the ’797 patent since at least as early as the service of this Complaint. Moreover, LEGO has been on notice of the ’797 patent since at least as early as September 7, 2017 when MQ Gaming notified LEGO it was infringing at least claims 1-6, 8-12, and 14 of the ’797 patent. Warner Bros. has been on notice the ’797 patent since at least as early as October 6, 2017 when MQ Gaming notified Warner Bros. it was infringing at least claims 1-6, 8-12, and 14 of the ’797 patent. Defendants’ continued actions of making,

using, selling, offering for sale, and/or importing into the United States any of the Accused Products, is with Defendants' knowledge of the '797 patent, knowledge of infringement of the '797 patent, intent to encourage others (e.g., consumers and third-party retailers) to infringe the '797 patent through the Accused Products and knowledge that Defendants' encouraging acts actually result in direct infringement of at least claim 1 of the '797 patent.

222. Defendants' acts of direct and indirect infringement of at least claim 1 of the '797 patent have caused damage to Plaintiffs, and Plaintiffs are entitled to recover damages in an amount subject to proof at trial.

223. On information and belief, Defendants' direct and indirect infringement was deliberate and in willful disregard of Plaintiffs' intellectual property rights as provided for in the '797 patent. During more than a year of correspondence, Defendants have never once asserted or even suggested that any claim of the '797 patent is invalid, and Defendants have never articulated a non-infringement position that has any support under prevailing principles of patent law. On information and belief, Warner Bros. has been aware of MQ Gaming's infringement allegations by virtue of its commercial partnership with LEGO. Despite being aware of the '797 patent, Warner Bros. continued to infringe, willfully, wantonly, and recklessly, as did LEGO.

224. The claims of the '797 patent, including claim 1, are directed to technological improvements that are unique to the field of electronic gaming and have no pre-electronic-gaming precursor or counterpart. Combining a physical element such as a toy or figurine with a computer animated game using an RFID tag that is wirelessly read by an RFID reader to exchange gaming and other information, including the provision of program instructions for displaying computer-animated characters or objects in a virtual play environment and sound or

lighting effects in a physical play environment based on machine-readable data stored on a physical toy, has no counterpart in the pre-electronic gaming world. Thus, the claims of the '797 patent are directed to concrete, physical combinations and technological improvements that have no pre-Internet or pre-electronic-gaming counterpart and were not routine, well-known, or conventional to persons skilled in the art at the time of the invention.

## COUNT XIII – INFRINGEMENT OF THE '652 PATENT

225. By the acts alleged herein Defendants have directly infringed and continue to directly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the '652 patent under 35 U.S.C. § 271(a).

226. The Accused Products, such as all Lego Dimensions Starter Packs comprise "[a] gaming system combining physical and virtual gameplay elements." For example, each Lego Dimensions Starter Pack is a gaming system for playing a toys-to-life game in which game participants use physical toys to interact with a computer-animated "virtual" game played on an associated game console.

227. Each Lego Dimensions Starter Pack includes "a first physical toy comprising a doll or action figure configured to enable a game participant to access a virtual game character in a computer-animated game played by said game participant on a compatible gaming platform, said first physical toy comprising a first radiofrequency identification (RFID) tag comprising non-volatile memory storing a first selection of information comprising machine-readable data identifying or describing said virtual game character." For example, each Lego Dimensions Starter Pack includes three LEGO minifigure toys (Gandalf, Wyldstyle, Batman), each of which

is a "doll" or "action figure" (below left) configured to enable a game participant to access a corresponding virtual game character in the Lego Dimensions game (below right).





On information and belief, the removable base (Toy Tag) of each minifigure incorporates a first MIFARE NTAG213 RFID tag, which includes non-volatile EEPROM memory organized in 36 pages (pages 4-39) with 4 bytes per page. Pages 36 and 37 of the EEPROM memory store a first selection of information comprising machine-readable data identifying the corresponding virtual game character (e.g., 01=Batman, 02=Gandalf, 03=Wyldstyle). Note that the minifigure need not be assembled with its corresponding Toy Tag to literally meet this claim limitation. For example, claim 5 (which depends from claim 1) makes clear the first physical toy may comprise "a plurality of modular components configured to be selectively and detachably assembled by said game participant to form said doll or action figure." Alternatively, each unassembled minifigure meets this limitation, either literally and/or under the doctrine of equivalents, because game participants are not required to assemble the minifigure to access and play the game and because an unassembled minifigure performs the same function in the same way to achieve the same result as the assembled minifigure.

228. Each Lego Dimensions Starter Pack includes "a second physical toy configured to be used in conjunction with said first physical toy to enable said game participant to access one

or more optional features of said computer-animated game, said second physical toy comprising a second RFID tag comprising programmable non-volatile memory configured to store a second selection of information comprising machine-readable data identifying or describing said one or more optional features." For example, each Lego Dimensions Starter Pack includes a Batmobile toy that is configured to be used in conjunction with one or more of the minifigure toys (e.g., Batman) to enable a game participant to access optional features of the Lego Dimensions game (e.g., Batman being able to drive the Batmobile vehicle in the game).



On information and belief, the Batmobile Toy Tag incorporates a second MIFARE NTAG213 RFID tag having non-volatile EEPROM memory. Pages 36-38 of the EEPROM memory store a second selection of information comprising machine-readable data identifying the corresponding virtual game object (e.g., 1006=Batmobile) and saved vehicle upgrades. Note that the Batmobile Toy Tag alone also literally meets this claim limitation because it is a "physical toy configured to be used in conjunction with said first physical toy." Alternatively, the unassembled Batmobile toy meets this limitation, either literally and/or under the doctrine of equivalents, because game participants are not required to assemble the toy to access and play the game and because an unassembled toy performs the same function in the same way to achieve the same result as the assembled toy.

229. Each Lego Dimensions Starter Pack includes "an RFID reader configured to: i) wirelessly communicate with each of said first and second RFID tags over a limited wireless communication range of less than 60 cm; ii) ascertain said corresponding first and second selections of information, [and] iii) communicate said first and second selections of information to said compatible gaming platform." For example, each Lego Dimensions Starter Pack includes a Toy Pad comprising, on information and belief, a MIFARE MFRC630 RFID reader. The RFID reader is configured to wirelessly communicate with each NTAG213 RFID tag over a limited wireless communication range of less than 60 cm (e.g., when the corresponding Toy Tags are placed on the Toy Pad), to ascertain the first and second selections of information stored therein (e.g., the contents of memory pages 36-37 of the first NTAG213 RFID tag and the contents of memory pages 36-38 of the second NTAG213 RFID tag), and to communicate that information (e.g., via a USB interface) to a compatible gaming platform (e.g., a home game console running the Lego Dimensions game.)

