# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| MQ GAMING, LLC, and CREATIVE KINGDOMS TECHNOLOGIES LLC, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No. 1:19-cv-00905-MN |
| LEGO SYSTEMS, INC., LEGO BRAND RETAIL, INC., WARNER BROS. HOME ENTERTAINMENT INC., WARNER BROS. INTERACTIVE ENTERTAINMENT INC., and WB GAMES INC., | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## DEFENDANTS' BRIEF IN SUPPORT OF ITS MOTION TO LIMIT THE SCOPE OF THIS SEVENTEEN PATENT CASE

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      INTRODUCTION ............................................................................................................1

II.     FACTUAL BACKGROUND .........................................................................................3

        A.      Plaintiffs' Claims and the Patents-in-Suit ................................................... 3

        B.      The Parties' Negotiations Concerning Case Narrowing ........................................ 7

III.    ARGUMENT ....................................................................................................................7

        A.      A Bellwether Patent Approach Is Consistent with this Court's Precedent ............. 7

        B.      Representative Bellwether Patents Can Be Chosen Which Will Provide
                Feedback About All of the Asserted Patents ........................................................ 10

        C.      Plaintiffs' Proposal Would Not Address the Unwieldy Nature of this Case ........ 12

        D.      Early Patent Limiting Would Not Prejudice Plaintiffs .......................................... 14

IV.     CONCLUSION...............................................................................................................15

# TABLE OF AUTHORITIES

**Cases**

*Ethicon LLC v. Intuitive Surgical, Inc.,* Civil Action No. 17-871-LPS-CJB
(D. Del.), Dkt. No. 68 ................................................................................................10

*Finjan, Inc. v. Rapid7, Inc.*, C.A. No. 18-1519 (D. Del.) ...........................................................12

*Greatbatch Ltd. v. AVX Corp.*, C.A. No. 13-723-LPS (D. Del.), Dkt. No. 368 ..........................10

*Intel Corp. v. Broadcom Corp.,* 173 F. Supp. 2d 201 (D. Del. 2001)..............................................9

*Intel Corp. v. Future Link Systems, LLC,* Case No. 14-377-LPS
(D. Del. July 31, 2017), Dkt. No. 640.................................................................... 8-9

*In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303
(Fed. Cir. 2011)...........................................................................................................8

*Landis v. North American Co.*, 299 U.S. 248 (S. Ct. 1936)...........................................................8

*LEO Pharma A/S, Leon Labs. Ltd. v. Actavis Labs. UT, Inc.,*
Civil Action No. 16-333-JFB-SRF (D Del.), Dkt. No. 287 .....................................10

*Masimo Corp. v. Philips Elecs. N. Am. Corp.,* Case No. 1:09-cv-00080-LPS
(D. Del. October 4, 2010), Dkt. No. 148 ....................................................................8

*Nuance Comm'cns, Inc. v. MModal LLC*, Civil Action No. 17-1484-MN-SRF
(D. Del.), Dkt. No. 82 .................................................................................................7

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
No. CIVA 04-1371 JJF, 2006 WL 2724879 (D. Del. Sept. 20, 2006)............... 10-11

*Sonos Inc. v. D&M Holdings Inc.*, Case No. 1:14-cv-1330-WCB
(D. Del. Oct. 3, 2017), Dkt. No. 418..........................................................................9

*TQ Delta, LLC v. 2Wire, Inc.,* No. 13-cv-1835-RGA (D. Del. Apr. 10, 2017),
Dkt. No. 280................................................................................................................9

*Unified Messaging Sols. LLC v. Google Inc.*, Case No. 6:11-cv-120,
2012 WL 11606516 (E.D. Tex. July 12, 2012) ..........................................................8

**Other Authorities**

Fed. R. Civ. P. 42(b) ........................................................................................................9

## I.      INTRODUCTION

Plaintiffs MQ Gaming, LLC and Creative Kingdoms Technologies LLC (collectively, "Plaintiffs") filed the present suit on May 14, 2019 alleging that LEGO Systems, Inc., LEGO Brand Retail, Inc., Warner Bros. Home Entertainment Inc., Warner Bros. Interactive Entertainment,[1] and WB Games Inc. (collectively, "Defendants") infringe 17 patents due to their manufacture, import, use, offer for sale, and sale of "LEGO® Dimensions" products (which were discontinued over a year before this case was filed).  The 17 patents include 514 total claims, of which 57 are independent.

