# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| MQ GAMING, LLC, and CREATIVE KINGDOMS TECHNOLOGIES LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 1:19-cv-00905-MN |
| LEGO SYSTEMS, INC., LEGO BRAND RETAIL, INC., WARNER BROS. HOME ENTERTAINMENT INC., WARNER BROS. INTERACTIVE ENTERTAINMENT INC., and WB GAMES INC., | ) ) ) ) ) | |
| Defendants. | ) ) | |

## DEFENDANTS' REPLY IN FURTHER SUPPORT OF THEIR MOTION TO LIMIT THE SCOPE OF THIS SEVENTEEN PATENT CASE

Dated:  December 16, 2019

**DUANE MORRIS LLP**

Richard L. Renck (#3893)
rlrenck@duanemorris.com
222 Delaware Avenue, Suite 1600
Wilmington, DE 19801
Telephone:  (302) 657-4900
Facsimile: (302) 657-4901

*Counsel for Defendants LEGO Systems, Inc., LEGO Brand Retail, Inc., Warner Bros. Home Entertainment Inc., Warner Bros. Interactive Entertainment Inc., and WB Games Inc.*

# TABLE OF CONTENTS

**Page**

I.    PLAINTIFFS' "FAIRNESS" ARGUMENTS ARE MERITLESS.....................................2

II.    PLAINTIFFS' PROPOSAL DOES NOT ADEQUATELY NARROW THE CASE FOR CLAIM CONSTRUCTION, DISCOVERY, OR TRIAL..............................5

III.    DEFENDANTS' PROPOSAL IS MORE CONSISTENT WITH PRECEDENT .............8

IV.    PLAINTIFFS' ONLY BASIS TO DISTINGUISH DEFENDANTS' CASES UNDERSCORES THE MERITS OF DEFENDANTS' MOTION..................................10

V.    CONCLUSION...........................................................................................................10

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Deere & Co. v. Agco Corp et. al.,* C.A. No. 18-00827-CFC ........................................................ 8-9

*Ethicon LLC v. Intuitive Surgical, Inc.*, C.A. No. 17-00871-LPS (January 9, 2018
    Order) .....................................................................................................................................3

*Intuitive Surgical, et al. v. Auris Health, Inc.,* C.A. No. 18-01359-MN at D.I. 62
    (April 15, 2019 Order) ……………………………………………………………….....2

*LEO Pharma A/S v. Actavis Labs. UT, Inc.*, 16-00333-JFB (March 29, 2018
    Order) .....................................................................................................................................9

*NexStep, Inc. v. Comcast Cable Comm'ns, LLC*, C.A. No. 19-01031-RGA
    (November 13, 2018 Oral Order)............................................................................................2

*Nuance Comm'ns, Inc. v. MModal LLC, et. al.*, C.A. No. 17-01484-MN (August
    3, 2018 Order)........................................................................................................................2

*VLSI Technology LLC v. Intel Corp.*, C.A. No. 18-00966-CFC (April 22, 2019
    Order) ....................................................................................................................................2

Plaintiffs' main argument in opposition to Defendants' Motion to Limit the Scope of this Seventeen Patent Case is that it is "unfair" to ask Plaintiffs to select four-patent of the 17 asserted patents to be tried in a first, bellwether case before claim construction and fact discovery is complete.  However, this argument is belied by the facts, contradicted by the very cases that Plaintiffs cite, and, if allowed to prevail, would significantly prejudice Defendants.

First, Plaintiffs' brief does not acknowledge or address the fundamental unfairness to Defendants of Plaintiffs initially asserting 17 patents, even though Plaintiffs admit that case narrowing will be necessary before trial.  Plaintiffs do not even dispute the fact that their assertion of 17 patents (far more than plaintiffs typically assert in a single case) is primarily intended to drive up Defendants' litigation costs, insulate Plaintiffs from *inter partes* reviews, and force a settlement.  Plaintiffs' proposal to "narrow" the case to 12 of the 17 patents is not narrowing at all: 12 patents will similarly burden the Court and Defendants with little apparent benefit on the merits of Plaintiffs' claims.

