IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MQ GAMING, LLC and CREATIVE KINGDOM TECHNOLOGIES LLC | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) C.A. No. 19-905 (MN) ) |
| LEGO SYSTEMS, INC., LEGO BRAND RETAIL, INC., WARNER BROS. HOME ENTERTAINMENT INC., WARNER BROS. INTERACTIVE ENTERTAINMENT INC., and WB GAMES INC., | ) ) ) ) ) ) ) ) |
| Defendants. | ) |

**MEMORANDUM ORDER**

At Wilmington this 20th day of October 2020:

IT IS HEREBY ORDERED that the claim terms of U.S. Patent Nos. 8,475,275 ("the '275 Patent"), 8,702,515 ("the '515 Patent"), 8,790,180 ("the '180 Patent"), 8,814,688 ("the '688 Patent"), 9,039,533 ("the '533 Patent"), 9,162,149 ("the '149 Patent"), 9,393,491 ("the '491 Patent"), 9,393,500 ("the '500 Patent"), 9,463,380 ("the '380 Patent"), 9,737,797 ("the '797 Patent"), and 9,770,652 ("the '652 Patent") with agreed-upon constructions are construed as follows (*see* D.I. 80)[1]:

>    1.  "ascertain selected game-relevant information" / "ascertain therefrom said first selection of game relevant information and said second selection of game relevant information" / "ascertain said corresponding first and second selections of information" / "ascertain said first and second selections of game-relevant information" / ascertain [] said first selection of game relevant information" / "ascertain said selected game-relevant information" / "ascertain a second selection of information" / "ascertain from said RF

---

[1] The parties filed four Joint Claim Construction Charts: D.I. 50, 55, 78-1, 80. The Court refers to and considers the final chart, D.I. 80, Third Amended Joint claim Construction Chart dated September 2, 2020.

    transceiver said first and second selections of information" / "ascertain said machine-readable data from each said RFID tag" / "ascertain said corresponding first and second selections of information" means "receive a transmission of said [game relevant information]" ('275 Patent – Claims 1 & 38, '688 Patent – Claim 47, '533 Patent – Claim 1, '149 Patent – Claims 1 & 13-16, '491 Patent – Claim 2, '500 Patent – Claim 8, '797 Patent – Claims 1 & 8, '652 Patent – Claims 1 & 9);

2. "physical gaming item[s]" means "physical item used in playing said computer-animated game" ('275 Patent – Claim 38);

3. "each of said one or more interactive toys" means "each of said one or more wireless interactive toys" ('515 Patent – Claim 29);

4. "each said toy" means "each of said one or more wireless interactive toys" ('515 Patent – Claim 29);

5. "at least one gaming item comprising a portable toy" means "at least one item used in playing said computer-animated game comprising a portable toy" ('688 – Claim 47);

6. "wireless toy" means "a toy capable of wireless communication" ('149 Patent – Claim 1);

7. "cause said effects controller to display at least one sound effect or lighting effect and wherein said at least one sound effect or lighting effect is selected based at least in part on said machine-readable data" means "cause said effects controller to display at least one lighting effect or audibly generate at least one sound effect and wherein said at least one sound effect or lighting effect is selected based at least in part on said machine-readable data" ('797 Patent – Claim 1);

8. "wherein said game software comprises instructions for said effects controller to cause display of a first sound effect or lighting effect when said machine-readable data satisfies a first set of conditions and a second sound effect or lighting effect when said machine-readable data satisfies a second set of conditions, and wherein said first set of conditions is different than said second set of conditions" means "wherein said game software comprises instructions for said effects controller to cause display of a first lighting effect or audibly generate a first sound effect when said machine-readable data has a first value and display a second lighting effect or audibly generate a second sound effect when said machine-readable data has a second value, and wherein said first value is different than said second value." ('797 Patent – Claim 1);

9. "change said second selection of information based on one or more objectives accomplished by said game participant in said computer-animated game" means "change a value of said second selection of

2

> information based on one or more objectives accomplished by said game participant in said computer-animated game" ('652 Patent – Claim 1);