230. The MIFARE MFRC630 RFID reader is also configured to "iv) change said second selection of information based on one or more objectives accomplished by said game participant in said computer-animated game." For example, the Batmobile toy sold with each Starter Pack is configured to be upgraded in the game. Upgrades are earned by accomplishing one or more game objectives (e.g., finding gold bricks or collecting LEGO "studs"). Once earned, game participants are given the option to "save upgrades to Toy Tag" which causes the RFID reader to change the vehicle upgrade information stored in the EEPROM memory of the Batmobile Toy Tag (e.g., at page 38).

231. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the

’652 patent under 35 U.S.C. § 271(b), (c) by selling, and/or offering for sale throughout the United States, and/or importing into the United States, components constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the ’652 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, and by intentionally encouraging and instructing purchasers of such components to use them in a manner that directly infringes (literally and/or under the doctrine of equivalents) at least claim 1 of the ’652 patent, and with specific intent to cause or encourage such infringement. These components include at least all Lego Dimensions Story Packs, Lego Dimensions Level Packs, Lego Dimensions Team Packs, and Lego Dimensions Fun Packs. Each of these Accused Products includes at least one RFID-tagged minifigure and/or associated Toy Tag especially made and adapted to be used with each Lego Dimensions Starter Pack to access additional Adventure Worlds and special character abilities in the game.

232. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’652 patent under 35 U.S.C. § 271(b), (c) by selling, and/or offering for sale throughout the United States, and/or importing into the United States, unassembled Lego minifigures and Toy Tags constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the ’652 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, and by intentionally encouraging and instructing purchasers of such components to assemble and use them in a manner that directly infringes (literally and/or under the doctrine of equivalents) at least claim 1 of the ’652 patent, and with specific intent to cause or encourage such infringement.

233. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’652 patent under 35 U.S.C. § 271(f) by supplying in or from the United States all or a substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe at least claim 1 of the ’652 patent if such combination occurred within the United States, and/or by supplying in or from the United States components constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the ’652 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, where such components are uncombined in whole or in part, knowing that such components are so made or adapted and intending that such components will be combined outside of the United States in a manner that would infringe at least claim 1 of the ’652 patent if such combination occurred within the United States. Such components include at least all Lego Dimensions Starter Packs, Lego Dimensions Story Packs, Lego Dimensions Level Packs, Lego Dimensions Team Packs, and Lego Dimensions Fun Packs.

234. On information and belief, Warner Bros. has also indirectly infringed and continues to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’652 patent under 35 U.S.C. § 271(b) by advertising and promoting the Accused Products and directing its website visitors to purchase the Accused Products from third-party retailers such as Amazon and GameStop via direct hyperlinks provided by Warner Bros. and/or by inducing such third-party retailers to sell and offer for sale the Accused Products in direct infringement

(literally and/or under the doctrine of equivalents) of at least claim 1 of the ’652 patent, and with specific intent to cause or encourage such infringement.

235. Defendants have been on notice of the ’652 patent since at least as early as the service of this Complaint. Moreover, LEGO has been on notice of the ’652 patent since at least as early as September 29, 2017 when MQ Gaming notified LEGO it was infringing at least claims 1-3, 5-16, 18 and 20 of the ’652 patent. Warner Bros. has been on notice the ’652 patent since at least as early as October 6, 2017 when MQ Gaming notified Warner Bros. it was infringing at least claims 1-3, 5-16, 18 and 20 of the ’652 patent. Defendants’ continued actions of making, using, selling, offering for sale, and/or importing into the United States any of the Accused Products, is with Defendants’ knowledge of the ’652 patent, knowledge of infringement of the ’652 patent, intent to encourage others (e.g., consumers and third-party retailers) to infringe the ’652 patent through the Accused Products and knowledge that Defendants’ encouraging acts actually result in direct infringement of at least claim 1 of the ’652 patent.

236. Defendants’ acts of direct and indirect infringement of at least claim 1 of the ’652 patent have caused damage to Plaintiffs, and Plaintiffs are entitled to recover damages in an amount subject to proof at trial.

237. On information and belief, Defendants’ direct and indirect infringement was deliberate and in willful disregard of Plaintiffs’ intellectual property rights as provided for in the ’652 patent. During more than a year of correspondence, Defendants have never once asserted or even suggested that any claim of the ’652 patent is invalid, and Defendants have never articulated a non-infringement position that has any support under prevailing principles of patent law. On information and belief, Warner Bros. has been aware of MQ Gaming’s infringement

allegations by virtue of its commercial partnership with LEGO. Despite being aware of the ’652 patent, Warner Bros. continued to infringe, willfully, wantonly, and recklessly, as did LEGO.

238. The claims of the ’652 patent, including claim 1, are directed to technological improvements that are unique to the field of electronic gaming and have no pre-electronic-gaming precursor or counterpart. Combining a physical element such as a toy or figurine with a computer animated game using an RFID tag that is wirelessly read by an RFID reader to exchange gaming and other information, including the provision of multiple RFID-tagged toys in combination to access optional game features and to save earned upgrades on physical toys, has no counterpart in the pre-electronic gaming world. For example, in the Notice of Allowability the examiner noted “[t]he closest prior art of US 2004/0259465 to Wright et al lacks at least the feature of the RFID-enabled dolls or action figures being configured to enable a game participant to access a virtual game character in a computer-animated game played by said game participant on a compatible gaming platform.” Thus, the claims of the ’652 patent are directed to concrete, physical combinations and technological improvements that have no pre-Internet or pre-electronic-gaming counterpart and were not routine, well-known, or conventional to persons skilled in the art at the time of the invention.

## COUNT XIV – INFRINGEMENT OF THE ’724 PATENT

239. By the acts alleged herein Defendants have directly infringed and continue to directly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’724 patent under 35 U.S.C. § 271(a).

240. Each of the Accused Products, including all Lego Dimensions Starter Packs, Lego Dimensions Story Packs, Lego Dimensions Level Packs, Lego Dimensions Team Packs, and

Lego Dimensions Fun Packs, includes at least one "gaming toy for playing a game having both physical and virtual gameplay elements." For example, the LEGO Dimensions Starter Pack includes at least four gaming toys—three Lego minifigures and one vehicle toy. Each gaming toy is configured to be used in the Lego Dimensions game as a central element of a toys-to-life game in which game participants use physical toys to interact with a computer-animated "virtual" game played on an associated game console. Other LEGO Dimensions gaming toys are sold in separate expansion packs (e.g., Story Packs, Fun Packs, Level Packs, Team Packs), and game participants are encouraged to purchase and use them to access additional portions and features of the game.