The only reason for Plaintiffs to assert so many patents is transparent:  it is a strategy meant to drive up Defendants' litigation costs, frustrate Defendants' right to file petitions for *inter partes* review, and force Defendants to the settlement table without ever testing the merits of Plaintiffs' claims.  The number of patents at issue will not measurably affect any potential damages award because Plaintiffs allege that the same, discontinued LEGO® Dimensions products infringe all the patents-in-suit.

Simply put, the scope of this case as pled is unmanageable and would unnecessarily expend the resources of the parties and Court with little apparent benefit.  Plaintiffs admit that some measure of case narrowing is necessary in order to manage this case, but refuse to limit the case to any fewer than 80 claims of 12 different patents that would be the subject of initial infringement contentions, invalidity contentions, and claim construction.  The eighty claims that Plaintiffs want to explore in discovery would likely result in well over 80 claim construction disputes that would need to be resolved by the Court.  According to Plaintiffs' proposed schedule, the parties' experts

---

[1] Warner Bros. Interactive Entertainment was incorrectly named in the present suit as Warner Bros. Interactive Entertainment Inc.

and Court would need to analyze 40 different claims from eight different patents to determine which patents survive summary judgment.

The narrowing of this case is inevitable, as Plaintiffs have already acknowledged. Indeed, there are *hundreds* of patent claims asserted in the Complaint that Plaintiffs know will never be tried. The Court should therefore utilize its inherent authority to adopt an approach employed in this District and others to streamline unwieldy patent cases: start with a trial of four "bellwether" patents, one patent from each of the four claimed technology groups that would be representative of the patents-in-suit as a whole, and sever and stay the remaining claims before the parties and the Court are required to invest significant resources in discovery and claim construction on patents that will likely never be tried.

A "bellwether" approach is likely to resolve the parties' dispute without the need for the extensive and unmanageable discovery, claim construction, and lengthy dispositive motion briefing that Plaintiffs' proposal would entail. The 17 asserted patents are interrelated, and use overlapping claim language, which will mean the bellwether approach would result in rulings that will assist the parties in assessing the merits of all the patents asserted in the Complaint.

A staggered bellwether approach also will not prejudice Plaintiffs. Defendants have agreed that Plaintiffs can conduct technical and other discovery on the accused LEGO Dimensions products before bellwether patent selection. Narrowing the first case to four patents will also allow the first case to proceed to trial more quickly, and without the unnecessary expenditure of time and money that would be required by the more sprawling case that Plaintiffs propose. The initial rulings and finding by the Court in the first trial would be binding on the parties for common issues in a subsequent trial. This would greatly enhance the parties' ability to streamline the issues for

the remaining patents, and given the certainty provided by the initial findings and rulings, potentially increase the opportunity for settlement.

For these reasons and as further explained below, the Court should grant Defendants' motion.

## II.    FACTUAL BACKGROUND

### A.    Plaintiffs' Claims and the Patents-in-Suit

Plaintiffs allege that Defendants' LEGO® Dimensions products infringe the following U.S. patents (hereafter, the "asserted patents" or the "patents-in-suit"):   8,475,275,  8,790,180, 9,393,491,  9,737,797,  10,179,283,  8,702,515,  9,162,149,  9,272,206,  9,463,380,  9,616,334, 10,010,790, 8,814,688, 9,039,533, 9,393,500, 9,770,652, 9,993,724, and 10,022,624.  The asserted patents allegedly describe various aspects of inventions in which real life objects like toys, action figures, and trading cards enabled with Radio Frequency Identification ("RFID") are recreated (i.e., visually represented) within a video game.  (Dkt. No. 1 at ¶ 15).  The same aspects of Defendants' LEGO® Dimensions toys (various alleged functionality of the RFID chip in the toys) are alleged to infringe all 17 patents.  (*Id.* at ¶ 11).

The patents-in-suit represent different "branches" of Plaintiffs' family of interactive gaming patents as shown in the graphics below.