Second, Plaintiffs' arguments about "information imbalance" are misplaced.  Defendants will provide Plaintiffs access to the LEGO® Dimensions source code as part of their core technical document production on January 15, 2020.  That technical product documentation is all the information that Plaintiffs should need in order to make their patent selection.  Moreover, Plaintiffs already have the necessary tools to identify which patents they believe are most likely to be invalid.

Third, Plaintiffs can cite no authority that supports adopting the 80 claim, 12 patent "narrowing" they propose.  Each of the cases Plaintiffs cite involved claim reductions far more significant than the ones that Plaintiffs proposed and in line with Defendants' proposal.  Perhaps more importantly, even Plaintiffs' own authority shows that patent plaintiffs are routinely required

to make choices about what claims to maintain early in a case, prior to claim construction and invalidity contentions.

In summary, Plaintiffs' case narrowing proposal is not supported by authority in this District and is unworkable in practice. Defendants' proposal – which allows Plaintiffs to make the decision about which specific representative patents to assert after receiving Defendants' source code and other technical discovery – is not "unfair" to Plaintiffs. Defendants' Motion, if granted, would dramatically streamline this case and provide guidance to the parties about the merits of Plaintiffs' claims on an accelerated timetable without prejudicing either party.

## I.      PLAINTIFFS' "FAIRNESS" ARGUMENTS ARE MERITLESS

Plaintiffs argue that they need not just technical information about the accused products, but also information about "the prior art landscape, and the Court's claim construction" before electing four patents for a streamlined, bellwether trial. (D.I. 26, the "Opp," at 6). This argument is contrary to the cases that Plaintiffs cite, each one of which required the patent holder to significantly limit the number of asserted claims prior to claim construction and invalidity contentions.[1] It is also contrary to the usual conduct of patent litigation matters, in which patent

---

[1] For example, in *Intuitive Surgical, et al. v. Auris Health, Inc.,* this Court ordered the plaintiffs in an eight-patent case to limit their total number of asserted claims to 50 just after the core technical production had been made, and to further reduce its asserted claims to no more than 32 claims prior to claim construction briefing, and then further down to 20 total claims by the final infringement contention stage. *See* C.A. No. 18-01359-MN at D.I. 62 (April 15, 2019 Order). In *Nuance Comm'ns, Inc. v. MModal LLC, et. al.*, C.A. No. 17-01484-MN at D.I. 82 (August 3, 2018 Order), this Court likewise required plaintiff to narrow its case prior to receipt of defendant's invalidity contentions to no more than 23 claims, which plaintiff had to further reduce by the final infringement contention stage to no more than 18 claims. In a "large," nine patent case involving a total of 216 claims, Judge Andrews ordered plaintiff to narrow the number of asserted claims to 50 in its initial contentions, further reduce the number of asserted claims to 25 shortly after the claim construction hearing, and then make a final election of no more than 10 asserted claims after the close of fact discovery. *NexStep, Inc. v. Comcast Cable Comm'ns, LLC*, C.A. No. 19-01031-RGA (November 13, 2019 Oral Order) and D.I. 30 (Scheduling Order). Likewise, in *VLSI Technology LLC v. Intel Corp.*, C.A. No. 18-00966-CFC at D.I. 136 (April 22, 2019 Order) and D.I. 40 (Scheduling Order), a five patent case, Judge Connolly ordered plaintiff to limit itself to

assertion plaintiffs conduct an analysis of the patents and accused products and narrow their asserted claims ***prior to bringing suit***.  While Plaintiffs at their own admission had several years to conduct such a streamlining (Opp at 1), they apparently did not do so.