10. "lighting effect" means "an effect capable of changing color of light or intensity of light" ('180 Patent – Claims 1 & 33; '533 Patent – Claim 7; '149 Patent – Claim 6; '491 Patent – Claim 2; '797 Patent – Claims 1 & 5; '652 Patent – Claim 7);

11. "game participant" means "person who uses [the gaming platform] to play the game." ('275 Patent – Claims 1 & 38; '515 Patent – Claim 29; '180 Patent – Claims 1, 22, & 33); '688 Patent – Claim 47; '533 Patent – Claim 1; '149 Patent – Claims 1, 8, & 15); ' Patent 491 – Claim 2; '500 Patent – Claim 1; '380 Patent – Claim 1; '797 Patent – Claim 1; '652 Patent – Claims 1, 9, & 15);

12. "aurally represented" means "acoustically played" ('515 Patent – Claim 29);

13. "develop certain skills, abilities or attributes associated with said one or more game characters or objects" / "progress or development of a corresponding game character played by said game participant in said game" means "gain or lose certain skills, abilities, or attributes of a specific game character or object that is associated with a specific [game piece] and played by said game participant in said virtual game environment" ('515 Patent – Claim 29);

14. "teach or train a game participant " means "direct a game participant" ('180 Patent – Claim 19);

15. "a plurality of modular components configured to be selectively and detachably assembled by [a/said] game participant" means "a plurality of standardized and interchangeable components configured to be optionally and detachably assembled by a game participant" ('500 Patent – Claim 1; '652 Patent – Claims 5, 9, & 15);

16. "at least one access code" means "said at least one encrypted access code" ('380 Patent – Claim 1);

17. "enable a game participant to access one or more portions or features of a game that would otherwise be inaccessible to said game participant" means "<u>allow</u> a game participant to access features or portions of a computer-animated game carried out on said one or more compatible gaming platforms that are otherwise inaccessible" ('380 Patent – Claim 1);

18. "player input device" means "device configured to generate one or more input signals based on selected positioning or movements of the portable toy made by a game participant" ('688 Patent – Claim 47);

3

19. "selection of information configured to enable a game participant to access [and play] [one or more optional features of] [a/said] computer-animated game" shall have its plain and ordinary meaning ('533 Patent – Claim 1);

20. "a first encryption key uniquely associated with said first RFID-tagged toy" shall have its plain and ordinary meaning ('149 Patent – Claim 8);

21. "selected attributes" / "selected traits or attributes" / "certain skills, abilities or attributes" / "attributes" / "in-game attributes" / "changeable attributes" / "powers or abilities" shall have its plain and ordinary meaning ('275 Patent – Claims 1 & 38; '515 Patent – Claim 29; '688 Patent – Claims 47 & 51; '533 Patent – Claim 3; '491 Patent – Claim 2; '500 Patent – Claim 1; '797 Patent – Claims 1 & 8; '652 Patent – Claims 8, 14, & 19);

22. "selected game-relevant information" shall have its plain and ordinary meaning ('275 Patent – Claims 1 & 38); and

23. "said game relevant information" shall have its plain and ordinary meaning ('515 Patent – Claim 29).

The parties also agree that the preambles of the following claims are limiting:

'515 Patent – Claim 29
'180 Patent – Claim 33
'491 Patent – Claim 2
'797 Patent – Claim 8

(*See* D.I. 80 at 5).

Further, as announced at the hearing on September 3, 2020, IT IS HEREBY ORDERED that the disputed claim terms of the '275 Patent, the '515 Patent, the '180 Patent, the '688 Patent, the '149 Patent, the '491 Patent, the '500 Patent, the '380 Patent, the '797 Patent, and the '652 Patent are construed as follows:

1. "depicting or representing persons, characters or objects associated with a computer-animated game" / "depicting or representing persons, characters or objects associated with said game" / "depicting or representing said game characters or objects relevant to said game" / "depict or represent one or more of a person, a character or an object relevant to said computer-animated game" / "depicting or representing a person, character, or object relevant to said interactive game" / "representing a person, character or object in said game" / "relevant to a computer-animated game" / "depicting or representing a different character or object in said computer-animated game" "corresponding to a character or object in said game" /