241. Each Lego Dimensions gaming toy includes "a plurality of interchangeable modular components configured to be selectively and detachably assembled by a game participant to form a physical object corresponding to a virtual object in a computer-animated game played by said game participant on a compatible gaming platform." For example, each Lego Dimensions gaming toy comprises multiple modular components (e.g., LEGO blocks) configured to be assembled by a game participant to form a physical object (e.g., a minifigure, vehicle or gadget) corresponding to a virtual object in the computer-animated game. Some Lego Dimensions toys, such as the Batmobile toy, are configured to be assembled into at least three different "builds" corresponding to different virtual objects in the game (see below).




242. Each Lego Dimensions gaming toy includes "a first at least one of said interchangeable modular components comprising a base component comprising a first attachment interface." For example, each Lego Dimensions toy includes a base component (Toy Tag) having a first attachment interface (e.g., male studs) for attaching other modular components. The Toy Tags for minifigures have male studs arranged in a 1x2 pattern, while the Toy Tags for vehicles and gadgets have male studs arranged in a 2x2 pattern (see below).




243. Each Lego Dimensions gaming toy includes "a second at least one of said interchangeable modular components comprising an auxiliary component comprising a second attachment interface configured to detachably mate with said first attachment interface." For

example, each Lego Dimensions toy includes at least one auxiliary component having a second attachment interface (e.g., a pattern of 1x2 or 2x2 female openings configured to receive each corresponding pattern of male studs) for detachably mating with the corresponding Toy Tag. This includes at least the lower torso/legs for minifigures and the cylindrical riser/spacer for vehicles and gadgets (see below).




Note that the upper torso of each minifigure also literally meets this claim limitation because it includes a female attachment interface for detachably mating with the male interface of its corresponding Toy Tag (e.g., by omitting the lower torso/legs). Similarly, the Batmobile toy includes at least four other modular components (not shown) that literally meet this claim limitation because they each include a female attachment interface for detachably mating with the male interface of its corresponding Toy Tag (e.g., by omitting the riser/spacer).

244. Each Lego Dimensions Toy Tag includes a "passive RFID tag" (e.g., on information and belief, a MIFARE NTAG213 RFID tag).

245. The NTAG213 RFID tag has an integrated circuit chip (NTAG213 tag IC) that includes: "(i) a microprocessor, [and] (ii) non-volatile memory storing a first selection of information comprising a unique identifier." For example, the NTAG213 tag IC includes a

microprocessor (Digital Control Unit) that is electrically coupled to non-volatile EEPROM memory through an EEPROM interface. Pages 0 and 1 of the EEPROM memory store a first selection of information comprising a 7-byte unique identifier (tag UID).

246. The NTAG213 tag IC also includes "(iii) programmable non-volatile memory storing a second selection of information comprising data identifying or describing one or more in-game attributes of said corresponding virtual object." For example, the NTAG213 tag IC includes 144 bytes of programmable non-volatile EEPROM memory organized in 36 pages (pages 4-39) with 4 bytes per page. Pages 36-39 of the EEPROM memory store a second selection of information comprising coded data identifying or describing the toy type (character, vehicle or gadget), the corresponding in-game character, vehicle or gadget (e.g., 01=Batman, 02=Gandalf, 03=Wyldstyle, 1006=Batmobile) and saved vehicle/gadget upgrade information.

247. The NTAG213 tag IC also includes "(iv) a radiofrequency (RF) transceiver configured to provide two-way wireless communications with said compatible gaming platform over a limited wireless communication range of less than 60 centimeters." For example, the NTAG213 tag IC includes an RF transceiver configured to provide two-way wireless communications with a compatible gaming platform (e.g., a Lego Dimensions Toy Pad connected to a home gaming console) over a limited wireless communication range of less than 60 cm (e.g., when the Toy Tag is placed on the Toy Pad).

248. The NTAG213 RFID tag includes "(v) an inductance coil electrically coupled to said RF transceiver and configured to electrically power said RF transceiver when said inductance coil is exposed to an externally-generated electromagnetic field." For example, the NTAG213 RFID tag includes a flat spiral-wound inductance coil that is electrically coupled to

the NTAG213 tag IC (which includes the RF transceiver). The inductance coil is configured to be wirelessly energized when exposed to an externally-generated electromagnetic field (e.g., produced by the Lego Dimensions Toy Pad/RFID reader) to thereby electrically power the NTAG213 RFID tag (see below).




249. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’724 patent under 35 U.S.C. § 271(b), (c) by selling, and/or offering for sale throughout the United States, and/or importing into the United States, components constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the ’724 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, and by intentionally encouraging and instructing purchasers of such components to use them in a manner that directly infringes (literally and/or under the doctrine of equivalents) at least claim 1 of the ’724 patent, and with specific intent to cause or encourage such infringement. These components include at least all Lego Dimensions Starter Packs, Lego Dimensions Story Packs, Lego Dimensions Level Packs, Lego Dimensions Team Packs, and Lego Dimensions Fun Packs. Each Lego Dimensions Starter Pack includes a Toy Pad and associated game software that is especially made and adapted to be used with the Lego

Dimensions gaming toys and have substantially no other non-infringing uses. Each of the other Accused Products includes at least one RFID-tagged minifigure and/or associated Toy Tag especially made and adapted to be used with each Lego Dimensions Starter Pack to access additional Adventure Worlds and special character abilities in the game.

250. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’724 patent under 35 U.S.C. § 271(b), (c) by selling, and/or offering for sale throughout the United States, and/or importing into the United States, unassembled Lego minifigures and Toy Tags constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the ’724 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, and by intentionally encouraging and instructing purchasers of such components to assemble and use them in a manner that directly infringes (literally and/or under the doctrine of equivalents) at least claim 1 of the ’724 patent, and with specific intent to cause or encourage such infringement.

251. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’724 patent under 35 U.S.C. § 271(f) by supplying in or from the United States all or a substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe at least claim 1 of the ’724 patent if such combination occurred within the United States, and/or by supplying in or from the United States components constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the ’724 patent,

and not a staple article or commodity of commerce suitable for substantial non-infringing uses, where such components are uncombined in whole or in part, knowing that such components are so made or adapted and intending that such components will be combined outside of the United States in a manner that would infringe at least claim 1 of the ’724 patent if such combination occurred within the United States. Such components include at least all Lego Dimensions Starter Packs, Lego Dimensions Story Packs, Lego Dimensions Level Packs, Lego Dimensions Team Packs, and Lego Dimensions Fun Packs.