3

**Game ID / Lighting Effects /Microprocessor Family Tree**



**Encryption Family Tree**



The patents-in-suit are also directed to four general technology groups.[2]  Five of the 17 patents (192 of the 514 total patent claims) include claims directed to storing and using game-relevant information, including identifying the gaming toy itself on an RFID Tag (the "Game ID" patents).  For example, claim 1 of the '275 Patent claims "[a]n interactive game ... comprising: one or more collectable figures depicting or representing persons, characters or objects associated with a computer-animated game, each said collectable figure comprising an electronically-readable radio frequency identification (RFID) tag ***comprising a unique identification number for uniquely identifying each said corresponding collectable figure***..."  The four other patents in the "Game ID" group include similar limitations requiring the RFID of the collectible figure to include a unique identifier of that toy.

Four of the 17 patents asserted in the Complaint (117 of the 514 total patent claims) require that the RFID reader or toy produce lighting effects (the "Lighting Effects" patents).  For example, claim 33 of the '180 Patent claims "a portable wireless toy comprising: i) a toy body configured to be held, moved and positioned selectively by a game participant within said physical play environment, ii) a unique identification number uniquely identifying said portable wireless toy, and iii) a second RF transceiver configured to provide two-way wireless communication of game-relevant information with at least said first RF transceiver, ***wherein said wireless gaming device or said portable wireless toy is configured to display at least one lighting effect*** based at least in part on one or more wireless communications exchanged between said first RF transceiver and said second RF transceiver."  The other three "Lighting Effects" patents include similar limitations requiring lighting displays.

---

[2] Exhibit A to this Motion charts the patent families by earliest priority date, specification, and technology group.

Six of the 17 patents (165 of the 514 total patent claims) are directed to storing, encrypting, and decrypting game-relevant information on an RFID tag (the "Encryption" patents).  The '515 Patent is exemplary and includes in claim 1, among other things, "an RFID tag comprising:... non-volatile memory storing game-relevant information including at least one of skills, abilities or attributes associated with one of said game characters or objects, ***wherein at least a portion of said game-relevant information is encrypted...***"  The other five patents in this group similarly include encryption limitations.

Finally, two of the 17 patents (40 of the 514 total patent claims) require modular components that are configured to form a physical object with at least one modular component including "a microprocessor" (the "Microprocessor" patents).  Claim 1 of the '500 Patent, for example, claims a "gaming toy comprising: a plurality of modular components configured to be selectively and detachably assembled by a game participant to form a doll, action figure or object relevant to a computer-animated game played by said game participant on a compatible gaming platform, ***at least one of said modular components comprising: (i) a microprocessor***; (ii) non-volatile memory electrically coupled to said microprocessor and storing a first selection of information comprising a unique identifier uniquely identifying said gaming toy within said computer-animated game."  The '724 Patent includes a similar limitation.

Plaintiffs' infringement allegations are similar for all of the asserted patents and identical for the relevant features of each of the technology groups.  Plaintiffs claim the "Toy Pad" that comes with certain LEGO® Dimensions kits meets the lighting effects claim limitations of the Lighting Effects patents.  (Dkt. No. 1 at ¶¶ 86, 213, 216, 293, 296).  Plaintiffs allege the MIFARE NTAG213 RFID tag allegedly incorporated into the accused products meets the encryption elements of the Encryption patents (*id.* at ¶¶ 71, 123, 137, 183, 198, 261), the "microprocessor"

elements of the Microprocessor patents (*id.* at ¶¶ 166, 245), and the unique identification number required by each of the Gaming ID patents (*id.* at ¶¶ 57, 58, 97, 98, 110, 111, 150, 152, 227, 228, 275).

### B.     The Parties' Negotiations Concerning Case Narrowing

As part of the parties' Rule 26(f) conferral process, Defendants proposed the four-patent bellwether trial procedure they seek in this Motion.  However, Plaintiffs did not agree.  Plaintiffs instead proposed to narrow the case to "no more than 80 claims and 12 patents" in the initial infringement contentions, and "no more than 40 claims and 8 patents" in the final infringement contentions.  Finally, Plaintiffs would agree to narrow to "no more than 20 claims and 6 patents" two weeks before the Pretrial Conference.  Plaintiffs' proposal includes no guidance about what patents or claims need to be selected as part of their narrowing procedure.  In other words, Plaintiffs could elect to narrow this case to only one or two patent groups, leaving disputes between the parties concerning the remaining patents for another day.  Notwithstanding the fact that six patents and 20 claims would remain in the case at the end of all discovery under their proposal, Plaintiffs agreed to a short five-day jury trial.