The parties have agreed that Defendants will produce core technical documents, including the source code for the LEGO® Dimensions products, on January 15, 2020.  Defendants propose that Plaintiffs elect the four patents on which to proceed on February 19, 2020.  To be clear, Defendants are not insisting that Plaintiffs make their four patent election prior to conducting a review of Defendants' technical information.  To the contrary, Defendants proposed that Plaintiffs make their election ***after*** Defendants' core technical document production, which Defendants have agreed will include source code for the LEGO® Dimensions products.[2]  To the extent Plaintiffs' objection is based on the time period between the production of core technical documents and the deadline for Plaintiffs to make the election (which Plaintiffs did not raise during the meet and confer discussions), then Defendants are amenable to expanding the time for Plaintiffs' and their experts to review those core technical documents.[3]

---

no more than 25 asserted claims a month prior to claim construction briefing, and then further limit its claims to no more than 18 after the issuance of the Court's claim construction order.  In *Ethicon LLC v. Intuitive Surgical, Inc.*, C.A. No. 17-00871-LPS at D.I. 68 (January 9, 2018 Order) and D.I. 47 (Scheduling Order), Judge Stark limited the plaintiff in a seven patent case to 52 claims for infringement contentions, to 30 claims several months before claim construction began, and then to 18 claims by final infringement contentions.

[2] For this reason, Plaintiffs' assertion that they would have to make their patent election "in the dark, based on limited information about the Dimensions product" (Opp at 6) is puzzling. Defendants also expect that Plaintiffs conducted some analysis of Defendants' products prior to bringing suit, as is required by Rule 11, such that they already have some idea about which of their 514 asserted claims are the strongest.

[3] Notably, Defendants also provided the asserted patent technology groupings to Plaintiffs as part of the meet and confer process but, again, received no questions or feedback from Plaintiffs.

Plaintiffs also contend that it would be unfair to have to select four bellwether patents for an initial trial without "detailed sales and marketing information."  However, they have offered no explanation why such information is relevant to Plaintiffs' ability to select four bellwether patents.  Plaintiffs accuse the same few LEGO® Dimensions product components of infringing all of the patents-in-suit.  (D.I. 22 at 3).  Therefore, substantially the same sales and marketing data would be relevant to all of the asserted patents, and Plaintiffs have no reasonable explanation why such information is necessary for the four bellwether patent selection.

Plaintiffs' proposal would shift a significant burden onto Defendants to produce their invalidity arguments for 80 claims from 12 patents before Plaintiffs substantially narrow their case.  Foisting such a burden on Defendants would give Plaintiffs, not Defendants, an unfair advantage.  Moreover, this Court routinely requires plaintiffs to make significant case narrowing prior to receiving invalidity contentions.[4]

In any event, Plaintiffs already have all the information they need to determine which of the asserted patents are most likely to survive an invalidity challenge – which patents can claim the earliest priority date and have the narrowest claim scope.  Plaintiffs also may have information from prior licensees and its own investigations about the most significant potential sources of invalidating art.  Therefore, deferring any significant claim narrowing until *after* Defendants have undertaken the significant expense associated with preparing invalidity contentions for 80 claims of 12 different patents is designed only to give Plaintiffs the chance to improperly exert settlement leverage and guard against petitions for *inter partes* review.

Finally, Plaintiffs do not dispute that the bellwether approach Defendants propose would give the parties information about the merits of Plaintiffs' claims as to *all* of the asserted patents.

---

[4] *See, e.g.,* decisions cited in footnote 1, which were also cited by Plaintiffs.

Instead, Plaintiffs baldly assert that Defendants' proposal affects their "due process and Seventh Amendment rights." (Opp at 6). That is incorrect. As Plaintiffs acknowledge (Opp at 7), Defendants' proposal would merely sever and stay litigation on 13 patents while the four-patent, bellwether trial proceeds. Plaintiffs would be giving up no rights whatsoever to the stayed claims under such a procedure. Any supposed prejudice that Plaintiffs would suffer as a result of the delay in litigating those 13 severed patents is belied by Plaintiffs' own delay in bringing this lawsuit, their failure to seek preliminary injunctive relief, and the fact that Defendants' LEGO® Dimensions products have been discontinued for nearly two years.

A four-patent case can proceed on a much faster schedule than a 12 patent, 80 claim case. The parties would also receive guidance from the Court (and PTAB, if applicable) concerning the merits of all of Plaintiffs' claims that much sooner. The streamlined case would be less expensive for the parties to litigate and less time consuming for the Court. Thus, taking all the facts into consideration, Defendants' four-patent, bellwether trial procedure is fairer to ***both sides*** than Plaintiffs' proposal.