4

    "corresponding to a virtual object in a computer-animated game" means "having the same or similar overall visual appearance as a computer-animation of a specific person, character or object in a computer-animated game" ('275 Patent – Claims 1 & 38, '515 Patent – Claim 29, '491 Patent – Claim 2, '500 Patent – Claim 1, '380 Patent – Claim 2, '797 Patent – Claims 1 & 8, and '652 Patent – Claim 15);

2.   "unique identification number" / "unique tag identification" / "unique tag identifier" means "a unique coded value associated with a specific RFID tag" ('275 Patent – Claims 1 & 38, '515 Patent – Claim 29, '180 Patent – Claims 1, 22, & 33, '688 Patent – Claim 47, '491 Patent – Claim 2, '500 Patent – Claim 1, '380 Patent – Claim 1, '797 Patent – Claims 1 & 8, '652 Patent – Claim 15);

3.   "game-relevant information" means "machine-readable information related to a game" ('275 Patent – Claims 1 & 38, '180 Patent – Claim 33, '688 Patent – Claim 47, '149 Patent – Claims 1, 8, & 15, '380 Patent – Claim 7);

4.   "access code comprising encrypted information" / "encryption-protected [] access code" means "encrypted information used to gain access to a game where the encrypted information is not the same as the unique identification number" ('149 Patent – Claims 1, 8, & 13);

5.   "programmable[,] non-volatile memory" / "nonvolatile[,] programmable memory" means "non-volatile memory capable of being written" ('275 Patent – Claims 1 & 38, '688 Patent – Claim 47, '149 Patent – Claim 1, '491 Patent – Claim 2, '500 Patent – Claim 1, '380 Patent – Claim 7, '797 Patent – Claim 8, '652 Patent – Claims 1 & 15);

6.   "physical play environment" shall have its plain and ordinary meaning ('180 Patent – Claims 1, 22, & 33, '491 Patent – Claim 2, '797 Patent – Claim 8);

7.   "gaming device" shall have its plain and ordinary meaning ('180 Patent – Claims 1, 22, & 33, '491 Patent – Claim 2);

8.   "moved or positioned by a game participant . . . to selectively activate or control" / "held, moved, and positioned selectively by a game participant . . . to selectively activate or control" shall have their plain and ordinary meaning ('180 Patent – Claims 1, 22, & 33); and

9.   "wherein said interactive game comprises a main game portion configured to be accessed and played by said game participant using said compatible gaming device, and one or more additional game portions or features accessed by said game participant using said compatible gaming device in combination with said one or more wireless toys" shall have its plain and ordinary meaning ('149 Patent – Claim 8).

5

The parties briefed the issues (*see* D.I. 73) and Defendants provided a tutorial describing the relevant technology. The Court carefully reviewed all submissions in connection with the parties' contentions regarding the disputed claim terms, heard oral argument (*see* D.I. 89), and applied the following legal standards in reaching its decision.

## I.    LEGAL STANDARD

"[T]he ultimate question of the proper construction of the patent [is] a question of law," although subsidiary fact-finding is sometimes necessary. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837-38 (2015). "[T]he words of a claim are generally given their ordinary and customary meaning [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc) (internal citations and quotation marks omitted). Although "the claims themselves provide substantial guidance as to the meaning of particular claim terms," the context of the surrounding words of the claim also must be considered. *Id.* at 1314. "[T]he ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted).

The patent specification "is always highly relevant to the claim construction analysis . . . [as] it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). It is also possible that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. "Even when the specification describes only a single embodiment, [however,] the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to

limit the claim scope using words or expressions of manifest exclusion or restriction." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014) (internal quotation marks omitted) (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004)).

In addition to the specification, a court "should also consider the patent's prosecution history, if it is in evidence." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). The prosecution history, which is "intrinsic evidence, . . . consists of the complete record of the proceedings before the PTO [(Patent and Trademark Office)] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

In some cases, courts "will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 135 S. Ct. at 841. Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. Expert testimony can be useful "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Phillips*, 415 F.3d at 1318. Nonetheless, courts must not lose sight of the fact that "expert reports and testimony [are] generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id.* Overall, although extrinsic evidence "may

7

be useful to the court," it is "less reliable" than intrinsic evidence, and its consideration "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318-19.  Where the intrinsic record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper.  *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (citing *Vitronics*, 90 F.3d at 1583).