252. On information and belief, Warner Bros. has also indirectly infringed and continues to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’724 patent under 35 U.S.C. § 271(b) by advertising and promoting the Accused Products and directing its website visitors to purchase the Accused Products from third-party retailers such as Amazon and GameStop via direct hyperlinks provided by Warner Bros. and/or by inducing such third-party retailers to sell and offer for sale the Accused Products in direct infringement (literally and/or under the doctrine of equivalents) of at least claim 1 of the ’724 patent, and with specific intent to cause or encourage such infringement.

253. Defendants have been on notice of the ’724 patent since at least as early as the service of this Complaint. Moreover, LEGO has been on notice of the ’724 patent since at least as early as July 28, 2018 when MQ Gaming notified LEGO it was infringing at least claims 1, 3, 5-7, 8 and 10-13 of the ’724 patent. Warner Bros. has been on notice the ’724 patent since at least as early as July 27, 2018 when MQ Gaming notified Warner Bros. it was infringing at least claims 1, 3, 5-7, 8 and 10-13 of the ’724 patent. Defendants’ continued actions of making, using, selling, offering for sale, and/or importing into the United States any of the Accused Products, is with Defendants’ knowledge of the ’724 patent, knowledge of infringement of the ’724 patent,

intent to encourage others (e.g., consumers and third-party retailers) to infringe the ’724 patent through the Accused Products and knowledge that Defendants’ encouraging acts actually result in direct infringement of at least claim 1 of the ’724 patent.

254. Defendants’ acts of direct and indirect infringement of at least claim 1 of the ’724 patent have caused damage to Plaintiffs, and Plaintiffs are entitled to recover damages in an amount subject to proof at trial.

255. On information and belief, Defendants’ direct and indirect infringement was deliberate and in willful disregard of Plaintiffs’ intellectual property rights as provided for in the ’724 patent. Defendants have never once asserted or even suggested that any claim of the ’724 patent is invalid, and Defendants have never articulated a non-infringement position that has any support under prevailing principles of patent law. On information and belief, Warner Bros. has been aware of MQ Gaming’s infringement allegations by virtue of its commercial partnership with LEGO. Despite being aware of the ’724 patent, Warner Bros. continued to infringe, willfully, wantonly, and recklessly, as did LEGO.

256. The claims of the ’724 patent, including claim 1, are directed to technological improvements that are unique to the field of electronic gaming and have no pre-electronic-gaming precursor or counterpart. Combining a physical element such as a toy or figurine with a computer animated game using an RFID tag that is wirelessly powered by an RFID reader to exchange gaming and other information, including the provision of an RFID-tagged gaming toy comprising multiple modular components configured to be selectively and detachably assembled by a game participant to form a physical object corresponding to a virtual object in a computer-animated game, has no counterpart in the pre-electronic gaming world. Thus, the claims of the

’724 patent are directed to concrete, physical combinations and technological improvements that have no pre-Internet or pre-electronic-gaming counterpart and were not routine, well-known, or conventional to persons skilled in the art at the time of the invention.

**COUNT XV – INFRINGEMENT OF THE ’790 PATENT**

257. By the acts alleged herein Defendants have directly infringed and continue to directly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’790 patent under 35 U.S.C. § 271(a).

258. Each of the Accused Products, including all Lego Dimensions Starter Packs, Lego Dimensions Story Packs, Lego Dimensions Level Packs, Lego Dimensions Team Packs, and Lego Dimensions Fun Packs, includes at least one “physical gaming item for accessing selected features or portions of a virtual game carried out on one or more compatible gaming platforms.” For example, the LEGO Dimensions Starter Pack includes at least three physical gaming items (e.g., the Toy Tags associated with the Batman, Gandalf and Wyldstyle minifigures) (see below).




Each Toy Tag is configured to be used in the Lego Dimensions game as a central element of a toys-to-life game played on a compatible gaming platform (e.g., a Lego Dimensions Toy Pad

connected to a home game console). Other LEGO Dimensions Toy Tags are sold in separate expansion packs (e.g., Story Packs, Fun Packs, Level Packs, Team Packs), and game participants are encouraged to purchase and use them to access additional portions and features of the game.

259. Each Lego Dimensions Toy Tag comprises "a wirelessly-powered radio frequency (RF) transceiver that provides two-way wireless communications with a wireless-compatible reader device associated with said one or more compatible gaming platforms over a limited wireless communication range of less than 60 cm." For example, on information and belief, each Toy Tag includes a passive (i.e., wirelessly-powered) MIFARE NTAG213 RFID tag, which includes an integrated RF transceiver that provides two-way wireless communications with a wireless-compatible reader device (e.g., the Lego Dimensions Toy Pad) over a limited wireless communication range of less than 60 cm (e.g., when the Toy Tag is placed on the Toy Pad).

260. The NTAG213 RFID tag has "non-volatile memory storing a selection of information uniquely associated with said gaming item." For example, the NTAG213 RFID tag has non-volatile EEPROM memory storing (e.g., at pages 0 and 1) a selection of information comprising a 7-byte unique identification number (tag UID) that is uniquely associated with the RFID tag and its corresponding Toy Tag.

261. The EEPROM memory of each NTAG213 RFID tag also stores "at least one item of encrypted information that can be decrypted or authenticated using an encryption algorithm and at least one encryption key, and wherein said encrypted information, when decrypted or authenticated, enables a game participant to access one or more optional features or portions of a computer-animated game played on said one or more compatible gaming platforms." For

example, pages 36-37 of the EEPROM memory store information comprising a character ID identifying a playable character represented by the associated Toy Tag (e.g., 01=Batman, 02=Gandalf, 03=Wyldstyle). Page 43 of the EEPROM memory stores a 4-byte password. The character ID and password are each encrypted and can be decrypted or authenticated using an encryption algorithm and at least one encryption key. The encrypted information, once decrypted or authenticated, unlocks optional features or portions of the Lego Dimensions game that can then be accessed by a game participant. These include, for example, additional "Adventure Worlds" and special in-game character abilities.

262. "[S]aid at least one encryption key is uniquely associated with said gaming item and is ascertainable from information stored in said non-volatile memory." For example, the Lego Dimensions Toy Pad decrypts or authenticates the encrypted password and character ID using two encryption keys: one public (the tag UID), and one private (a secret key used to generate a hash of the tag UID). The tag UID is uniquely associated with the Toy Tag and is ascertainable from information stored in its EEPROM memory (e.g., at pages 0 and 1).

263. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the '790 patent under 35 U.S.C. § 271(b), (c) by selling, and/or offering for sale throughout the United States, and/or importing into the United States, components constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the '790 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, and by intentionally encouraging and instructing purchasers of such components to use them in a manner that directly infringes (literally and/or under the doctrine of equivalents) at least claim 1 of the '790 patent, and with specific intent to cause or

encourage such infringement. These components include at least all Lego Dimensions Starter Packs, Lego Dimensions Story Packs, Lego Dimensions Level Packs, Lego Dimensions Team Packs, and Lego Dimensions Fun Packs. Each Lego Dimensions Starter Pack includes a Toy Pad and associated game software that is especially made and adapted to be used with the Lego Dimensions Toy Tags and have substantially no other non-infringing uses. Each of the other Accused Products includes at least one RFID-tagged minifigure and/or associated Toy Tag especially made and adapted to be used with each Lego Dimensions Starter Pack to access additional Adventure Worlds and special character abilities in the game.

264. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’790 patent under 35 U.S.C. § 271(b), (c) by selling, and/or offering for sale throughout the United States, and/or importing into the United States, unassembled Lego minifigures and Toy Tags constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the ’790 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, and by intentionally encouraging and instructing purchasers of such components to assemble and use them in a manner that directly infringes (literally and/or under the doctrine of equivalents) at least claim 1 of the ’790 patent, and with specific intent to cause or encourage such infringement.

265. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’790 patent under 35 U.S.C. § 271(f) by supplying in or from the United States all or a substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such

components outside of the United States in a manner that would infringe at least claim 1 of the ’790 patent if such combination occurred within the United States, and/or by supplying in or from the United States components constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the ’790 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, where such components are uncombined in whole or in part, knowing that such components are so made or adapted and intending that such components will be combined outside of the United States in a manner that would infringe at least claim 1 of the ’790 patent if such combination occurred within the United States. Such components include at least all Lego Dimensions Starter Packs, Lego Dimensions Story Packs, Lego Dimensions Level Packs, Lego Dimensions Team Packs, and Lego Dimensions Fun Packs.

266. On information and belief, Warner Bros. has also indirectly infringed and continues to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’790 patent under 35 U.S.C. § 271(b) by advertising and promoting the Accused Products and directing its website visitors to purchase the Accused Products from third-party retailers such as Amazon and GameStop via direct hyperlinks provided by Warner Bros. and/or by inducing such third-party retailers to sell and offer for sale the Accused Products in direct infringement (literally and/or under the doctrine of equivalents) of at least claim 1 of the ’790 patent, and with specific intent to cause or encourage such infringement.

267. Defendants have been on notice of the ’790 patent since at least as early as the service of this Complaint. Moreover, LEGO has been on notice of the ’790 patent since at least as early as July 28, 2018 when MQ Gaming notified LEGO it was infringing at least claims 1-6, 7-8, 11-13, 14-16 and 18-20 of the ’790 patent. Warner Bros. has been on notice the ’790 patent

since at least as early as July 27, 2018 when MQ Gaming notified Warner Bros. it was infringing at least claims 1-6, 7-8, 11-13, 14-16 and 18-20 of the ’790 patent. Defendants’ continued actions of making, using, selling, offering for sale, and/or importing into the United States any of the Accused Products, is with Defendants’ knowledge of the ’790 patent, knowledge of infringement of the ’790 patent, intent to encourage others (e.g., consumers and third-party retailers) to infringe the ’790 patent through the Accused Products and knowledge that Defendants’ encouraging acts actually result in direct infringement of at least claim 1 of the ’790 patent.

268. Defendants’ acts of direct and indirect infringement of at least claim 1 of the ’790 patent have caused damage to Plaintiffs, and Plaintiffs are entitled to recover damages in an amount subject to proof at trial.

269. On information and belief, Defendants’ direct and indirect infringement was deliberate and in willful disregard of Plaintiffs’ intellectual property rights as provided for in the ’790 patent. Defendants have never once asserted or even suggested that any claim of the’790 patent is invalid, and Defendants have never articulated a non-infringement position that has any support under prevailing principles of patent law. On information and belief, Warner Bros. has been aware of MQ Gaming’s infringement allegations by virtue of its commercial partnership with LEGO. Despite being aware of the ’790 patent, Warner Bros. continued to infringe, willfully, wantonly, and recklessly, as did LEGO.

270. The claims of the ’790 patent, including claim 1, are directed to technological improvements that are unique to the field of electronic gaming and have no pre-electronic-gaming precursor or counterpart. Combining a physical element such as a toy or figurine with a

computer animated game using an RFID tag that is wirelessly powered by an RFID reader to exchange gaming and other information, including the provision of encrypted information configured to be decrypted or authenticated using an encryption key comprising unique information stored on the physical toy to unlock corresponding portions of a virtual game displayed on an associated game console, has no counterpart in the pre-electronic gaming world. Thus, the claims of the ’790 patent are directed to concrete, physical combinations and technological improvements that have no pre-Internet or pre-electronic-gaming counterpart and were not routine, well-known, or conventional to persons skilled in the art at the time of the invention.

## COUNT XVI – INFRINGEMENT OF THE ’624 PATENT

271. By the acts alleged herein Defendants have directly infringed and continue to directly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’624 patent under 35 U.S.C. § 271(a).

272. Each of the Accused Products, including all Lego Dimensions Starter Packs, Lego Dimensions Story Packs, Lego Dimensions Level Packs, Lego Dimensions Team Packs, and Lego Dimensions Fun Packs, includes at least one “gaming toy for playing a game that combines elements of physical play and virtual play.” For example, the LEGO Dimensions Starter Pack includes at least three gaming toys (e.g., Batman, Gandalf, Wyldstyle minifigures). Each minifigure is configured to be used in the Lego Dimensions game as a central element of a toys-to-life game in which game participants use physical toys to interact with a computer-animated game played on a game console. Other LEGO Dimensions minifigures are sold in separate expansion packs (Story Packs, Fun Packs, Level Packs, Team Packs), and game participants are encouraged to purchase and use them to advance further in the game.

273. Each Lego Dimensions minifigure includes "a plurality of modular components configured to be selectively and detachably secured to one another by a game participant to form a modularly constructed toy having one of a variety of possible assembled configurations." For example, each Lego Dimensions minifigure is a modularly constructed toy formed from multiple modular components (e.g., LEGO building blocks) detachably secured together in any one of a variety of possible configurations (see below).



274. At least one modular component of each Lego Dimensions minifigure comprises "a plastic body having an internal cavity formed therein [and] a passive radiofrequency identification (RFID) tag disposed within said internal cavity." For example, the Toy Tag of each Lego Dimensions minifigure comprises a molded plastic body having an internal cavity in which, on information and belief, a passive MIFARE NTAG213 RFID tag is disposed.