## III.   ARGUMENT

### A.     A Bellwether Patent Approach Is Consistent with this Court's Precedent

District courts in Delaware and across the country consistently hold that limiting the number of patent claims a plaintiff can assert promotes efficiency.  *See Nuance Comm'cns, Inc. v. MModal LLC*, Civil Action No. 17-1484-MN-SRF (D. Del.), Dkt. No. 82 (limiting plaintiff to no more than 23 claims in its initial contentions and to no more than 18 claims in its final contentions).  Specifically, given that claims and prior art references are "inevitably...abandoned as the case proceeds to trial," early narrowing of claims can "serve to reduce the overall costs of the litigation by eliminating needless discovery regarding issues that will likely be dropped prior to trial and

allow the Court to dedicate its resources to the truly dispositive and meritorious issues." *Unified Messaging Sols. LLC v. Google Inc.*, Case No. 6:11-cv-120, 2012 WL 11606516, at *1 (E.D. Tex. July 12, 2012). Limiting the number of asserted patent claims also has "the virtue of giving the parties a near-term opportunity to obtain certainty ... as to the value of a substantial subset of their disputes" and thus is "likely to promote settlement." *Intel Corp. v. Future Link Systems, LLC,* Case No. 14-377-LPS (D. Del. July 31, 2017), Dkt. No. 640, at 3-4. The power to limit the number of asserted claims is consistent with the Court's power to "control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. North American Co.*, 299 U.S. 248, 254-55 (S. Ct. 1936); *see also In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303 (Fed. Cir. 2011) (affirming district court's decision to require plaintiff to select a subset of claims to pursue because plaintiff could not show the other asserted claims raised unique issues of infringement and invalidity).

In cases where ten or more patents are asserted, other sessions in this Court have limited plaintiffs to two to three "bellwether" patents to be asserted in an initial trial while severing and staying the remaining patents for trial for a later proceeding if necessary. For example, in *Masimo Corp. v. Philips,* the parties had alleged infringement of a total of fourteen patents. Before the close of fact discovery, Magistrate Judge Thynge ordered the plaintiff to select four patents and the defendant to select three patents on which to proceed. Magistrate Judge Thynge ruled such an approach would reduce claim construction issues, streamline issues for damages discovery and expert reports, and allow for a "clear, orderly presentation" of the case to a jury at trial. *Masimo Corp. v. Philips Elecs. N. Am. Corp.,* Case No. 1:09-cv-00080-LPS (D. Del. October 4, 2010), Dkt. No. 148.

8

In *Intel Corp. v. Future Link Systems,* "up to 17 patents" were asserted in what the Court characterized as a "highly complex ... litigation." *Intel Corp. v. Future Link Systems, LLC,* Case No. 14-377-LPS (D. Del. July 31, 2017), Dkt. No. 640.  To manage the trial, Judge Stark limited the patent holder to ten claims on three patents.  *Id.* at 5 n. 7. He stayed proceedings on the remaining claims and patents until after the bellwether trial.  In so ordering, Judge Stark noted that conducting a bellwether trial on liability and damages issues relating to just three patents was a "well-worn path in other oversized patent cases" and that it had the "virtue of giving the parties a near-term opportunity to obtain certainty—in this Court, and then on appeal—as to the value of a substantial subset of their disputes." *Id.* at 2-3.

The procedural history of *Sonos Inc. v. D&M Holdings Inc.* demonstrates the significant efficiencies that a bellwether approach can achieve.  Case No. 1:14-cv-1330-WCB (D. Del. Oct. 23, 2017), Dkt. No. 423.  In that case, Sonos alleged infringement of nineteen total patents.  Judge Bryson, sitting by designation in this District, first ordered Sonos to limit its claims to 27 claims in eight patents.  *See Sonos Inc. v. D&M Holdings Inc.*, Case No. 1:14-cv-1330-WCB (D. Del. Oct. 3, 2017), Dkt. No. 418.  Then, before trial, he ordered Sonos to select "no more than two to three patents" involving ten total asserted claims on which to proceed, while staying the plaintiff's claims on the remaining patents.  Shortly after the jury's verdict on the first bellwether trial, the parties resolved the entire litigation.  *Id.* at Dkt. Nos. 528, 565.  *See also* Fed. R. Civ. P. 42(b) (separate trials may be ordered "[f]or convenience, to avoid prejudice, or to expedite and economize"); *Intel Corp. v. Broadcom Corp.,* 173 F. Supp. 2d 201, 205 (D. Del. 2001) (ordering that trial in five patent case proceed in two parts, with a first trial concerning two out of the five patents, and a subsequent trial regarding the remaining three patents); *TQ Delta, LLC v. 2Wire,*