## II.   PLAINTIFFS' PROPOSAL DOES NOT ADEQUATELY NARROW THE CASE FOR CLAIM CONSTRUCTION, DISCOVERY, OR TRIAL

Plaintiffs concede that a significant case narrowing is necessary in this matter. Plaintiffs also do not dispute that one patent from each technology group, if chosen, would be representative of Plaintiffs' infringement claims as a whole.

But Plaintiffs propose to make their elections only after Defendants and the Court have expended significant, but ultimately unnecessary, effort on infringement and invalidity contentions, claim construction, and dispositive motion practice.

In an effort to undermine Defendants' arguments that the four-patent trial will promote significant case efficiencies, Plaintiffs contend that Defendants incorrectly speculate about the

number of claim construction disputes that would result from Plaintiffs' 80 patent claim narrowing proposal.  (Opp at 4).  However, even without information about which 80 claims Plaintiffs would select, Defendants can confidently claim that the number of claim construction disputes presented under Plaintiffs' proposal would be significant.  That is because there are important differences between even seemingly similar terms across the patent technology groups, all of which would need to be dealt with at claim construction.

As just an example, Plaintiffs' Complaint indicates that across the 17 asserted patents, Plaintiffs are reading at least 27 different claim terms on just one component of the accused products, namely the LEGO® Dimensions figurines.[5]  In the Gaming ID Patent Group alone, there are five such terms being read on the LEGO® Dimensions figurines, as illustrated below:

---

[5] *See* D.I. 1 at ¶¶ 57 ("***collectable figures***" for '275 Patent); 70 ("***collectible toys***" for '515 Patent); 85 ("***portable wireless toy***" comprising a "toy body," "unique identification number uniquely identifying said portable wireless toy" and "second RF transceiver" for '180 Patent); 96 ("***gaming item comprising a portable toy***" for '688 Patent); 110 ("***doll or action figure***" for '533 Patent); 122 ("***[first/second] wireless toy***" for '149 Patent); 135 ("***game token or toy***" for '206 Patent); 150 ("***gaming toys each representing a person, character, or object in said game***" for '491 Patent); 165 ("***a plurality of modular components configured to be selectively and detachably assembled by a game participant to form a doll, action figure or object***" for '500 Patent); 180 ("***wireless game token***" for '380 Patent); 195 ("***a wireless-enabled toy representing a playable character in said computer-animated game and comprising a wirelessly powered radio-frequency identification (RFID) tag configured to wirelessly communicate with one or more compatible RFID tag readers communicatively associated with said compatible game console***" for '334 Patent); 209 ("***gaming toys each representing a person, character, or object in said game***" for '797 Patent); 227 ("***[first/second] physical toy comprising a doll or action figure***" for '652 Patent); 241 ("a plurality of ***interchangeable modular components*** configured to be selectively and detachably assembled by a game participant ***to form a physical object corresponding to a virtual object*** in a computer-animated game played by said game participant on a compatible gaming platform" for '724 Patent); 258 ("***physical gaming item for accessing selected features or portions of a virtual game carried out on one or more compatible gaming platforms***" for '790 Patent); 273 ("***a plurality of modular components*** configured to be selectively and detachably secured to one another by a game participant ***to form a modularly constructed toy*** having one of a variety of possible assembled configurations" for the '624 Patent); 290 ("***at least one gaming toy configured to be moved or positioned selectively by said game participant as part of said game, said gaming toy having an internal cavity containing a radiofrequency identification (RFID) tag***" for '283 Patent).

6

"collectable figures"; "gaming item"; "doll or action figure"; "first physical toy"; and "second physical toy". Each claim further includes specific elements that "comprise" the figure, item, or toy claimed. For example, the claimed "gaming item" must comprise a "portable toy" that is configured in a specific way. The "first/second physical toy" likewise must include certain RFID components and be configured to be used in a specific way.