## II.     THE COURT'S RULING

The Court's rulings regarding the disputed claim terms of the '275, '515, '180, '688, '149, '491, '500, '380, '797, and '652 Patents were announced from the bench at the conclusion of the hearing as follows:

> [T]hank you for the arguments today.  They were very helpful.  At issue we have eleven patents, in four families,[2] and nine disputed claim terms.
>
> I am prepared to rule on each of those disputes.  I will not be issuing a written opinion, but I will issue an order stating my rulings.  I want to emphasize before I announce my decisions that although I am not issuing a written opinion, we have followed a full and thorough process before making the decisions I am about to state.  I have reviewed each of the patents in dispute.  Those patents were the only intrinsic evidence submitted – the only evidence submitted.  There was full briefing on each of the disputed terms.  There was also a tutorial on the technology submitted by Defendants.  And there has been argument here today.  All of that has been carefully considered.
>
> Now as to my rulings.  As an initial matter, I am not going to read into the record my understanding of claim construction law generally.  I have a legal standard section that I have included in earlier opinions, including recently in *Best Medical International v. Varian Medical Systems, Inc.,* Civil Action No. 18-1599.  I incorporate that law and adopt it into my ruling today and will also set it out in the order that I issue.

---

[2]     The '275 Patent, '688 Patent, '533 Patent, '500 Patent, and '652 Patent share a specification, the '180 Patent, '491 Patent, and '797 Patent share another specification, the '515 Patent and '149 Patent share another specification, and the '380 Patent has yet another specification.

Neither party has offered a definition of a person of skill in the art in their papers, but the parties seem to agree that there are no disputes as to who a person of ordinary skill is that are relevant to the issues before me today.

Now the disputed terms:

The first term is actually a number of terms in various claims that involve the relationship between the appearance of a physical object and a virtual character.[3] The parties agree that each of the iterations has the same meaning.

During the argument today, the parties agreed to the construction "having the same or similar overall visual appearance as a computer-animation of a specific person, character or object in a computer-animated game." I will adopt that construction.

The second term is also a group of similar claim terms in various claims that the parties agree have the same meaning. The terms here are "unique identification number," "unique tag identification," and "unique tag identifier."[4]

Plaintiffs propose the construction "a unique coded value associated with a specific RFID tag." Defendants proposed the construction "a unique preselected coded value associated with a specific RFID tag." The dispute here is whether the coded value

---

[3] The terms as listed in the Third Amended Joint Claim Construction Chart (D.I. 80) are "depicting or representing persons, characters or objects associated with a computer-animated game" / "depicting or representing persons, characters or objects associated with said game" / "depicting or representing said game characters or objects relevant to said game" / "depict or represent one or more of a person, a character or an object relevant to said computer-animated game" / "depicting or representing a person, character, or object relevant to said interactive game" / "representing a person, character or object in said game" / "relevant to a computer-animated game" / "depicting or representing a different character or object in said computer-animated game" "corresponding to a character or object in said game" / "corresponding to a virtual object in a computer-animated game". These terms are in claims 1 and 38 of the '275 Patent, claim 29 of the '515 Patent, claim 2 of the '491 Patent, claim 1 of the '500 Patent, claim 2 of the '380 Patent, claims 1 and 8 of the '797 Patent and claim 15 of the '652 Patent.

[4] These terms are in claims 1 and 38 of the '275 Patent, claim 29 of the '515 Patent, claims 1, 22, and 33 of the '180 Patent, claim 47 of the '688 Patent, claim 2 of the '491 Patent, claim 1 of the '500 Patent, claim 1 of the '380 Patent, claims 1 and 8 of the '797 Patent and claim 15 of the '652 Patent.

9

must be "preselected," which Defendants say contemplates that a choice is made by the participant or the vendor in a retail transaction.

I am going to adopt Plaintiffs' construction. Defendants cite to several embodiments in the specifications that reference preselected or pre-programmed values.[5] Those references, however, appear to refer to address storage blocks with a transmitter module and not the unique identification numbers of the claims, which are limited to RFID. In the patents, where the actual term at issue here – "unique identification number" – is used, there is no reference to "preselection." Instead, it simply says, for example, that the RFID tag comes with the unique identification number, not that a choice must be made.[6] Thus, I cannot conclude that "preselected" is required and I will not add that to the term.