275. The NTAG213 RFID tag has an integrated circuit chip (NTAG213 tag IC) that includes "(i) a unique identifier [and] (ii) non-volatile memory storing a first selection of information identifying a virtual game character in a computer-animated game played by said game participant on a compatible gaming platform." For example, the NTAG213 tag IC includes non-volatile EEPROM memory. Pages 0 and 1 of the EEPROM memory store a 7-byte unique identifier (tag UID) that uniquely identifies the RFID tag and its associated Toy Tag. Pages 36

and 37 of the EEPROM memory store a first selection of information comprising a character ID identifying a corresponding virtual game character in the Lego Dimensions game (e.g., 01=Batman, 02=Gandalf, 03=Wyldstyle).

276. The NTAG213 tag IC also includes "(iii) a radiofrequency (RF) transceiver configured to provide two-way wireless communications with said compatible gaming platform over a limited wireless communication distance of less than 60 cm." For example, the NTAG213 tag IC includes an RF transceiver configured to provide two-way wireless communications with a compatible gaming platform (e.g., a Lego Dimensions Toy Pad connected to a home gaming console) over a limited wireless communication range of less than 60 cm (e.g., when the Toy Tag is placed on the Toy Pad).

277. The NTAG213 RFID tag includes "(iv) an antenna electrically coupled to said RF transceiver and configured to power said RF transceiver when said antenna is wirelessly energized by an externally-generated electromagnetic field." For example, the NTAG213 RFID tag includes a flat spiral-wound antenna that is electrically coupled to the NTAG213 tag IC (which includes the RF transceiver). The antenna is configured to be wirelessly energized by an electromagnetic field generated by the Lego Dimensions Toy Pad (on information and belief, a MIFARE MFRC630 RFID reader) to power the RF transceiver.

278. Each Lego Dimensions minifigure "is configured to communicate with said compatible gaming platform after the plurality of modular components are secured to one another." For example, each assembled Lego Dimensions minifigure can communicate (via its associated Toy Tag) with a compatible gaming platform (e.g., a Toy Pad connected to a home game console).

279. Each Toy Tag "is configured to be selectively detached and interchanged with one or more like modular components comprising non-volatile memory storing a second selection of information that is different than said first selection of information." For example, the Batman Toy Tag may be interchanged with the Gandalf Toy Tag which may be interchanged with the Wyldstyle Toy Tag, etc. (see below left). Other combinations are also possible, including mixing modular components from different Lego Dimensions minifigures (see below right).





Each of the Gandalf and Wyldstyle Toy Tags include non-volatile memory storing a second selection of information (e.g., a tag UID and a character ID) that is different than said first selection of information stored on the Batman Toy Tag.

280. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the '624 patent under 35 U.S.C. § 271(b), (c) by selling, and/or offering for sale throughout the United States, and/or importing into the United States, components constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an

infringement of the ’624 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, and by intentionally encouraging and instructing purchasers of such components to use them in a manner that directly infringes (literally and/or under the doctrine of equivalents) at least claim 1 of the ’624 patent, and with specific intent to cause or encourage such infringement. These components include at least all Lego Dimensions Starter Packs, Lego Dimensions Story Packs, Lego Dimensions Level Packs, Lego Dimensions Team Packs, and Lego Dimensions Fun Packs. Each Lego Dimensions Starter Pack includes a Toy Pad and associated game software that is especially made and adapted to be used with the Lego Dimensions gaming toys and have substantially no other non-infringing uses. Each of the other Accused Products includes at least one RFID-tagged minifigure and/or associated Toy Tag especially made and adapted to be used with each Lego Dimensions Starter Pack to access additional Adventure Worlds and special character abilities in the game.

281. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’624 patent under 35 U.S.C. § 271(b), (c) by selling, and/or offering for sale throughout the United States, and/or importing into the United States, unassembled Lego minifigures and Toy Tags constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the ’624 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, and by intentionally encouraging and instructing purchasers of such components to assemble and use them in a manner that directly infringes (literally and/or under the doctrine of equivalents) at least claim 1 of the ’624 patent, and with specific intent to cause or encourage such infringement.

282. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’624 patent under 35 U.S.C. § 271(f) by supplying in or from the United States all or a substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe at least claim 1 of the ’624 patent if such combination occurred within the United States, and/or by supplying in or from the United States components constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the ’624 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, where such components are uncombined in whole or in part, knowing that such components are so made or adapted and intending that such components will be combined outside of the United States in a manner that would infringe at least claim 1 of the ’624 patent if such combination occurred within the United States. Such components include at least all Lego Dimensions Starter Packs, Lego Dimensions Story Packs, Lego Dimensions Level Packs, Lego Dimensions Team Packs, and Lego Dimensions Fun Packs.

283. On information and belief, Warner Bros. has also indirectly infringed and continues to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 1 of the ’624 patent under 35 U.S.C. § 271(b) by advertising and promoting the Accused Products and directing its website visitors to purchase the Accused Products from third-party retailers such as Amazon and GameStop via direct hyperlinks provided by Warner Bros. and/or by inducing such third-party retailers to sell and offer for sale the Accused Products in direct infringement

(literally and/or under the doctrine of equivalents) of at least claim 1 of the ’624 patent, and with specific intent to cause or encourage such infringement.

284. Defendants have been on notice of the ’624 patent since at least as early as the service of this Complaint. Moreover, LEGO has been on notice of the ’624 patent since at least as early as July 28, 2018 when MQ Gaming notified LEGO it was infringing at least claims 1-2, 4-7, 8-9, 11-12, 13-14 and 16-20 of the ’624 patent. Warner Bros. has been on notice the ’624 patent since at least as early as July 27, 2018 when MQ Gaming notified Warner Bros. it was infringing at least claims 1-2, 4-7, 8-9, 11-12, 13-14 and 16-20 of the ’624 patent. Defendants’ continued actions of making, using, selling, offering for sale, and/or importing into the United States any of the Accused Products, is with Defendants’ knowledge of the ’624 patent, knowledge of infringement of the ’624 patent, intent to encourage others (e.g., consumers and third-party retailers) to infringe the ’624 patent through the Accused Products and knowledge that Defendants’ encouraging acts actually result in direct infringement of at least claim 1 of the ’624 patent.

285. Defendants’ acts of direct and indirect infringement of at least claim 1 of the ’624 patent have caused damage to Plaintiffs, and Plaintiffs are entitled to recover damages in an amount subject to proof at trial.