*Inc.,* No. 13-cv-1835-RGA (D. Del. Apr. 10, 2017), Dkt. No. 280 at 12 (setting out schedule for sequential trials by patent family).

In some cases, this Court has imposed limitations on the number of claims per patent that a plaintiff can pursue, typically around four claims per patent. *See e.g. LEO Pharma A/S, Leon Labs. Ltd. v. Actavis Labs. UT, Inc.,* Civil Action No. 16-333-JFB-SRF (D Del.), Dkt. No. 287 (limiting plaintiff in ten patent case to "no more than forty (40) claims per defendant" in phase one, and "no more than twenty (20) claims per defendant" in phase two); *Ethicon LLC v. Intuitive Surgical, Inc.,* Civil Action No. 17-871-LPS-CJB (D. Del.), Dkt. No. 68 (limiting plaintiff initially to no more than 30 claims and final narrowing to 18 claims in seven patent case); *Greatbatch Ltd. v. AVX Corp.*, C.A. No. 13-723-LPS (D. Del.), Dkt. No. 368 (ordering plaintiffs to initially narrow its claims to no more than 15 asserted claims of the five remaining asserted patents); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, No. CIVA 04-1371 JJF, 2006 WL 2724879, at *6 (D. Del. Sept. 20, 2006) (limiting patent owner to a total of seven claims for trial). But that approach is more common where the total number of patents asserted is ten or fewer.  In this case, where a total of 17 patents are asserted, the "typical" approach of a per-patent claim limitation would not be sufficient to reasonably streamline this case.  That is because a limitation of four claims per patent in this case would result in "narrowing" to a total of 68 claims.  That many claims are not manageable.  Instead, the Court should adopt the approach of other sessions of this Court when a plaintiff asserts ten or more patents and require Plaintiffs to select four bellwether patents.

**B.    Representative Bellwether Patents Can Be Chosen Which Will Provide Feedback About All of the Asserted Patents**

This case presents the ideal facts for proceeding with four bellwether patents and severing and staying the remaining patents pending a merits decision with respect to the bellwether patents.

While the originally asserted 17 patents involve 17 different prosecution histories, five different specifications, and up to **514** total claims, all 514 claims focus on only four discrete aspects of the purported toys-to-life invention.  As a result, rulings on any of the four bellwether patents would be applicable across a large number of the remaining patents and claims asserted in this case.

For example, the Court could order Plaintiff to proceed with one patent from each group of asserted patents described above and in Exhibit A (Game ID, Lighting Effects, Encryption or Microprocessor).  Choosing their strongest patent from each group would permit the resolution of infringement issues common across the patents in that group.  For example, every one of the "Lighting Effects" patents requires that lighting effects be produced by the RFID reader or toy.  Plaintiffs have asserted that the "Toy Pad" that comes with certain of the LEGO Dimensions kits meets these limitations in all of the asserted claims.  Therefore, a critical issue with respect to infringement of all of the Lighting Effects patents is whether the lighting effects produced by the Toy Pad meet the limitations of the claims, including whether the Toy Pad is properly characterized as an RFID reader or collectible toy and where the controller for any produced lighting effects is located.  The outcome of that dispute would be informative for all of the Lighting Effects patents.

Given the common lineage of the patents-in-suit and overlapping scope of the patents, the outcome of a first, bellwether trial on some of the earliest inventions would also give the parties guidance about the validity or invalidity of the remaining patents.  That is, any invalidating prior art is likely to be common across the technology groups (if not the patents-in-suit as a whole), even though that art would need to be individually applied to each asserted claim.  If the bellwether patents are found to be valid or invalid, by either this Court or by the Patent Trial and Appeal Board in *inter partes* reviews, then the parties could expect similar outcomes on the overlapping asserted patents.