**Gaming ID Patent Group:**

1. **'275 Patent (claim 1 excerpt)**: "one or more ***collectable figures*** depicting or representing persons, characters or objects associated with a computer-animated game, each said collectable figure comprising an electronically-readable radio frequency identification (RFID) tag comprising a unique identification number for uniquely identifying each said corresponding ***collectable figure***"

2. **'688 Patent (claim 47 excerpt)**: "***at least one gaming item*** comprising ***a portable toy*** configured to be used by a game participant as a player input device or a player tracking device in a computer-animated game carried out on a compatible gaming platform"

3. **'533 Patent (claim 1 excerpt)**: "***doll or action figure*** comprising a first radio frequency identification (RFID) comprising non-volatile memory storing a first selection of information configured to enable a game participant to access and play a computer animated game on a compatible gaming platform"

4. **'652 Patent (claim 1 excerpt)**: "***a first physical toy*** comprising ***a doll or action figure*** configured to enable a game participant to access a virtual game character in a computer-animated game played by said game participant on a compatible gaming platform, said ***first physical toy*** comprising a first radiofrequency identification (RFID) tag comprising non-volatile memory storing a first selection of information comprising machine-readable data identifying or describing said virtual game character; ***a second physical toy*** configured to be used in conjunction with ***said first physical toy*** to enable said game participant to access one or more optional features of said computer-animated game, said ***second physical toy*** comprising a second RFID tag comprising programmable non-volatile memory configured to store a second selection of information comprising machine-readable data identifying or describing said one or more optional features"

5. **'624 Patent (claim 1 excerpt)**: "***gaming toy*** for playing a game that combines elements of physical play and virtual play, said ***gaming toy*** comprising: ***a plurality of modular components*** configured to be selectively and detachably secured to one another by a game participant ***to form a modularly constructed toy*** having one of a variety of possible assembled configurations"

7

The claim elements being read on the LEGO® Dimensions figurines from the other patent groups likewise use different claim terms comprised of different features and functionality that will need to be construed.  (*See* footnote four above).  The fact that there will be at least 27 claim construction disputes for ***one claim element*** of the ***17*** representative patent claims identified in Plaintiffs' complaint make clear that a ***80*** claim, 12 patent case will involve ***many multiples*** of that number of claim construction issues.

Plaintiffs' proposal, which would keep 80 claims from 12 patents at issue in the case through claim construction, would do nothing to narrow the number of claim construction disputes to something that would be manageable for the parties and the Court.  Defendants' proposal, which would limit the case to only four patents, would substantially limit the number of independent and dependent claims at issue, resulting in a more manageable case for claim construction and any dispositive motion practice.

## III.   DEFENDANTS' PROPOSAL IS MORE CONSISTENT WITH PRECEDENT

Plaintiffs argue that their proposed schedule is "in line with this District's practice of adopting a multi-phase narrowing procedure."  (Opp at 4).  This argument, however, puts form over substance.  Each of the cases cited by Plaintiffs (all of which concerned significantly fewer total asserted patents) adopted multi-stage case narrowing-proposals that began, and ended, with a much lower total claim limit than Plaintiffs propose.[6]  Even the two cases cited by Plaintiffs that concern 10 and 12 asserted patents involved far fewer asserted patent claims.

*Deere & Co. v. Agco Corp et. al.,* C.A. No. 18-00827-CFC, which was originally filed asserting 12 patents, and later amended to assert 13 patents, is the most factually on point.  In *Deere & Co.,* approximately 200 patent claims were included in the patents-in-suit, and defendants

---

[6] *See, e.g.,* cases cited in footnote one.

filed a motion to limit the number of claims, proposing an initial narrowing to 25 claims as part of the infringement contentions and then 10 total claims after receipt of the claim construction order.   *See* C.A. No. 18-00827-CFC at D.I. 47 (Motion to Limit).  Plaintiffs responded seeking to keep 50 claims until submission of Joint Claim Construction Statement, and then 25 for trial.  *Id. at* D.I. 56 (Answering Brief in Opposition to Motion to Limit).  The Court ultimately ordered plaintiff limited to no more than 39 claims with its infringement contentions, then to 20 claims before claim construction briefing, and to 10 claims within 30 days of issuance of the claim construction order.  *See id.* at D.I. 72 (Scheduling Order).