The third term is "game-relevant information."[7] Plaintiffs propose it has its plain and ordinary meaning, which is "machine-readable information related to a game." Defendants' latest amended proposed construction is "machine-readable data pertinent to a game participant's play experience." Thus, the parties agree that "information" means "machine-readable data" but dispute the meaning of "game-relevant."

Here, I agree with Plaintiffs and will construe the term to have its plain and ordinary meaning of "machine-readable information related to a game." Defendants' addition of the words "pertinent to a game participant's play experience" are not supported by the specification or the claims. To be sure, there are

---

[5]   (*See* D.I. 73 at 15 (citing '275 Patent col 19, ll. 63-67 (describing RFID tag "pre-programmed with a unique person identifier number ("UPIN") and unique group identifier number ("UGIN")"), col. 36, ll. 56-57 (unique coded value is "a preselected coded value that may be uniquely associated with a particular transmitter module 150"), col. 39, ll. 16-21 ("Address storage 368 includes addressable registers or memory 386 in which are stored the preselected coded identification values corresponding to the preselected coded identification value of each of a plurality of compatible RF transmitter modules 150 desired to be operably associated with receiver 362."); see also '515 Patent col. 12, ll. 23-37, col. 21, ll. 40-44; '180 Patent col. 18, ll. 21-25, col. 27, ll. 27-29, col. 34, .ll. 58-61; '380 Patent, col. 15, ll. 9-33; col. 20, ll. 35-38; col. 24 , ll. 46-49)).

[6]   (*See, e.g.*, '515 Patent col. 21, ll. 40-44, col. 33, ll. 8-10;'275 Patent col. 63, ll. 52-57, col. 67, ll. 4-7, col. 71, ll. 5-7; '533 Patent, col. 63, ll. 36-40, col. 70, ll. 51-53; '380 Patent, col. 20, ll. 34-38; '652 Patent, col. 65, ll. 20-25; '688 Patent, col. 63, ll. 36-47; '500 Patent, col. 63, ll. 53-64).

[7]   This term is in claims 1 and 38 of the '275 Patent, claim 33 of the '180 Patent, claim 47 of the '688 Patent, claims 1, 8, and 15 of the '149 Patent and claim 7 of the '380 Patent.

some types of game-relevant information described in the patents that are relevant to the play experience but there are others that are not clearly related. For example, claim 43 of the '515 Patent says that the game-relevant information includes "at least said unique identification number," which is not clearly pertinent to the play experience. Indeed, during the argument Defendants asserted that, contrary to the claim language, a unique identification number alone was not sufficient under its construction. Similarly, claims 1 and 15 of the '149 Patent claim game relevant information comprising an access code and an encryption key" – neither of which is clearly pertinent to the play experience of a user.

The fourth term is two similarly worded phrases: "access code comprising encrypted information" and "encryption-protected [] access code," which are in claims 1, 8, and 13 of the '149 Patent. Plaintiffs say it has its plain and ordinary meaning, which they offer is "encrypted information used to gain access to a game." Defendants construe the term as "encrypted password obtained from a participating game venue distinct from unique identification number."

During the argument, the parties agreed that the encrypted password is not the same as the unique identification number. So the only remaining dispute is whether the source of access codes is limited.

I agree with Plaintiffs and construe this term to mean "encrypted information used to gain access to a game where the encrypted information is not the same as the unique identification number." In doing so, I conclude that the source of the access code is not limited to a game venue as Defendants propose.

Initially, I note that venue is described very broadly as comprising dentists and doctors['] offices, automobiles, television sets, et cetera, and combinations thereof.[8] And so I'm not entirely sure Defendants' construction is adding to the understanding of the claim.

But, in any event, Defendants argue that the '149 Patent describes only the secret codes "'obtained from' participating venues, and the claims should be limited to the embodiment enabled by the specification."[9] In support, Defendants cite to portions of

---

8 (*See e.g.,* '149 Patent col. 27, ll. 9-20).

9 (D.I. 73 at 37).