286. On information and belief, Defendants’ direct and indirect infringement was deliberate and in willful disregard of Plaintiffs’ intellectual property rights as provided for in the ’624 patent. Defendants have never once asserted or even suggested that any claim of the’624 patent is invalid, and Defendants have never articulated a non-infringement position that has any support under prevailing principles of patent law. On information and belief, Warner Bros. has

been aware of MQ Gaming's infringement allegations by virtue of its commercial partnership with LEGO. Despite being aware of the '624 patent, Warner Bros. continued to infringe, willfully, wantonly, and recklessly, as did LEGO.

287. The claims of the '624 patent, including claim 1, are directed to technological improvements that are unique to the field of electronic gaming and have no pre-electronic-gaming precursor or counterpart. Combining a physical element such as a toy or figurine with a computer animated game using an RFID tag that is wirelessly powered by an RFID reader to exchange gaming and other information, including the provision of an RFID-tagged gaming toy for use in a toys-to-life game comprising multiple modular components configured to be selectively and detachably assembled by a game participant, has no counterpart in the pre-electronic gaming world. Thus, the claims of the '624 patent are directed to concrete, physical combinations and technological improvements that have no pre-Internet or pre-electronic-gaming counterpart and were not routine, well-known, or conventional to persons skilled in the art at the time of the invention.

**COUNT XVII – INFRINGEMENT OF THE '283 PATENT**

288. By the acts alleged herein Defendants have directly infringed and continue to directly infringe (literally and/or under the doctrine of equivalents) at least claim 8 of the '283 patent under 35 U.S.C. § 271(a).

289. The Accused Products, such as all Lego Dimensions Starter Packs, comprise "[a] gaming system for playing a game wherein a game participant uses one or more physical toys to interact with a virtual play environment displayed on a compatible game console." For example, each Lego Dimensions Starter Pack is a toys-to-life gaming system in which game participants

use physical toys to interact with a computer animated "virtual" play environment (e.g., the Lego Dimensions game) displayed on a compatible game console.

290. Each Lego Dimensions Starter Pack includes "at least one gaming toy configured to be moved or positioned selectively by said game participant as part of said game, said gaming toy having an internal cavity containing a radiofrequency identification (RFID) tag." For example, each Lego Dimensions Starter Pack includes four gaming toys (three minifigure toys and one vehicle toy), each of which can be selectively moved or positioned by a game participant (e.g., on the Toy Pad) to play the Lego Dimensions game. According to LEGO, "[g]amers command the action—where and when the physical toys are moved on the LEGO Toy Pad will impact what happens in the game." Each toy includes a removable Toy Tag comprising a molded plastic body having upper and lower halves forming an internal cavity containing, on information and belief, a passive MIFARE NTAG213 RFID tag. Note that each Toy Tag alone also literally meets this claim limitation because each is a "gaming toy configured to be moved or positioned selectively by said game participant as part of said game." Alternatively, each unassembled Lego Dimensions toy meets this limitation, either literally and/or under the doctrine of equivalents, because game participants are not required to assemble the toy to access and play the game and because an unassembled toy performs the same function in the same way to achieve the same result as the assembled toy.

291. The NTAG213 RFID tag has an integrated circuit chip (NTAG213 tag IC) that includes "a unique tag identifier and non-volatile memory storing a first selection of information identifying or describing a corresponding virtual game character or object." For example, the NTAG213 tag IC includes non-volatile EEPROM memory storing (e.g., at pages 0 and 1) a 7-byte unique tag identifier (tag UID). Pages 36 and 37 of the EEPROM memory store a first

selection of information comprising coded information identifying a corresponding virtual game character or object in the Lego Dimensions game (e.g., 01=Batman, 02=Gandalf, 03=Wyldstyle, 1006=Batmobile).

292. Each Lego Dimensions Starter Pack includes "an RFID reader configured to be communicatively coupled to said game console, said RFID reader comprising: (i) a radiofrequency (RF) transceiver configured to wirelessly communicate with said RFID tag over a limited communication range of less than 25 centimeters [and] (ii) a communication interface configured to communicate information to and from said game console." For example, each Lego Dimensions Starter Pack includes a Toy Pad comprising, on information and belief, a MIFARE MFRC630 RFID reader. The RFID reader includes an RF transceiver configured to wirelessly communicate with the NTAG213 RFID tag over a limited communication range of less than 25 cm (e.g., when the Toy Tag is placed on the Toy Pad). The Toy Pad also includes a USB cable communication interface configured to communicate information to and from a connected game console.

293. Each Lego Dimensions Toy Pad includes "(iii) an effects controller configured to actuate or control one or more associated sound effects or lighting effects." For example, each Lego Dimensions Toy Pad includes an effects controller configured to cause the Toy Pad to light up, flash and change colors.

294. Each Lego Dimensions Starter Pack includes "non-transitory storage storing game software comprising program instructions that, when executed: (i) cause said RFID reader to ascertain said first selection of information from said RFID tag." For example, each Lego Dimensions Starter Pack includes a videogame disk storing game software comprising program

instructions configured to be executed by the associated game console. The game software includes program instructions that cause the Toy Pad (RFID reader) to ascertain the first selection of information stored in the RFID tag (e.g., the coded information identifying the corresponding virtual game character or object in the Lego Dimensions game).

295. The game software also includes program instructions that, when executed: "(ii) cause said game console to display in said virtual play environment one or more computer animations depicting said corresponding virtual game character or object." For example, when the Gandalf and Wyldstyle toys are placed on the Toy Pad, the game console displays in the Lego Dimensions game computer animations depicting the corresponding virtual game characters (Gandalf and Wyldstyle). Similarly, when the Batmobile toy is placed on the Toy Pad, the game console displays in the Lego Dimensions game a computer animation depicting the corresponding virtual game object (the Batmobile vehicle).

296. The game software also includes program instructions that, when executed: "(iii) cause said effects controller to actuate or control said one or more associated sound effects or lighting effects in accordance with said game." For example, in the "Chroma" mode a game participant can place the Gandalf toy at a particular physical location on the Toy Pad and then move the corresponding in-game character to a particular virtual location in the computer-animated game to change the color of the Toy Pad at that physical location.

297. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 8 of the '283 patent under 35 U.S.C. § 271(b), (c) by selling, and/or offering for sale throughout the United States, and/or importing into the United States, components constituting a material part of

the invention, knowing the same to be especially made or especially adapted for use in an infringement of the ’283 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, and by intentionally encouraging and instructing purchasers of such components to use them in a manner that directly infringes (literally and/or under the doctrine of equivalents) at least claim 8 of the ’283 patent, and with specific intent to cause or encourage such infringement. These components include at least all Lego Dimensions Story Packs, Lego Dimensions Level Packs, Lego Dimensions Team Packs, and Lego Dimensions Fun Packs. Each of these Accused Products includes at least one RFID-tagged minifigure and/or associated Toy Tag especially made and adapted to be used with each Lego Dimensions Starter Pack to access additional Adventure Worlds and special character abilities in the game.

298. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 8 of the ’283 patent under 35 U.S.C. § 271(b), (c) by selling, and/or offering for sale throughout the United States, and/or importing into the United States, unassembled Lego minifigures and Toy Tags constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the ’283 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, and by intentionally encouraging and instructing purchasers of such components to assemble and use them in a manner that directly infringes (literally and/or under the doctrine of equivalents) at least claim 8 of the ’283 patent, and with specific intent to cause or encourage such infringement.

299. On information and belief, Defendants have also indirectly infringed and continue to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 8 of the ’283 patent under 35 U.S.C. § 271(f) by supplying in or from the United States all or a

substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe at least claim 8 of the ’283 patent if such combination occurred within the United States, and/or by supplying in or from the United States components constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the ’283 patent, and not a staple article or commodity of commerce suitable for substantial non-infringing uses, where such components are uncombined in whole or in part, knowing that such components are so made or adapted and intending that such components will be combined outside of the United States in a manner that would infringe at least claim 8 of the ’283 patent if such combination occurred within the United States. Such components include at least all Lego Dimensions Starter Packs, Lego Dimensions Story Packs, Lego Dimensions Level Packs, Lego Dimensions Team Packs, and Lego Dimensions Fun Packs.

300. On information and belief, Warner Bros. has also indirectly infringed and continues to indirectly infringe (literally and/or under the doctrine of equivalents) at least claim 8 of the ’283 patent under 35 U.S.C. § 271(b) by advertising and promoting the Accused Products and directing its website visitors to purchase the Accused Products from third-party retailers such as Amazon and GameStop via direct hyperlinks provided by Warner Bros. and/or by inducing such third-party retailers to sell and offer for sale the Accused Products in direct infringement (literally and/or under the doctrine of equivalents) of at least claim 8 of the ’283 patent, and with specific intent to cause or encourage such infringement.

301. Defendants have been on notice of the ’283 patent since at least as early as the service of this Complaint. Defendants’ continued actions of making, using, selling, offering for

sale, and/or importing into the United States any of the Accused Products, is with Defendants' knowledge of the '283 patent, knowledge of infringement of the '283 patent, intent to encourage others (e.g., consumers and third-party retailers) to infringe the '283 patent through the Accused Products and knowledge that Defendants' encouraging acts actually result in direct infringement of at least claim 8 of the '283 patent.

302. Defendants' acts of direct and indirect infringement of at least claim 8 of the '283 patent have caused damage to Plaintiffs, and Plaintiffs are entitled to recover damages in an amount subject to proof at trial.

303. On information and belief, Defendants' direct and indirect infringement was deliberate and in willful disregard of Plaintiffs' intellectual property rights as provided for in the '283 patent. Despite being aware of the '283 patent, Warner Bros. continued to infringe, willfully, wantonly, and recklessly, as did LEGO.

304. The claims of the '283 patent, including claim 8, are directed to technological improvements that are unique to the field of electronic gaming and have no pre-electronic-gaming precursor or counterpart. Combining a physical element such as a toy or figurine with a computer animated game using an RFID tag that is wirelessly read by an RFID reader to exchange gaming and other information, including the provision of an RFID reader configured to display lighting effects in accordance with the game, has no counterpart in the pre-electronic gaming world. Thus, the claims of the '283 patent are directed to concrete, physical combinations and technological improvements that have no pre-Internet or pre-electronic-gaming counterpart and were not routine, well-known, or conventional to persons skilled in the art at the time of the invention.

**DEMAND FOR TRIAL BY JURY**

305. Plaintiffs respectfully request a trial by jury on all issues so triable in accordance with Rule 38 of the Federal Rules of Civil Procedure.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request the following relief:

a) The entry of judgment on the Complaint, including all claims, causes of action, and requests for relief therein, in favor of Plaintiffs and against Defendants;

b) The entry of judgment that Defendants have directly and/or indirectly infringed and continue to directly and/or indirectly infringe, the ’275, ’515, ’180, ’688, ’533, ’149, ’206, ’491, ’500, ’380, ’334, ’797, ’652, ’724, ’790, ’624, and ’283 patents;

c) The entry of judgment against Defendants, awarding Plaintiffs damages adequate to compensate Plaintiffs for Defendants’ direct and/or indirect infringement of the Asserted Patents, and for any continuing or future infringement through the date such judgment is entered, including pre-judgment interest and post-judgment interest, costs, and expenses, as well as an accounting and award of damages against Defendants for all future infringing acts occurring after the date such judgment is entered;

d) The entry of judgment that Defendants’ direct and/or indirect infringement of the ’275, ’515, ’180, ’688, ’533, ’149, ’206, ’491, ’500, ’380, ’334, ’797, ’652, ’724, ’790, ’624, and ’283 patents has been willful;

e) The entry of judgment that the award of damages against Defendants for their direct and/or indirect infringement of the ’275, ’515, ’180, ’688, ’533, ’149, ’206, ’491, ’500, ’380, ’334, ’797, ’652, ’724, ’790, ’624, and ’283 patents is trebled, as provided by 35 U.S.C. § 284, due to Defendants’ willful infringement;

f) The entry of a permanent injunction, enjoining Defendants, their officers, directors, agents, employees, parents, subsidiaries, affiliates, licensees, successors, and assigns, and those acting in concert or participation with them, from further acts of direct and/or indirect infringement of the ’275, ’515, ’180, ’688, ’533, ’149, ’206, ’491, ’500, ’380, ’334, ’797, ’652, ’724, ’790, ’624, and ’283 patents;

g) A determination that this case is exceptional pursuant to 35 U.S.C. § 285, and that Plaintiffs be awarded their reasonable attorneys’ fees, expenses, and costs; and

h) An award to Plaintiffs of such further and additional relief as this Court deems just and proper.

ASHBY & GEDDES

*/s/ Steven J. Balick*

Steven J. Balick (#2114)
Andrew C. Mayo (#5207)
500 Delaware Ave., 8th Floor
P.O. Box 1150
Wilmington, DE 19801
(302) 654-1888
sbalick@ashbygeddes.com
amayo@ashbygeddes.com

*Attorneys for Plaintiffs*

*Of Counsel:*

John M. Williamson
Elizabeth D. Ferrill
Marcus A.R. Childress
Ghani Hamadi
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
901 New York Avenue, N.W.
Washington, D.C. 20001-4413
(202) 408-4000

Dated: May 14, 2019