**C.** **Plaintiffs' Proposal Would Not Address the Unwieldy Nature of this Case**

The same management efficiencies cannot be achieved under Plaintiffs' proposal. That is because Plaintiffs' proposal would require the parties and the Court to initially proceed with 80 different patent claims and 12 patents, which is unwieldy and inefficient.

Plaintiffs' proposal for "narrowing" this case is not a narrowing at all. Plaintiffs' proposal still forces the Court and the parties to litigate "no more than 80 claims and 12 patents" as part of initial fact discovery and claim construction, and "no more than 40 claims and 8 patents" in the expert discovery and dispositive motion practice. This proposal suffers from the same manageability issues as proceeding on all 17 patents asserted in the Complaint. Given that Plaintiffs propose to narrow their case to "no more than 20 claims and 6 patents" two weeks before the Pretrial Conference, Plaintiffs' proposed schedule necessarily means that Defendants will be forced to take and defend discovery for at least 60 claims and six patents that are never part of any trial. Tellingly, Plaintiffs' proposal demonstrates that even Plaintiffs know that the trial in this case cannot encompass all 17 patents and 516 claims they originally asserted.

Plaintiffs' proposal necessarily means significantly more fact and expert discovery, claim construction issues, invalidity and infringement contentions, dispositive motion briefing, and trial days. With respect to claim construction, there are at least 116 unique (or semi-unique) terms across the 17 asserted patents for potential claim construction—a little less than seven potential claim terms per patent. Therefore, under Plaintiffs' proposal, 84 terms from the 80 patent claims could be the subject of claim construction briefing and discovery. This is simply out of line with this Court's expressed preferences, and far beyond what is reasonable for a claim construction hearing. *See Finjan, Inc. v. Rapid7, Inc.*, C.A. No. 18-1519 (D. Del.), Transcript of July 31, 2019 Teleconference (limiting the parties to twenty total terms for construction after explaining that "forty-three terms for [the Court] to construe is not something that I think is an effective or efficient

12

use of the Court's time" and suggesting a bellwether trial on one or more patents) (attached hereto as Exhibit B).

With respect to infringement and invalidity issues, under Plaintiffs' proposal the parties would have to prepare infringement and invalidity contentions for **80** different patent claims across 12 patents, and the parties' experts would have to address **40** different claims across eight different patents in their reports.  Even if Defendants are able to identify prior art that is common across the 12 patents, each set of art would have to be applied to the specific language found in each of the 80 asserted claims.  The same would be true of the invalidity expert report—the parties' experts would have to opine as to the applicability of Defendants' prior art to each and every element of each and every one of the remaining claims.  A summary judgment motion on invalidity that would result in a complete resolution of the case would likewise require the Court to engage in the painstaking process of applying common prior art to the claim language unique to each of the 40 remaining claims.

The same is true for non-infringement arguments.  Defendants and their experts would have to address each of the remaining claims in eight patents, substantially increasing the time the parties' attorneys and experts, and the Court, would have to spend on any non-infringement-related task.  Ultimately, because Plaintiffs' proposed schedule does not provide any guidance about how the narrowed claims should be selected (e.g., one or two per patent family), the parties could finish this case and have no little more knowledge about the merits of Plaintiffs' claims on the original 17 asserted patents than they do today.

Plaintiffs recognize that this case needs to be narrowed; it is simply not realistic to think that the parties would proceed to discovery, claim construction, and trial on 17 asserted patents.  Even trying 20 claims of six asserted patents is unworkable for the five trial days that parties are

typically allotted in this District (and which the Plaintiffs agreed to in the Proposed Scheduling Order).  The Court would multiply the efficiencies gained from any case narrowing by ordering the Plaintiffs to select four bellwether patents early in this case, after Defendants have provided Plaintiffs with their core technical documents and before the parties have meaningfully commenced discovery.