*LEO Pharma A/S v. Actavis Labs. UT, Inc.* concerned 10 patents-in-suit.  In *LEO Pharma,* the plaintiff voluntarily reduced the number of asserted patent claims to 49 and 69 for the two defendants, and the Court further ordered that the plaintiff reduce the claims to 40 after claim construction and 20 after completion of expert discovery.  *See LEO Pharma A/S v. Actavis Labs. UT, Inc.*, 16-00333-JFB at D.I. 287 (March 29, 2018 Order) and D.I. 181 (Amended Scheduling Order).

Plaintiffs propose to "narrow" their case, this would still result in several times more claims than the cases on which they rely.  They further propose to reduce the number of claims at issue more slowly than in the cases they cite, making a reduction to 20 claims only ***after*** the parties and Court have engaged in the expensive and time-consuming claim construction and dispositive motion practice.  While Plaintiffs may contend that their proposal is consistent with the approximate number of claims per patent that have been allowed in past cases, they ignore the fact that a total of 17 asserted patents and 514 patent claims is unprecedented.  In this situation, the "typical" per-patent claim limitation just would not be sufficient to reasonably streamline this case.

IV.   **PLAINTIFFS' ONLY BASIS TO DISTINGUISH DEFENDANTS' CASES UNDERSCORES THE MERITS OF DEFENDANTS' MOTION**

Because Plaintiffs cannot dispute that this Court has the authority and discretion to control its own docket and grant the relief Defendants seek, and has done so on the numerous occasions, Plaintiffs' resort to trying to factually distinguish Defendants' supporting authority based on the procedural posture of those cases.   Essentially, Plaintiffs contend that in each of those cases "plaintiff had the benefit of full discovery, claim construction, and invalidity contentions prior to making its [bellwether patent] selection."  (Opp at 10).  But, as previously explained above, such arguments have little weight in light of the lengthy tradition in this District of requiring patent plaintiffs to make significant reductions in the number of their asserted claims prior to even receiving invalidity contentions as an exercise in managing the Court's docket and streamlining patent cases for trial.  The fact that judges in this District have employed techniques of staggering trials by family group or into a first, bellwether proceeding illustrates the benefits of such procedures.  Imposing case management procedures now would only increase the efficiencies achieved in those procedures.  The parties and Court know such a significant narrowing *will be* necessary for the five day trial the Plaintiffs have proposed,.  As such, it makes sense to consider adopting a bellwether approach now, before the parties and Court waste unnecessary time and effort.

V.   **CONCLUSION**

For all of the foregoing reasons, this Court should order Plaintiffs to select four bellwether patents for initial discovery, claim construction, and trial along the lines of the schedule set forth in Defendants' proposal, and sever and stay the remaining thirteen patents-in-suit.

*(Signature Block on Following Page)*

10

Respectfully submitted,

Dated: December 16, 2019

**DUANE MORRIS LLP**

**OF COUNSEL:**

Alison Haddock Hutton (admitted *pro hac vice*)
ahhutton@duanemorris.com
**DUANE MORRIS LLP**
1075 Peachtree Street, NE
Suite 2000
Atlanta, GA 30309-3929
Telephone: (404) 253-6932

Anthony J. Fitzpatrick (admitted *pro hac vice*)
ajfitzpatrick@duanemorris.com
**DUANE MORRIS LLP**
100 High Street, Suite 2400
Boston, MA 02110-1724
Telephone: (857) 488-4220

Patrick D. McPherson (admitted *pro hac vice*)
pdmcpherson@duanemorris.com
**DUANE MORRIS LLP**
505 9th Street, Suite 1000
Washington, D.C. 20004-2166
Telephone: (202) 776 5214

Gregory S. Bombard (admitted *pro hac vice*)
gbombard@duanemorris.com
**DUANE MORRIS LLP**
100 High Street, Suite 2400
Boston, MA 02110-1724
Telephone: (857) 488 4235

*/s/ Richard L. Renck*
Richard L. Renck (#3893)
rlrenck@duanemorris.com
**DUANE MORRIS LLP**
222 Delaware Avenue, Suite 1600
Wilmington, DE 19801
Telephone: (302) 657-4900
Facsimile: (302) 657-4901

*Counsel for Defendants LEGO Systems, Inc., LEGO Brand Retail, Inc., Warner Bros. Home Entertainment Inc., Warner Bros. Interactive Entertainment Inc., and WB Games Inc.*