11

sentences in the specification describing certain examples and access codes. Yet one pertinent sentence from those examples says, in full: "These secret codes or pass words may be obtained from any participating game venue (e.g., fast food venues, toy store, theme parks, etc.) or other sources that will become obvious once the game is implemented."[10] Moreover, the specification explicitly notes that all such examples are "provided for purposes of illustration and for better understanding of the invention and should not be taken as limiting the invention in any way." This language is contrary to Defendants' argument and suggests that the source of access codes is not limited.

I understand that Defendants say that the "other sources" mentioned in the specification are not enabled, but that is not an issue that I can address on the record before me with the arguments made today.

The fifth [6] term is "programmable[,] non-volatile memory" or "non-volatile[,] programmable memory."[11] Plaintiffs asset the term has its plain and ordinary meaning, which they say is "non-volatile memory capable of being written." Defendants construe the term to mean "non-volatile memory capable of being written by the RFID reader or game platform."

The dispute is whether the claims require the claimed memory to be written generally (as Plaintiffs propose) or written by an RFID reader or game platform specifically (as Defendants propose).[12]

Here, I cannot find support to read in the limitation proposed by Defendants. Although it may be that many of the embodiments involve writing by an RFID writer or game platform, there are also statements that are not so limited. For example, in the '275 Patent at column 40, lines 24 through 26, it states that "[o]nce set by the manufacturer or the user, the preselected coded value stored . . . is fixed and will not change absent human intervention." This indicates that the coded value can be set by the manufacturer or the user, neither of whom is included in Defendants' construction.

---

[10] ('149 Patent, col. 25 ll. 23-26).

[11] These terms are in claims 1 and 38 of the '275 Patent, claim 47 of the '688 Patent, claim 1 of the '149 Patent, claim 1 of the '491 Patent, claim 1 of the '500 Patent, claim 7 of the '380 Patent, claim 8 of the '797 Patent and claims 1 and 15 of the '652 Patent.

[12] (D.I. 73 at 40).

Defendants argue that the value described in that part of the specification is fixed and thus it is not "programmable"; however, the specification states that it is fixed unless changed by human intervention, not that it cannot be changed at all.

Thus, I will construe the term to mean "non-volatile memory capable of being written."

The sixth [9] term is "physical play environment" in claims 1, 22, and 33 of the '180 Patent, claim 2 of the '491 Patent, and claim 8 of the '797 Patent. Plaintiffs assert that it should have its plain and ordinary meaning. Defendants construe the term to mean "a themed play area, play structure, family entertainment center, theme park, or game center."

Here, I again agree with Plaintiffs and construe the term to have its plain and ordinary meaning. Defendants' construction improperly reads in some embodiments from the specification while at the same time excluding others. For example, the '180 Patent, at column 2, lines 5 through 21, describes a physical play environment broadly as "virtually any suitable play environment, play structure, play area or other area (either commercial or residential), as desired." And it goes on to say that the play environment may be "a multi-purpose area such as a restaurant dining facility, family room, bedroom or the like."[13] There is no basis in the intrinsic evidence to limit the play environment to the specific areas proposed by Defendants. And I will not do so.

The seventh [10] term is "gaming device" in claims 1, 22, and 33 of the '180 Patent and claim 2 of the '491 Patent. The parties agree that the term has the same meaning in each of these claims.

Plaintiffs argue that "gaming device" should be given its plain and ordinary meaning and notes that "[d]epending on the claim, 'gaming device' may refer to different devices and each device does not necessarily 'control at least one portion of the game.'" Defendants dispute that and propose the construction "a device including a processor configured to control at least one portion of a game carried out in one of a physical play environment or a virtual play environment."

---

13      (*See also* '180 Patent col. 28, l. 65-col. 29, l. 14 (describing the physical play environment as merely an "RFID-enabled play facility"), col. 52, ll. 29-63; '491 Patent, col. 2, ll. 14-30, col. 54, ll. 6-11; '797 Patent, col. 2, ll. 5-21, col. 28, l. 65-col. 29, l. 14, col. 52, ll. 59-63).