> ### D.      Early Patent Limiting Would Not Prejudice Plaintiffs

To be certain, this is not a dispositive motion.  Defendants are not asking the Court to make any determination with respect to the merits of the claims asserted, or that Plaintiffs or the Court dismiss any of the asserted patents.  After limiting Plaintiffs to four patents, the Court should simply sever and stay the remaining claims.  Plaintiffs are not giving up any rights and may still obtain the relief to which they are entitled — if any — on all of the patents asserted.

Moreover, Plaintiffs cannot credibly claim they would be prejudiced by the slight delay that would result from staying some of the asserted patents.  Any delay in resolution of the non-selected patents would likely be minimal, especially when considering the parties' competing scheduling proposals for a four patent versus a 12 patent case.  A four patent case can proceed to trial much faster than the unwieldy case Plaintiffs propose.  Furthermore, the Complaint does not allege there is any urgency with respect to the resolution of these clams.  Plaintiffs have not sought any preliminary injunctive relief because Plaintiffs cannot credibly claim irreparable harm with respect to any of their claims as production of the accused products ceased early in 2018.  Plaintiffs already delayed filing suit for three years and waited to serve Defendants with process after filing the complaint for nearly the entire 90-day period provided by Rule 4(m).  *See* Complaint (ECF 1) at ¶¶ 27-29.

Plaintiffs are also not prejudiced by having to select four bellwether patents early in the case.  As evidenced by Defendants' scheduling proposal, Plaintiffs would have the advantage of

receiving Defendants' core technical documents including source code before making their four patent election. Therefore, Plaintiffs will be able to determine which of the patents-in-suit have the best infringement read under their understanding of the patent claims. Plaintiffs also have information that would enable them to determine which patents are most likely to survive an invalidity challenge – namely, which patents can claim the earliest priority date and have the narrowest claim scope.

Finally, any alternative schedule for bellwether patent selection would defeat the purpose of selecting bellwether patents entirely. If the bellwether patents are not selected until after invalidity contentions are served, or until closer to the trial in this case, the parties will be forced to expend substantial resources on discovery relating to patents and claims that will not be part of the initial case. If the asserted patents are not selected until after claim construction, the parties and Court will have expended time briefing claim construction issues on patents that may never be tried.

By ordering Plaintiffs to limit their initial case to four patents, the Court would be merely asking Plaintiffs to do what patent owners do routinely – make an educated selection of patents out of their portfolio to initially assert. Ordering Plaintiffs to make that selection now, rather than later, ensures that the maximum efficiencies can be afforded for the parties and Court.

## IV.   CONCLUSION

For all of the foregoing reasons, this Court should order Plaintiffs to select four bellwether patents for initial discovery, claim construction, and trial along the lines of the schedule set forth in Defendants' proposal, and sever and stay the remaining thirteen patents-in-suit.

Dated: November 25, 2019                  Respectfully submitted,

                                          /s/ Richard L. Renck
                                          Richard L. Renck (#3893)
                                          rlrenck@duanemorris.com
                                          **DUANE MORRIS LLP**
                                          222 Delaware Avenue, Suite 1600
                                          Wilmington, DE 19801
                                          Telephone:  (302) 657-4900
                                          Facsimile: (302) 657-4901

                                          Alison Haddock Hutton (admitted *pro hac vice*)
                                          ahhutton@duanemorris.com
                                          **DUANE MORRIS LLP**
                                          1075 Peachtree Street, NE
                                          Suite 2000
                                          Atlanta, GA 30309-3929
                                          404-253-6932
                                          Fax: 404-253-6901

                                          Anthony J. Fitzpatrick (admitted *pro hac vice*)
                                          ajfitzpatrick@duanemorris.com
                                          **DUANE MORRIS LLP**
                                          100 High Street, Suite 2400
                                          Boston, MA 02110-1724
                                          Telephone:  857-488-4220

                                          Patrick D. McPherson (admitted *pro hac vice*)
                                          pdmcpherson@duanemorris.com
                                          **DUANE MORRIS LLP**
                                          505 9th Street, Suite 1000
                                          Washington, D.C. 20004-2166
                                          Telephone:  (202) 776 5214

                                          Gregory S. Bombard (admitted *pro hac vice*)
                                          gbombard@duanemorris.com
                                          **DUANE MORRIS LLP**
                                          100 High Street, Suite 2400
                                          Boston, MA 02110-1724
                                          Telephone:  (857) 488 4235

                                          *Counsel for Defendants*