Here, I agree with Plaintiffs and will construe this term to have its plain and ordinary meaning. In doing so, I reject Defendants' efforts to add the requirement that the device include a processor configured to control at least one portion of a game. The '180 Patent and at least one of the claims at issue (claim 1 of the '180 Patent) describe three different gaming devices – a "first gaming device," a "second gaming device," and a "third gaming device." Neither the second nor the third gaming device is described as having "a processor configured to control at least one portion of the game."

For example, claim 1 of the '180 Patent claims an interactive game with three gaming devices. The second gaming device is configured to produce physical effects – like light, sound or vibration. Those effects are described at column 20, lines 26 through 50, where the patent notes that the device triggering them may be a "simple reed switch." And, at column 44, lines 39 through 60, the patent again notes that the effects may be triggered by an RFID receiver, an RFID reader or writer, or a magnetic reed switch, the last of which the parties agree does not require a processor.

Similarly, the required components of the third gaming device are enumerated in the claim, but a processor configured to control a portion of a game is not specified. Also, at column 28, line 63 through the beginning of column 29 of the '180 Patent, there is a description of a third gaming device as a trading card, which does not necessarily require a processor to store and transport information pertinent to a person, character, or object.[14]

Finally, I will not include Defendants' addition that at least one portion of the game be carried out in a physical play environment or a virtual play environment. Each of the four claims containing "gaming device" already makes clear that the game must be played in part in one of those environments. The parties agree on that. The language proposed is redundant.

The eighth [11] term is two slightly different phrases that the parties agree mean the same thing. The phrases are "moved or positioned by a game participant . . . to selectively activate or control" and "held, moved, and positioned selectively by a game participant . . . to selectively activate or control." These phrases are in claims 1, 22, and 33 of the '180 Patent.

---

14  (*See also* col. 28, ll. 1-20; col. 30, ll. 36-59).

Plaintiffs assert that the words have their plain and ordinary meaning. Defendants, on the other hand, construe this term to mean "move or position said [game piece] in one of a plurality of predetermined orientations selected by game participant to generate an input signal that actuates."

Here, I agree with Plaintiffs and will construe the term to have its plain and ordinary meaning. That being said, there is no dispute that the moving component requires predetermined orientations. The dispute is whether the position component of the term requires predetermined orientations.

Here, I again agree with Plaintiffs. Defendants cite to a number of portions of the specification to support their construction. But each of those describes a preferred embodiment. Indeed, virtually all of the citations cited begin with the phrase "in one embodiment" or "in a preferred embodiment."

Moreover, it appears that Defendants' construction improperly reads out at least one embodiment related to trading cards. At column 29, lines 29 through 37 of the '180 Patent, there is a discussion of trading cards that may be stacked and read by an RFID reader. It does not state in the text that the particular stacking order must be predetermined. Moreover, if only one card is being used, then proximity rather than a particular orientation is what is required.[15]

The ninth [12] and final term is "wherein said interactive game comprises a main game portion configured to be accessed and played by said game participant using said compatible gaming device, and one or more additional game portions or features accessed by said game participant using said compatible gaming device in combination with said one or more wireless toys," which is in claim 8 of the '149 Patent.

Plaintiffs assert that this limitation has its plain and ordinary meaning, which they say "is clear on its face." Defendants' construction is "wherein said interactive game comprises a main game portion configured to be accessed and played using only said compatible gaming device, and one or more optional game portions or features accessed by said game participant using said compatible gaming device in combination with said one or more wireless toys."

---

15   (*See* '180 Patent col. 54, ll. 38-48).

Defendants essentially make two changes – deleting "by said game participant" and adding "only," and changing "additional" to "optional." During the argument, however, Defendants agreed that the second modification is unnecessary and that "additional" is acceptable.

As to the other change, Defendants assert that the change clarifies that claim 8 refers to two separate game portions that are accessed using different elements of the interactive game: a main portion and additional portions. And that the main portion can only be accessed and played with the gaming device and not also with a wireless toy.

In claim construction, I look to the words of the claims themselves. Here, the claim does not say "only." Defendants have offered no compelling support to change the language as they propose and I will not do so.

Thus, I will construe the final term to have its plain and ordinary meaning of the words used.

*Maryellen Noreika*
The Honorable Maryellen Noreika
United States District Judge

16